IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

AUG 2 6 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| STEVEN J. HATFILL, M.D., c/o Harris, Wiltshire & Grannis LLP, 1200 18th Street, N.W. Suite 1200, Washington, DC 20036, | ) ) ) ) |
| Plaintiff | ) ) ) |
| v. | ) ) ) |
| ATTORNEY GENERAL JOHN ASHCROFT, in his individual and official capacities, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, DC 20530; | ) ) ) ) |
| U.S. DEPARTMENT OF JUSTICE, 950 Pennsylvania Avenue, N.W., Washington, DC 20530; | ) ) ) |
| FEDERAL BUREAU OF INVESTIGATION, J. Edgar Hoover Building, 935 Pennsylvania Avenue, N.W., Washington, DC 20535; | ) ) ) |
| DOJ EMPLOYEE TIMOTHY BERES, in his individual and official capacities, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, DC 20530; | ) ) ) ) |
| DOJ EMPLOYEE DARYL DARNELL, in his individual and official capacities, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, DC 20530; | ) ) ) ) |
| FBI SUPERVISORY SPECIAL AGENT VAN HARP, in his individual and official capacities, address unknown; | ) ) ) |
| AN UNKNOWN NUMBER OF UNKNOWN AGENTS OF THE FEDERAL BUREAU OF INVESTIGATION, addresses unknown; and | ) ) ) ) ) ) |

CASE NUMBER  1:03CV01793

JUDGE: Reggie B. Walton

DECK TYPE: Civil Rights (non-employment

DATE STAMP: 08/26/2003

*JURY ACTION*

Civil Action No. _____

*1*

AN UNKNOWN NUMBER OF                        )
UNKNOWN EMPLOYEES OF THE                    )
DEPARTMENT OF JUSTICE, addresses            )
unknown,                                    )
                                            )
          Defendants                        )
_____)

## COMPLAINT

### INTRODUCTION

1.   This Complaint describes how the Attorney General of the United States and a number of

     his subordinates intentionally violated the constitutional rights of one U.S. citizen, Dr.

     Steven Hatfill, in order to promote their own personal and political interests.  The context

     for these actions was the government's official investigation into the deadly anthrax

     mailings of 2001.

2.   With our nation still shaken by the terror attacks of September 11, 2001, the anthrax

     mailings created enormous public anxiety, as well as considerable political pressure on

     the Attorney General and his subordinates to identify and bring the mailers to justice.

     Unfortunately, the Attorney General and his subordinates have failed to make any

     substantial progress in solving the case in nearly two years.  No one could possibly be

     more disappointed about that than Dr. Steven Hatfill.

3.   The early stages of the anthrax investigation were motivated by a desire to apprehend the

     real murderers who mailed the anthrax-laden letters.  However, as time wore on and the

     investigation stalled, the Attorney General and his subordinates came to understand that

     for their own personal and political interests, as well as the institutional interests of the

     Federal Bureau of Investigation ("FBI") and the Department of Justice ("DOJ"), it was

     essential to *appear* to know who committed theses crimes.  Thus, in the summer of 2002,

they embarked on a highly public campaign to accuse Dr. Hatfill without formally

naming him a suspect or charging him with any wrongdoing.

4.  To achieve their political and public relations goals, without affording Dr. Hatfill the

protections of the criminal justice system, the Attorney General and his subordinates

intentionally trampled Dr. Hatfill's constitutional rights and their own rules.  By having

him terminated from his job and ensuring that he remains unemployable, they have

violated Dr. Hatfill's right not to be deprived of liberty or property without due process of

law.  In the fall of 2002, without any legal process or proper justification for doing so and

without affording Dr. Hatfill any opportunity to be heard, the Attorney General and his

subordinates engineered Dr. Hatfill's firing from his new job at Louisiana State

University ("LSU").  They have ruined Dr. Hatfill's current and future employment

prospects by repeatedly leaking anonymous, defamatory, and erroneous information

about his character and criminal culpability to the news media, expecting that it would be

widely disseminated.  Defendants' elimination of Dr. Hatfill's ability to earn a living has

deprived him of liberty and property without due process of law in violation of the Fifth

Amendment to the United States Constitution.

5.  When Dr. Hatfill did no more than proclaim his innocence publicly and lodge official

protests of the patently illegal campaign of harassment against him, the defendants

responded with further intimidation and harassment in retaliation for the exercise of his

First Amendment rights.  Such efforts to chill free speech violate the First Amendment.

6.  Furthermore, the Attorney General and his subordinates have failed to eliminate,

condemn, or seriously investigate the violations.  While aware of the abuses, the Attorney

General and his subordinates decided against taking any action to remedy the obvious

3

injustices done to Dr. Hatfill.  By opting against remedial measures, the Attorney General

and other high ranking DOJ and FBI officials have, in effect, condoned and encouraged

the government abuses of power that have occurred since the summer of 2002.

7.    The officials who have engaged in this pattern of deceptive and injurious conduct –

which has lasted more than a year and which still continues – include the nation's

highest-ranking law enforcement officer, as well as other federal officials who have taken

an oath to uphold the Constitution and laws of the United States.  Besides United States

Attorney General John Ashcroft, the defendants include FBI Supervisory Special Agent

Van Harp (retired), DOJ Employee Daryl Darnell, DOJ Employee Timothy Beres, and a

number of unknown employees of the United States Department of Justice and unknown

agents of the Federal Bureau of Investigation (collectively, "individual defendants"), as

well as the FBI and the DOJ.

8.    Though the individual defendants' job responsibilities vary, none of them has any official

responsibility more critical than upholding the Constitution and laws of the United States.

Yet in this case, they abdicated their duty – not inadvertently, not in a split-second

judgment made under extreme circumstances – but intentionally, with premeditated acts

over many months during which the only exigency was their own need to come up with a

scapegoat.  The rights defendants violated did not rest in murky corners of the

Constitution not yet illuminated by case law, but instead have been clearly established in

published opinions from the nation's highest courts.

9.    Individual defendants' bad faith is apparent not only from the clear violation of Dr.

Hatfill's constitutional rights, but also from the many ways in which the Attorney

General and his subordinates have intentionally departed from "standard procedure."  In

addition to violating the Constitution, defendants have cast aside the regulations, policies, and investigative practices of their own agencies.

a.   *Public Commentary on Ongoing Investigation* — DOJ policy generally prohibits any prosecutor or law enforcement officer from making public comments on investigative procedures and evidence outside of formal criminal processes. The obvious purpose of the prohibition is to protect the name and reputation of those not yet charged or convicted of crimes, and those who never will be. The prohibition on public comment also serves another purpose: to protect the integrity of an investigation and potential prosecution. Releasing this kind of information compromises an investigation by providing opportunities to plant evidence, tamper with a crime scene, or manufacture an alibi. It also compromises potential prosecutions by tainting the jury pool and creating prejudice against a future criminal defendant. In Dr. Hatfill's case, the Attorney General and his subordinates ignored all that, repeatedly violating their own regulations by providing to the media scores of anonymous leaks detailing specific investigative procedures, including the times and places of searches; subjective observations about Dr. Hatfill's character; opinions about his guilt; and an array of alleged "evidence" in the case. By leaking false and misleading information to the press (and in some cases by making false and misleading public statements), while withholding facts tending to prove Dr. Hatfill's innocence, the Attorney General and his subordinates succeeded in using the news media to deflect congressional and media scrutiny of the FBI's competence and effectiveness in the fight against domestic terrorism. They also misled an anxious

5

public into thinking that the Attorney General and his subordinates were making progress in the investigation of the anthrax mailings. The truth is that there has never been any credible evidence linking Dr. Hatfill to the anthrax mailings and investigators have made little or no progress toward apprehending the mailers.

b.    *Wiretap and In-Home Video and Listening Devices* — On or about August 2002, Attorney General Ashcroft, or one of his deputies, approved the FBI's installation of electronic eavesdropping equipment in Dr. Hatfill's apartment and on his private residential telephone line. Since that time, special agents of the FBI have listened in on every conversation Dr. Hatfill has had while in his apartment or while using his telephone. In order to initially obtain a court order to electronically eavesdrop on Dr. Hatfill, and for each subsequent monthly extension of that Title III order, an FBI special agent was required to swear under oath to a federal district court judge that there was "probable cause for belief that particular communications concerning [the anthrax murders] will be obtained through such interception." 18 U.S.C. § 2518 (3)(b) & (5). Government agents have been aware since the fall of 2002 that Dr. Hatfill knew of the electronic surveillance. Therefore, FBI special agents have known since then that there was no reasonable expectation that the electronic surveillance would yield evidence of a past or future crime. The continuing electronic surveillance is thus not designed to uncover any evidence in the government's investigation. Rather, its sole purpose is to harass Dr. Hatfill by invading the most personal and private sphere of his life. He cannot speak to his friends or family, discuss what the government

6

is doing to him in this "investigation," or share any intimacy with his girlfriend without the constant presence of the government.

c.   *Single-Photo Identification* — When law enforcement officers seek to determine whether a suspect was seen in a particular place they present a photo array that includes others as well as the suspect. This standard practice is intended as a safeguard to avoid tainting witness memory by unfairly pointing to one individual. But here, once the government determined the anthrax letters were mailed from Princeton, New Jersey, FBI special agents showed over 200 residents of Princeton only one photograph – a photo of Dr. Hatfill – and asked whether anyone saw him in the area. This unconventional, prejudicial, and unfairly suggestive procedure was designed to induce someone – anyone – to support the government's theory that Dr. Hatfill was involved in the anthrax attacks, so that the defendants could leak to the press that they were making progress in their investigation. Significantly, even under these conditions, no credible witness identified Dr. Hatfill; but the defendants nonetheless succeeded in generating press reports that they had been showing Dr. Hatfill's photo, further solidifying in the public imagination the link between Steven Hatfill and anthrax. This, too, was a break from standard practice and was designed to impugn Dr. Hatfill and to create the appearance of progress in the investigation.

d.   *Surveillance* — Sound law enforcement policy dictates that surveillance is to be covert, designed to discover illicit or criminal behavior. However, in the anthrax investigation, the Attorney General and his subordinates have undertaken a program of so-called "surveillance" so overt, extensive, and intrusive as to

7

constitute a roaming house arrest for Dr. Hatfill. The obvious and well-publicized surveillance was clearly designed to create the façade of an investigation making progress, and served no legitimate law enforcement purpose. Moreover, these heavy-handed tactics were designed to harass Dr. Hatfill and communicate to the public an implicit accusation of guilt that the government could not even think of testing in a court of law. These tactics reached a crescendo earlier this year when an FBI employee actually drove his car into Dr. Hatfill in the Georgetown section of Washington, D.C.

10. Just as our laws are supposed to protect all American citizens, including Steven Hatfill, against being required to answer for any crime except through formal government processes, our laws provide qualified protection to public officials who make honest mistakes while pursuing the public interest. The acts described in this Complaint are not honest mistakes. They are the acts of government agents who long ago chose expedience over principle and abandoned any pretense of concern for the constitutional rights of an American citizen. Unfortunately, almost two full years after the horrifying anthrax attacks were committed, the government has made no appreciable progress toward apprehending the real perpetrators. That, by itself, is a great tragedy. But the defendants' willingness to cast aside the rule of law and principles of ordered liberty for the sake of saving their institution's reputation at the expense of Dr. Hatfill is more than a tragedy. It is an affront to the basic principles of fairness and individual rights on which our Constitution is based.

11. Dr. Hatfill seeks a declaration that defendants have violated his constitutional rights and the law. Dr. Hatfill seeks an injunction against future violations of his constitutional

rights, the Privacy Act, 5 U.S.C. § 552a *et seq.*, and DOJ, FBI, and U.S. Attorney

regulations, policies, practices and standards.  Dr. Hatfill seeks monetary damages

against the DOJ and the FBI for violations of the Privacy Act and against the individual

defendants, acting under color of legal authority, in their individual capacities, for the

egregious violations of Dr. Hatfill's constitutional rights.

## JURISDICTION AND VENUE

12.    This case arises under the United States Constitution and the laws of the United States

and presents a federal question within this Court's jurisdiction under Article III of the

Constitution and 28 U.S.C. §§ 1331 & 1343(a)(3) and 5 U.S.C. § 552a(g)(1)(D) & (g)(4).

Plaintiff seeks monetary damages against federal employees acting under color of legal

authority, in their individual capacities, under Bivens v. Six Unknown Agents of Fed.

Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 28 L.Ed.2d 619 (1971).   Plaintiff

seeks actual damages as well as fees and costs against the DOJ and the FBI for the

intentional and willful violation of the Privacy Act, 5 U.S.C. § 552a(g)(5). The Court has

authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C.

§ 2201 *et seq*. The Court has authority to grant injunctive relief under the federal courts'

inherent equitable powers.

13.    Venue is proper in this district under 28 U.S.C. § 1391(e).  Dr. Hatfill resides in the

District of Columbia, and a substantial portion of defendants' unlawful acts giving rise to

Dr. Hatfill's claims occurred in the District of Columbia.

## PARTIES

14. Plaintiff Dr. Steven J. Hatfill is a citizen of the United States and a resident of the District of Columbia. Dr. Hatfill is a medical doctor and a scientist who has devoted a significant portion of his professional life to protecting the United States, its military and civilian officers, and the citizenry from potential dangers posed by biological weapons. As a result of defendants' unconstitutional, illegal, and unethical acts, Dr. Hatfill is currently unemployed and unemployable.

15. Defendant Attorney General John Ashcroft heads the United States Department of Justice, which is the agency of the United States government responsible for enforcement of federal criminal laws and domestic terrorism investigations. Mr. Ashcroft has ultimate authority for supervising all of the operations and functions of the Department of Justice. The DOJ includes the FBI, the principal investigatory arm of the Department of Justice. Defendant Attorney General Ashcroft is the highest-ranking law enforcement officer in the United States.

16. It is Mr. Ashcroft's responsibility not only to enforce the laws but also to follow them. When he took the oath of office he swore to faithfully uphold and defend the Constitution and the laws of the United States. In his conduct and action regarding Dr. Hatfill, Mr. Ashcroft has repeatedly and flagrantly violated that oath. Defendant Attorney General Ashcroft is sued in his individual capacity for money damages, and in his individual and official capacities for declaratory and injunctive relief.

17. Defendant Van Harp was, during relevant times concerning offending actions described in this Complaint, the FBI supervisory special agent in charge of the anthrax investigation. He was assigned to the FBI's Washington, D.C. Field Office. He recently

retired from the FBI. Defendant Harp is sued in his individual capacity for money damages, in his individual and official capacities for declaratory relief.

18. Defendant Timothy Beres is an employee of the Department of Justice. During times relevant to this Complaint, Mr. Beres served as Acting Director of the DOJ's Office for Domestic Preparedness. Defendant Beres is sued in his individual capacity for money damages, and in his individual and official capacities for declaratory and injunctive relief.

19. Defendant Daryl Darnell is an employee of the Department of Justice. Plaintiff is informed and believes that Mr. Darnell, at times relevant to this Complaint, worked in the DOJ's Office for Domestic Preparedness. Defendant Darnell is sued in his individual capacity for money damages, and in his individual and official capacities for declaratory and injunctive relief.

20. The true names and capacities of the individual defendants sued as Unknown Employees of the DOJ and Unknown Agents of the FBI are unknown to the plaintiff. Plaintiff is informed and believes and thereon alleges that such defendants are legally responsible for each of the acts and/or omissions causing the claimed damages. The identities of the Unknown Employees of the DOJ and Unknown Agents of the FBI defendants will be determined after a reasonable opportunity for discovery. At all times relevant to this Complaint said defendants were acting under color of legal authority and in their official capacities as employees of the DOJ or agents of the FBI. Said defendants are sued in their individual and official capacities.

21. Defendant FBI is a federal agency within the meaning of 5 U.S.C. § 552a(a)(1).

22. Defendant DOJ, the parent agency of Defendant FBI, is also a federal agency within the meaning of 5 U.S.C. § 552a(a)(1).

11

## FACTS

23.     The following facts are alleged on information and belief:

Background

24.     In the fall of 2001, the nation learned that someone had mailed letters containing the

deadly pathogen anthrax to members of the press and to two United States senators.

These letters were apparently dropped in a postal box in Princeton, New Jersey, with the

letters to the media mailed on or about September 18, 2001, and those to Senators

Thomas A. Daschle and Patrick J. Leahy mailed on or about October 9, 2001. Five

people died, many others took ill, and panic seized the nation as a result of the anthrax

mailings.

25.     In the months after the attacks, investigators interviewed hundreds of scientists working

in fields related to biological weapons. Although he had never worked with anthrax and

knew that he probably had little to offer, Dr. Hatfill willingly cooperated with the FBI.

Over several months, the FBI interviewed Dr. Hatfill several times. He volunteered to

take a polygraph examination and was informed by the examiner that he had passed,

indicating that he had no involvement in the anthrax mailings.

26.     Because of the paucity of forensic clues and other evidence, the government's

investigation, code-named "Amerithrax," faltered. FBI special agents sent out posters

with photographs of the four hand-addressed anthrax letters. Federal agencies offered a

reward and invited members of the microbiology field to share their suspicions.

27.     Among those who responded was Barbara Hatch Rosenberg, a Professor of

Environmental Science at the State University of New York, at Purchase. Although she

had neither background experience working with biological weapons nor access to the

12

anthrax letters or the powder itself, she devised a theory of the case. The perpetrator, she believed, opposed her campaign to encourage the United States to agree to monitoring under the Biological Weapons and Toxin Convention, to which the United States was a party. Dr. Hatfill apparently fit her "profile" of the anthrax mailer. Despite never having met Dr. Hatfill, during the early months of 2002, Ms. Rosenberg embarked on a campaign to convince investigators that he should be their prime suspect in the anthrax mailings.

28.  Despite her best efforts to implicate Dr. Hatfill, Ms. Rosenberg's suggestions initially fell on deaf ears at the FBI. That was because the FBI had already spoken to Dr. Hatfill, and investigators had no basis to suspect him. No physical evidence linked him to the crime and his dutiful cooperation and successful polygraph examination allowed investigators to quickly move on to more promising leads.

29.  Undaunted, Ms. Rosenberg continued in her efforts to finger Dr. Hatfill. On June 18, 2002, Ms. Rosenberg received an audience with members of the staffs of Senators Leahy and Daschle, the two Senators to whom anthrax-laden letters were addressed. Defendant Van Harp, then the FBI supervisory special agent in charge of the anthrax investigation, also attended this meeting. In this meeting, Ms. Rosenberg, who had no official authority, no investigative experience, and most significantly no access to the forensic tests conducted on the anthrax letters or the FBI's investigative file, informed the Daschle and Leahy staff members that her suspicions led her to believe that Dr. Hatfill was the person most likely responsible for the mailings.

30.  At the time of the Rosenberg meeting many Senators had publicly made it known that they were displeased at how the FBI had handled investigations into terrorism on U.S.

13

soil. Many had remarked that it was time to think about revoking the FBI's responsibility in investigating domestic terrorism and to consider turning those responsibilities over to another government agency. Special Agent Harp, anxious to respond to those concerns, directed the FBI's full attention in the direction of Dr. Hatfill following the Rosenberg meeting.

June 25, 2002 Consensual Search of Dr. Hatfill's Apartment

31.     Within a week of Ms. Rosenberg's meetings on Capitol Hill, the FBI searched Dr. Hatfill's apartment under the white-hot glare of the national press. On June 25, 2002, the day of the search, Dr. Hatfill had volunteered to meet with FBI special agents assigned to the Washington Field Office. The meeting was held at the FBI's Regional Resident Agency in Frederick, Maryland, approximately 50 miles from Washington, D.C. At the conclusion of the meeting, Dr. Hatfill readily volunteered to have FBI agents search his Frederick, Maryland apartment.

32.     After Dr. Hatfill consented to the search, he and the FBI special agents drove by Dr. Hatfill's apartment, a drive of less than ten minutes. Dr. Hatfill was astonished to see that his apartment complex was surrounded by news helicopters and television vans filming the search. FBI personnel arrived in a large truck with technicians clad in hazardous material protective gear. The FBI had tipped off the media well in advance of the search to ensure news crews could make the one-hour trip from Washington D.C. to Frederick, Maryland, to capture the search on television. The FBI was putting on a show and wanted a national audience.

33.     The agents knew that this was not the way that consensual searches are ordinarily handled by the FBI, and it was not the way Dr. Hatfill had been told the search would be

14

conducted. They also knew that this was not the way that consensual searches are supposed to be conducted. In this case government agents deliberately departed from standard procedure and deliberately violated Dr. Hatfill's constitutional rights.

34.   Thus began one of the most public searches in the history of criminal investigation, broadcast live on national television. The FBI's leaks to the news media regarding the consensual search of Dr. Hatfill's apartment set off a media firestorm and subjected Dr. Hatfill to a torrent of scurrilous innuendo and vilification. Indeed, although the FBI had spoken to hundreds of scientists in the Amerithrax investigation, and had searched many scientists' homes with their consent, this was the first time that DOJ and/or FBI officials had purposely leaked the name of a scientist to the media.

35.   This marked the beginning of a pattern of government abuse of power and violation of laws, which brought about the ruination of Dr. Hatfill's life, including his ability to earn a living and to speak or move about freely.

August 1, 2002 Search of Dr. Hatfill's Apartment

36.   Prior to the June 25, 2002 consensual search, in May 2002, Dr. Hatfill had secured a position as associate director of the National Center for Biomedical Research and Training at Louisiana State University in Baton Rouge. He was hired to train state and local first responders to identify and react to biological attacks. His appointment was effective July 1, 2002.

37.   According to press reports, in late July 2002, FBI agents observed Dr. Hatfill throwing trash into a dumpster outside of his apartment building. This activity was natural enough for a man who was packing and preparing to move to his new job in Baton Rouge, and as such should not have aroused any suspicions. Though investigators had found nothing of

15

interest during the first search, Dr. Hatfill's trip to the trash apparently heightened their interest in him and motivated them to search his apartment again.

38.  In late July 2002, FBI Special Agent Bob Roth phoned Dr. Hatfill and requested an interview with him. Dr. Hatfill referred the request to his civil attorney, Victor M. Glasberg. Mr. Glasberg called Special Agent Roth immediately and left a voicemail indicating that Dr. Hatfill would happily cooperate, as he had previously when the FBI had requested to interview him, administer a polygraph examination, and search his home and other property. Mr. Glasberg suggested an interview on August 5, 6, or 7. Though he received the message, Special Agent Roth never responded to it.

39.  Instead, government agents obtained a search warrant, and on August 1, 2002, they once again searched Dr. Hatfill's Frederick apartment. Again, as was the case with the initial consensual search, the agents, including Defendant Special Agent Van Harp, tipped off the media to ensure that the search would be broadcast live to the nation.

40.  Upon learning from Dr. Hatfill that the search was underway, Mr. Glasberg phoned Special Agent Roth to ask why he had ignored his voicemail message offering to cooperate. Special Agent Roth acknowledged listening to the phone message, but contended he did not understand the offer of cooperation. Mr. Glasberg requested that Special Agent Roth save the voicemail message to settle the issue of its content. Special Agent Roth refused to guarantee the safekeeping of the voicemail. Mr. Glasberg then wrote to Mr. Kenneth Kohl, the Assistant United States Attorney for the District of Columbia assigned to the anthrax investigation, to alert him to the situation and request the voicemail message be secured. Mr. Kohl never responded to Mr. Glasberg's letter. Dr. Hatfill does not know whether the government preserved or destroyed this evidence.

DOJ Personnel Order Louisiana State University to Eliminate Dr. Hatfill from DOJ-Funded
Projects

41.     On or around August 1, 2002, the day of the second search, Daryl Darnell, a DOJ

        employee, presumably with the full knowledge and consent of Mr. Ashcroft, telephoned

        LSU to order that Dr. Hatfill not be employed on any DOJ-funded project. At that time,

        Dr. Hatfill had not been arrested, he had not been charged and, according to official

        statements made by law enforcement officials, he was not even a suspect in the anthrax

        investigation.

42.     Nevertheless, Timothy Beres, Acting Director of DOJ's Office for Domestic

        Preparedness, confirmed Mr. Darnell's instructions by e-mail to Mr. Guillot, Dr. Hatfill's

        boss. Mr. Beres wrote: "I want to reiterate that the Office of Justice Programs/Office for

        Domestic Preparedness directs that the Louisiana State University Academy of Counter-

        Terrorist Education immediately cease and desist from utilizing the subject matter expert

        and course instructor duties of Steven J. Hatfill on all Department of Justice funded

        programs." As Dr. Hatfill had been hired specifically for these duties, Mr. Ashcroft's

        Department of Justice effectively ordered the employer of a presumptively innocent Dr.

        Hatfill to terminate him from his employment.

43.     Dr. Hatfill is informed and believes that Mr. Beres acted under instructions from, or with

        the approval of, Mr. Ashcroft. Mr. Darnell, Mr. Beres, and Mr. Ashcroft knew that Dr.

        Hatfill's job at LSU consisted almost entirely of DOJ-funded activities, specifically

        acting as a subject matter expert and course instructor training first responders.

44.     The next day, August 2, 2002, having received its order from the Department of Justice,

        LSU placed Dr. Hatfill on 30-day administrative leave. Dr. Hatfill was not informed of

        the basis for this decision, let alone given an opportunity to challenge it. At the end of

17

the 30-day period Dr. Hatfill was terminated. Again, he was neither advised of the basis for this decision nor provided an opportunity to appeal.

45. On September 18, 2002, Senator Charles Grassley, a member of the Senate Judiciary Committee's Subcommittee on Crime and Drugs, inquired into the DOJ's standards, processes, and historical practice with respect to having someone disqualified to work on a DOJ-funded project. In response, Assistant Attorney General Daniel J. Bryant acknowledged that the DOJ has no standards at all governing how it exercises its power to disqualify private citizens from work. Mr. Bryant further acknowledged that the DOJ has no appeals process in place to challenge arbitrary decisions. Finally, the DOJ was unable to identify a single individual, other than Dr. Hatfill, whom it had ever terminated from employment based on similar circumstances. Mr. Bryant's letter drew the following response from Senator Grassley, "I also appreciate the department's candidness that the action regarding Mr. Hatfill and his employment is unprecedented, and that there is no formal policy, level of evidentiary standard, procedure, or formal definition for the term 'person of interest.' Government agencies need to be mindful of the power they wield over individual citizens, and should exercise caution and good judgment when they use that power."

46. The day after Dr. Hatfill's termination, September 5, 2002, Mr. Glasberg wrote to Mr. Ashcroft. Mr. Glasberg reviewed DOJ's central role in the firing of Dr. Hatfill, and quoted the following from a September 5, 2002 *New York Times* article: "Several senior law enforcement officials expressed embarrassment over the email incident, saying the Domestic Preparedness Office acted improperly because Mr. Hatfill has never been

charged with any wrongdoing and has not been identified as a suspect in the anthrax

attacks that killed five people last fall."

47.    Explaining that the embarrassment of a few senior officials was no substitute for the

$150,000 per year job of which DOJ officials had deprived Dr. Hatfill, Mr. Glasberg

made several requests of Mr. Ashcroft. He requested that Mr. Ashcroft "immediately

publicly countermand the department's August 1 blackball of Dr. Hatfill," and apologize

to Dr. Hatfill. He requested that Mr. Ashcroft "promptly . . . secure appropriate

employment for Dr. Hatfill, at LSU or elsewhere," in light of the fact that the

inappropriate actions of Mr. Ashcroft and his subordinates at DOJ had rendered Dr.

Hatfill "not only unemployed, but as a practical matter unemployable." Finally, Mr.

Glasberg requested Mr. Ashcroft provide the legal basis for DOJ's interference in Dr.

Hatfill's employment. A copy of the letter was sent to H. Marshall Jarrett, the head of the

DOJ's Office of Professional Responsibility ("OPR").

48.    Mr. Ashcroft never responded to Mr. Glasberg's letter. Nor did Mr. Ashcroft take any

steps to ameliorate the unethical and illegal actions of his subordinates, actions senior

officials in his own department decried as improper. Despite Mr. Ashcroft's knowledge

and awareness of the improper behavior, he refused to take any remedial steps

whatsoever.

Mr. Ashcroft Names Dr. Hatfill a "Person of Interest" on National Television

49.    Instead, during this same period, Mr. Ashcroft personally joined the ranks of those

publicly implicating Dr. Hatfill, lending the substantial weight and authority of his office

to the baseless innuendo ruining Dr. Hatfill's personal and professional life. On August

6, 2002, Mr. Ashcroft appeared on two morning television shows. On CBS's "The Early

19

Show," Mr. Ashcroft identified Dr. Hatfill as "a person of interest" in the Amerithrax investigation. On NBC's "Today Show," Mr. Ashcroft stated that Dr. Hatfill was "a person that – that the FBI's been interested in" in its investigation. Later, on August 22, 2002, during a press conference at the Peter Rodino Federal Building in Newark, New Jersey, Mr. Ashcroft tarred Dr. Hatfill a third time as "a person of interest to the Department of Justice."

50.     At that point in time Mr. Ashcroft could have decried the fact that the name of a presumptively innocent American citizen had been leaked, unethically and illegally, to the press, subjecting that citizen to enormous public suspicion, if not scorn and hatred. Indeed, under the circumstances of post-9/11 America, any fair-minded individual might have expressed concern for Dr. Hatfill's personal safety, taken the news media to task for their recklessness, and castigated his subordinates for setting this sequence of events in motion. Instead, just as he had ignored the opportunity to set right the fact that his department had directly caused Dr. Hatfill's firing, Mr. Ashcroft abdicated his duty to condemn the leaks. Worse, he abdicated his duty to stop the leaks and, in so doing, he encouraged his subordinates to provide the deluge of leaks that was to come.

51.     During his public appearances, Mr. Ashcroft could have truthfully stated that Dr. Hatfill had fully cooperated in all phases of the FBI's investigation. Mr. Ashcroft could have truthfully explained that it would be natural for the FBI to interview (and seek consent to search from) anyone with Dr. Hatfill's expertise, as it had with dozens of other eminent scientists. Mr. Ashcroft could have truthfully stated that the FBI had no evidence whatsoever linking Dr. Hatfill to the anthrax mailings. Mr. Ashcroft could have truthfully stated that Dr. Hatfill was presumed innocent and that the FBI's interest in

20

continuing to talk to him should not lead anyone to conclude that Dr. Hatfill had any involvement in the anthrax attacks. Mr. Ashcroft elected not to speak any of these truths.

52. Instead, by repeatedly describing Dr. Hatfill as "a person of interest," Mr. Ashcroft in his press appearances violated the very laws and Constitution that he and his subordinates are sworn to uphold. On information and belief, this is the first time in the history of our country that a sitting Attorney General has ever used the term "person of interest" to describe an American citizen in connection with a criminal investigation. The designation "person of interest" has no significance to any formal criminal process, but has been used recently as a euphemism for "the individual the government suspects is responsible for the offense."

53. Mr. Ashcroft publicly identified Dr. Hatfill for a specific purpose – to suggest to the American public and a concerned Congressional contingent (who were considering revoking the FBI's charter to investigate cases of domestic terrorism) that the DOJ and the FBI could be trusted, and that investigators were properly conducting the Amerithrax investigation, and that they were making substantial progress.

54. Mr. Ashcroft acted to protect both his department's and his own political future and public image, at the expense of Dr. Hatfill's constitutional rights. Faced with public interest in Dr. Hatfill and rampant speculation that he might have committed mass murder – speculation that Mr. Ashcroft's subordinates had deliberately set in motion through patently illegal actions – the Attorney General chose not to uphold the Constitution of the United States. He declined to speak the truth: that the FBI had made no real progress in its investigation and that no real evidence pointed to Dr. Hatfill. Mr. Ashcroft knew the consequences of his decision. Once he singled out Dr. Hatfill as the fall guy and gave his

21

imprimatur to the innuendo that Dr. Hatfill had committed the anthrax attacks, Mr.

Ashcroft knew the overwhelming thirst for answers in the public and the press would

destroy Dr. Hatfill's life.  And he has been proven correct.

Mr. Ashcroft's Statements and DOJ and FBI Leaks Violate the Privacy Act, DOJ Regulations, and FBI Policy

55.    Mr. Ashcroft's public statements implicating Dr. Hatfill, and those of other DOJ and FBI

personnel, are in direct violation of the Privacy Act and specific regulations governing

what law enforcement officials may publicly disclose regarding ongoing investigations.

56.    The Privacy Act prohibits the FBI and DOJ from disclosing "any record which is

contained in a system of records by any means of communication to any person, or to

another agency, except pursuant to a written request by, or with the prior written consent

of, the individual to whom the record pertains . . . ."  5 U.S.C. § 552a(b).  Here, the FBI

and the DOJ intentionally and willfully have disclosed records kept by the agencies

pertaining to Dr. Hatfill in order to falsely implicate Dr. Hatfill and convey the false

impression that the agencies were making progress in the anthrax case.

57.    Defendants also violated DOJ regulations.  Precisely to prevent political pressures from

encouraging government agents to publicly smear a presumptively innocent, uncharged

person like Dr. Hatfill, the DOJ promulgated regulations governing the "[r]elease of

information by personnel of the Department of Justice relating to criminal and civil

proceedings."

58.    Section 50.2 of Title 28 of the Code of Federal Regulations prohibits DOJ personnel from

releasing any information which "would serve no law enforcement function" or "which

could reasonably be expected . . . to influence the outcome of a pending or future trial."

28 C.F.R. § 50.2(b) (2003).

22

59.    The defendants' leaks to the media regarding the searches of Dr. Hatfill's apartment and
       their efforts to implicate him publicly in the crime served no law enforcement function.
       Those actions served only to subject Dr. Hatfill to unfair, unjustified public scrutiny and
       vilification that would certainly prejudice any future trial, and to send an erroneous
       message to the American public and an impatient Congress that the FBI was making
       progress in the case.

60.    Other DOJ regulations require DOJ personnel to "refrain from making available the
       following": (1) "Observations about a defendant's character"; (2) "Reference to
       investigative procedures such as fingerprints, polygraph examinations, ballistic tests, or
       laboratory tests, or to the refusal by the defendant to submit to such tests or
       examinations"; (3) "Statements concerning the identity, testimony, or credibility of
       prospective witnesses"; (4) "Statements concerning evidence or argument in the case,
       whether or not it is anticipated that such evidence or argument will be used at trial"; and,
       (5) "Any opinion as to the accused's guilt . . . ."

61.    DOJ regulations also state: "Personnel of the Department of Justice should take no action
       to encourage or assist news media in photographing or televising a defendant or accused
       person being held or transported in Federal custody."

62.    These regulations govern the public statements of DOJ personnel with respect to criminal
       defendants and accused individuals.  The privacy and liberty interests served by these
       laws are even stronger when the citizen that DOJ personnel publicly expose to scorn is
       not charged with any crime or officially named as a suspect.

63.    Moreover, the DOJ's United States Attorneys' Manual specifically prohibits public
       commentary on uncharged parties.  It states: "In all public filings and proceedings,

federal prosecutors should remain sensitive to the privacy and reputation interests of unchanged third parties. . . . [T]his means that, in the absence of some significant justification, it is not appropriate to identify (either by name or unnecessarily-specific description) . . . a third-party wrongdoer unless that party has been officially charged with the misconduct at issue. . . . [F]ederal prosecutors should strive to avoid unnecessary public references to wrongdoing by uncharged third-parties." U.S. Attorneys' Manual § 9-27.760 (2003).

64.    A "series of cases makes clear" the U.S. Attorneys' Manual adds, that "there is ordinarily 'no legitimate governmental interest served' by the government's public allegation of wrongdoing by an uncharged party, and this is true '[r]egardless of what criminal charges may . . . b[e] contemplated by the Assistant United States Attorney against the [third-party] for the future.' *In re Smith*, 656 F.2d 1101, 1106-07 (5th Cir. 1981)." U.S. Attorneys' Manual § 9-27.760.

65.    The letter and spirit of FBI policies also prohibit public disclosure of investigative details and public identification of uncharged individuals. On its Internet website, as of August 16, 2003, under a section entitled General Frequently Asked Questions, the FBI published the following: "[Question:] **Can I obtain detailed information about a current FBI investigation I see in the news?** [FBI Answer:] No. Such information is protected from public disclosure, in accordance with current law and DOJ and FBI policy. This policy preserves the integrity of the investigation and the privacy of individuals involved in the investigation prior to any public charging for violations of the law. It also serves to protect the rights of people not yet charged with a crime." *See*

24

http://www.fbi.gov/aboutus/faqs/faqsone.htm. Nonetheless, in this case, FBI agents have
provided detailed information about their investigation to the press.

66.    Mr. Ashcroft's violation of Dr. Hatfill's constitutional rights and DOJ's own regulations
prohibiting unnecessary and prejudicial public disclosures emboldened and encouraged
his subordinates at DOJ and at the FBI to violate those rules, which are designed to
protect all Americans.

67.    Many FBI and DOJ employees, taking their cue from Mr. Ashcroft, continued on a
campaign of illegal and unethical (but always anonymous) leaks intended to ensure that
Dr. Hatfill would forever remain unemployed.

Dr. Hatfill Tries to Salvage His Name and Reputation

68.    On Sunday, August 11, 2002, Dr. Hatfill made his first public statement. He did so
reluctantly, and only because the unrelenting media firestorm fueled by government leaks
was destroying his life. Dr. Hatfill declared publicly what he had told investigators
repeatedly – that he had nothing to do with the anthrax attacks.

69.    Dr. Hatfill tried to set the record straight and correct the misinformation being
disseminated by the defendants. He explained that he had cooperated all along with
investigators. He had sat for several interviews and a polygraph test, which he had been
told he passed. Afterward, FBI officials informed Dr. Hatfill that he was not a suspect.
Dr. Hatfill explained the renewed interest in him after the Rosenberg meeting on Capitol
Hill; and he explained that he had consented to FBI requests to search his apartment, car,
and other belongings.

70.    Dr. Hatfill described his shock and dismay at discovering the orchestrated media events
at the searches of his apartment. He explained that he had never worked with anthrax,

did not have a current inoculation against anthrax, and that his expertise was in virology, not bacteriology (which encompasses the study of anthrax). Finally, Dr. Hatfill challenged the government to stop the campaign of media leaks intended to destroy his life by unfairly and falsely conveying that he had committed the anthrax attacks.

71. On August 13, 2002, Mr. Glasberg filed a formal complaint on Dr. Hatfill's behalf with the FBI Office of Professional Responsibility and the DOJ Office of Professional Responsibility. The complaint focused on several issues: (1) improper government leaks to the media of details regarding the searches of Dr. Hatfill's apartment (noting that Dr. Hatfill's father had received a telephone call from a reporter the day before the second search informing him that the FBI intended to conduct another search); (2) an improper government leak of evidence from the search of Dr. Hatfill's apartment to ABC News, one hour prior to Dr. Hatfill's August 11, 2002 public statement; (3) the violent, destructive, and threatening manner in which federal agents conducted the search of the home of Dr. Hatfill's girlfriend on August 1, 2002; (4) Special Agent Roth's misrepresentation to superiors regarding Dr. Hatfill's willingness to cooperate in the investigation (along with another request to secure the voicemail message in which Mr. Glasberg offered Dr. Hatfill's continued cooperation); and (5) improper and highly prejudicial government leaks appearing in the August 12, 2002 issue of *Newsweek* concerning investigative procedures and their results, government officials' bases for focusing on Dr. Hatfill, statements concerning evidence, and witness statements.

72. On August 16, 2002, Mr. Glasberg supplemented his formal complaint, adding a request that the professional responsibility officers at the FBI and DOJ look into still more improper government leaks about investigative procedures and results. Mr. Glasberg's

letter also noted government agents' general disregard for Dr. Hatfill's privacy and the confidentiality of the investigation, and requested that the OPR officers inquire into leaks to *New York Times* columnist Nicholas Kristoff.

73.   On August 21, 2002, Mr. Glasberg made a request to congressional representatives for an inquiry into the unfair and illegal campaign being waged against Dr. Hatfill by Mr. Ashcroft and others at the DOJ and FBI. He requested an inquiry into Mr. Ashcroft's novel use of the term "person of interest" to incriminate Dr. Hatfill. He objected to the FBI's presentation of a single photo, of Dr. Hatfill, to Princeton, New Jersey residents in an effort to place Dr. Hatfill at the scene of the crime. He objected to the FBI's harassing surveillance of Dr. Hatfill. And, he protested the rampant government leaks. The consequences of these improper actions, the letter explained, included the loss of Dr. Hatfill's employment and future prospects for employment, as well as the loss of his personal life as he knew it.

## FBI and DOJ Personnel Retaliate Against Dr. Hatfill for Exercising His First Amendment Rights to Free Speech and to Petition His Government for Redress

74.   Dr. Hatfill's efforts to clear his name publicly and protest the government abuses ruining his professional and personal life were met by still greater government abuses at the hands of the defendants. A number of the defendants sought to punish Dr. Hatfill for speaking out and seeking redress from his government. They sought to chill any future efforts by Dr. Hatfill to speak out, defend himself, or complain. Such retaliation violated Dr. Hatfill's First Amendment right to free speech and to petition his government for redress of grievances.

75.   When news circulated of Dr. Hatfill's intent to issue a public statement, on August 11, 2002, the government stepped up its efforts to marginalize and discredit him.

Immediately prior to Dr. Hatfill's statement, government agents leaked to ABC News a draft novel taken from Dr. Hatfill's computer during the government searches of his apartment. The leak of Dr. Hatfill's draft novel, revolving around a biomedical terrorist attack, was designed to bolster the government's basis for interest in Dr. Hatfill. Release of such evidence flagrantly violates the Privacy Act, and FBI and DOJ rules.

76. Government officials then informed *Newsweek* magazine that a search warrant was imminent and provided *Newsweek* extensive details about bloodhound sniff tests they claimed implicated Dr. Hatfill. Putting aside the utter unreliability of this "evidence," and its certain inadmissibility in court, such disclosures squarely violated the Privacy Act and DOJ regulations forbidding DOJ personnel from making "[r]eference to investigative procedures such as fingerprints, polygraph examinations, ballistic tests, or laboratory tests, or to the refusal by the defendant to submit to such tests or examinations" and making "[s]tatements concerning evidence or argument in the case . . . ." 28 C.F.R. §50.2. The clear (and clearly false) import of the government's message, conveyed to *Newsweek,* was that Dr. Hatfill had committed the anthrax attacks.

77. In further violation of the same laws and regulations, FBI and/or DOJ officials leaked to *New York Times* columnist Nicholas Kristoff erroneous and prejudicial information about investigative procedures and their results. Government sources provided the basis for Mr. Kristoff's claim that Dr. Hatfill "failed three successive polygraph examinations since January [2002], and canceled plans for another polygraph exam two weeks ago." Obviously, these comments violated the rule against making reference to "investigative procedures such as . . . polygraph examinations . . . or the refusal by the defendant to submit to such tests or examinations." 28 C.F.R. §50.2. Furthermore, these statements

were untrue and were clearly designed to discredit Dr. Hatfill, bolster the government innuendo implicating him in the crime, and punish him for speaking out.

78.    Immediately after Dr. Hatfill's public statement, in an effort to obtain any evidence adverse to Dr. Hatfill with public relations value, however unreliable and inadmissible in court, federal investigators began showing a single photo of Dr. Hatfill to residents of Princeton, New Jersey in the hope that someone would place him at the scene of the anthrax mailings. The presentation of a single photo instead of an array of photos, in dereliction of FBI protocol is so unfairly suggestive – particularly during a week in which Dr. Hatfill appeared on television and in newspapers around the nation and during the same week *Newsweek* published a two-page spread featuring several photos of Dr. Hatfill – that no criminal investigator could rightfully believe it to have a proper law enforcement function. Instead, it was designed to further punish Dr. Hatfill, stigmatize him as the culprit, and yield public relations fodder for the government by providing an opportunity to leak to the media that Dr. Hatfill had been "identified" as being present in Princeton.

79.    Even under those grossly suggestive conditions, not one credible witness claimed to have seen Dr. Hatfill in Princeton. That is not surprising – Dr. Hatfill has never been to Princeton, New Jersey.

80.    During the same period, federal agents increased the intensity of their "surveillance" of Dr. Hatfill. The tactics were not surveillance in the proper sense, *i.e.*, covert observation to detect criminal behavior or evidence of a crime. Instead, the constant, in-your-face government presence was designed to intimidate, punish, and harass Dr. Hatfill for

availing himself of his First Amendment rights and to chill any future plans to exercise those rights.

81. The defendants' retaliation was made without good cause, maliciously, and in violation of government regulations and Dr. Hatfill's statutory and constitutional rights.

The Aftermath:  Continuing Government Abuses, Failure of DOJ and FBI Oversight Arms to Properly Investigate or Control Abuses, and Continued Destruction of Dr. Hatfill's Personal and Professional Life

82. A year has passed since Dr. Hatfill publicly declared his innocence and began filing complaints with the appropriate oversight officials.  He has continued to maintain his innocence, and continued to keep oversight officials abreast of new government abuses.  His protests have been ignored.

83. DOJ and FBI employees have no evidence linking Dr. Hatfill to the anthrax attacks despite devoting tens of thousands of man-hours and tens of millions of dollars trying to pin the anthrax attacks on him.  Nevertheless, some defendants continue to implicate him in the crime through their anonymous leaks to the media.  They thereby continue to prevent Dr. Hatfill from finding gainful employment, or enjoying any semblance of a normal life.

84. The abuses, leaks, and defamatory stories are too numerous to recount.  A few examples follow.

85. On January 9, 2003, ABCNEWS.com reported that "several officials who attended a recent [domestic terrorism] task force summit meeting in Washington . . . talked with ABCNEWS on the condition of confidentiality."  Those officials told ABC that Dr. Hatfill is "the man most likely responsible" for the anthrax attacks.  One official who attended the summit was quoted by ABCNEWS as saying, "we may have enough right

now to get an indictment but we don't have anywhere near enough to get a conviction."

Finally, ABCNEWS reported that "[o]fficials attending the meeting" said that FBI agents

are planning to interview other persons of interest in an "attempt to rule out anybody else

who has come across our radar . . . so we can focus entirely on Hatfill."

86.    On May 8, 2003, CBSNEWS.com reported that FBI agents said, "they already have their

man," referring to Dr. Hatfill.  The report also noted that sources suggested "the

government may take the unusual step of bringing charges against Hatfill unrelated to the

anthrax attacks at all, if they become convinced that's the only way to prevent future

incidents."  This was characterized as an Al Capone-style tactic.

87.    On May 11, 2003, a front-page *Washington Post* article was littered with FBI and/or DOJ

leaks regarding evidence, theories, and future investigative plans in the anthrax case.

Specifically, the leaks centered on items the FBI discovered in a search of a pond in

Frederick, Maryland (based on a tip, FBI sources leaked), and government plans to drain

the pond.  "These investigators contend that the water theory is the result of the FBI's

interest in one subject, Steven J. Hatfill," the *Post* reported.

88.    These rampant leaks reflect the efforts of DOJ and FBI personnel to keep Dr. Hatfill at

the center of the tempest.  More fundamentally, identification of the pond as a place the

FBI intended to search within the upcoming two months risked compromising the

investigation and the reliability of any evidence it revealed.  There is no credible law

enforcement organization that announces in advance its plan to search a potential crime

scene.  In this case the FBI publicly announced its intention to search the Maryland pond,

two months before it actually conducted its search.  Announcing the search in advance

was an open invitation to any fanatic hooked on the anthrax investigation to throw manufactured evidence into the unsecured pond.

89. "The $250,000 and three weeks draining 1.45 million gallons of water from the pond in a search for evidence" turned up nothing but junk, the *Washington Post* reported August 1, 2003.

90. In the face of these obvious violations of the Constitution, the Privacy Act, and DOJ and FBI regulations (and the resulting devastation of Dr. Hatfill's life), the FBI and DOJ Offices of Professional Responsibility failed to conduct a serious investigation, and Mr. Ashcroft failed to rein in his subordinates. H. Marshall Jarrett, the head of the DOJ OPR, ignored Dr. Hatfill's pleas to employ polygraph examinations to aid in identifying those defendants who had illegally and unethically leaked malicious untruths about Dr. Hatfill to the press.

91. In contrast to the Amerithrax investigation, which has conducted countless polygraph examinations to test the truthfulness of witnesses, Mr. Jarrett decided instead to rely on the honor system. In an April 11, 2003 letter responding to complaints of earlier leaks, Mr. Jarrett acknowledged as much when he stated: "Each person interviewed denied, under penalty of perjury, having leaked any information to the media." Mr. Jarrett did not reveal how many or which DOJ or FBI officials were interviewed or how many investigators or attendees of the summit referenced in paragraph 85 he did not even bother to question.

92. Acknowledging the impropriety of the leaks, Mr. Jarrett expressed regret at his office's inability to identify the source of the leaks. This claimed regret is belied by the token effort undertaken by the DOJ OPR to determine the source of the leaks. Mr. Jarrett's

half-hearted effort to identify the source of these defamatory leaks stands in stark contrast

to the enormous investigative resources DOJ has brought to bear in other cases in which

information that the DOJ considers embarrassing has been leaked to the press.   The

disparate treatment makes one thing clear:  Leaks that embarrass the DOJ are treated

seriously and lead to criminal referrals (as in the case of former DOJ employee Jesselyn

Radack), while leaks the DOJ and FBI view as helpful (by placing the organizations in a

good light) are ignored.

93.   Mr. Ashcroft knew that the Office of Professional Responsibility would never sanction a

sitting Attorney General for an ethical violation, no matter how egregious.  His belief was

confirmed when Mr. Jarrett, in concluding his investigation regarding Mr. Ashcroft's use

of the term "person of interest" to identify Dr. Hatfill, informed the Attorney General that

he had exercised "good judgment" in using that term.  Other DOJ and FBI employees

understood Mr. Ashcroft's implicit, if not explicit, support for their behavior would

shield them from punishment, and these beliefs have been borne out.

94.   Mr. Ashcroft, as Attorney General, has a public relations office within DOJ at his

disposal.  Before publicly proclaiming that Dr. Hatfill was a "person of interest" he was

fully aware that the resulting media frenzy would virtually destroy Dr. Hatfill's life.  He

knew that the press would disseminate his and his subordinates' leaks regarding Dr.

Hatfill without challenging them or subjecting them to serious scrutiny.  They were fully

aware that members of the press corps – despite the hard lesson of the Richard Jewell

fiasco, when members of the press reported statements of federal officials implicating the

wrong man in the bombing at the 1996 Atlanta Olympic Games – would report virtually

anything leaked to them by high level DOJ and FBI officials, so long as they could identify the information as coming from an inside source.

95.  In addition to the public relations campaign against Dr. Hatfill, the pattern of law-enforcement harassment has continued.  Emboldened by Mr. Ashcroft's violations of DOJ rules, the Constitution, and common decency, Mr. Ashcroft's subordinates, with his approval, have subjected Dr. Hatfill to an unrelenting campaign of harassment, weakly camouflaged as surveillance.  Government agents, with Mr. Ashcroft's encouragement and direction, have continued to "bumper lock" Dr. Hatfill whenever he goes out in public.  He has been and continues to be followed by a caravan of five to seven FBI employees wherever he goes.

96.  Dr. Hatfill has volunteered to wear a portable electronic tracking system at all times so that his minders at the FBI can know his whereabouts.  The FBI declined this offer because the true purpose of its monitoring of Dr. Hatfill is not surveillance.  It is harassment.

97.  The FBI's campaign of harassment resulted in an FBI employee running over Dr. Hatfill's foot with a car in order to prevent (or retaliate for) Dr. Hatfill's attempt to take the employee's photograph to corroborate the harassment he endures 24 hours a day.

98.  The government has continued its campaign to preclude Dr. Hatfill from securing employment.  In addition to having him fired from his job at LSU, and destroying his professional reputation to scare away other prospective employers, FBI agents intentionally and maliciously destroyed the sole potential employment lead Dr. Hatfill had this year.

99.     On or about March 2003, Dr. Hatfill went to a McLean, Virginia hotel room to meet a

        prospective employer to discuss plans for Dr. Hatfill to provide consulting services.

        Those plans were dashed, however, when at the conclusion of his meeting, he and his

        prospective employer walked out of the meeting room and were met by FBI special

        agents conspicuously videotaping the encounter (and the prospective employer). After

        being subjected to this invasion the prospective employer no longer had any interest in

        hiring Dr. Hatfill and thus, the FBI's harassment had its intended effect.

100.    Through their intentional actions, defendants have violated Dr. Hatfill's clearly

        established rights.


                              **CAUSES OF ACTION**

                                   Count I

            (Violation of 5th Amendment Due Process Liberty and Property Rights)

101.    Paragraphs 1 through 100 are realleged and incorporated herein.

102.    It is clearly established Supreme Court law that the Fifth Amendment to the U.S.

        Constitution encompasses "the right of the individual to contract [and] . . . to engage in

        any of the common occupations of life." Board of Regents of States Colleges v. Roth,

        408 U.S. 564, 572 (1972). Thus, "where a person's good name, reputation, honor or

        integrity is at stake because of what the government is doing to him, notice and an

        opportunity to be heard are essential." Id. at 573 (internal quotation marks omitted). "To

        be deprived not only of present employment but of future opportunity for it certainly is

        no small injury when government employment so dominates the field of opportunity."

        Paul v. Davis, 424 U.S. 693, 704 (1976) (internal quotation marks omitted).


                                      35

103.    In this case, Mr. Ashcroft, and the individual defendants knowingly, willfully, and intentionally violated Dr. Hatfill's Fifth Amendment rights to liberty and property without due process of law.

104.    As the DOJ acknowledged in the October 18, 2002 letter from Assistant Attorney General Daniel J. Bryant to Senator Grassley, the DOJ's Office of Justice Programs "does not have any laws, rules, policies, standards, or guidelines that focus specifically on the ability of OJP to determine who should or should not work on an OJP-funded grant or cooperative agreement [except for certain provisions inapplicable here]." This arbitrary process permitted political and personal motivations to cloud professional judgment. DOJ employees intentionally and maliciously interfered with Dr. Hatfill's $150,000 per year job at LSU. The result was his firing. Dr. Hatfill was given no pre-termination opportunity to be heard. The DOJ, in the Bryant letter, acknowledged that it has no established appeal process. Dr. Hatfill was given no opportunity to appeal, or be heard in any forum, about the DOJ's decision to forbid him from working on DOJ-funded programs and DOJ's decision to interfere with his employment at LSU.

105.    Public and private statements by DOJ and FBI officials defaming Dr. Hatfill, attacking his character, and implicating him in the anthrax attacks without evidence have prevented Dr. Hatfill from obtaining employment in his field of expertise, research and training in biowarfare preparedness and countermeasures. That field consists almost entirely of government and government-funded jobs.

106.    The actions of FBI agents at Dr. Hatfill's McLean, Virginia job interview confirm the intentional and malicious nature of defendants' interference with Dr. Hatfill's right to earn a living.

107.   These actions were undertaken by Defendant Mr. Darnell, Defendant Mr. Beres, and unknown agents of the FBI and unknown employees of the DOJ, with the knowledge, encouragement, acquiescence, and complicity of Defendant Mr. Ashcroft.

108.   Individual defendants were acting under color of legal authority and are sued for money damages in their individual capacities pursuant to <u>Bivens</u>, and for injunctive and declaratory relief in their individual and official capacities.

## Count II

(Violation of First Amendment Right to Free Speech and
Petition the Government for Redress of Grievances)

109.   Paragraphs 1 through 100 are realleged and incorporated herein.

110.   The First Amendment guarantees the right to free speech and to petition the government for redress of grievances. Government officials may not interfere with these rights directly, punish an individual for exercise of those rights, or engage in retaliatory conduct aimed at chilling future exercise of those rights.

111.   Unknown agents of the FBI and employees of the DOJ, with the knowledge, encouragement, acquiescence, and complicity of Defendant Mr. Ashcroft, sought to punish and retaliate against Dr. Hatfill for the exercise of his First Amendment rights. Through this retaliatory behavior, they sought to chill Dr. Hatfill's further exercise of those rights.

112.   All individual defendants were acting under color of legal authority and are sued for money damages in their individual capacities pursuant to <u>Bivens</u>, and for injunctive and declaratory relief in their individual and official capacities.

### Count III

(Violations of Privacy Act, 5 U.S.C. § 552a(b) against Defendants FBI and DOJ)

113.    Paragraphs 1 through 100 are realleged and incorporated herein.

114.    The Privacy Act states: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ." 5 U.S.C. §552a(b). None of the exceptions to the disclosure prohibition applies here.

115.    Plaintiff is informed and believes that Defendants FBI and DOJ both maintain, with respect to the Amerithrax investigation, a "system of records" as defined by the Privacy Act, 5 U.S.C. § 552a(a)(5). This "system of records" includes "records," as defined by 5 U.S.C. § 552a(a)(4), pertaining to Dr. Hatfill.

116.    Both the FBI and the DOJ have intentionally and willfully disclosed "records" pertaining to Dr. Hatfill from within the "systems of records" to other individuals and/or agencies without Dr. Hatfill's prior written consent or approval.

117.    The FBI's and DOJ's intentional, willful, and unauthorized disclosures of records pertaining to Dr. Hatfill have had an adverse effect on Dr. Hatfill. Among other adverse effects, the unlawful disclosures have eliminated Dr. Hatfill's employment opportunities and ability to earn a living, have irreparably damaged his personal and professional reputation, and have caused Dr. Hatfill extreme mental and emotional distress.

118.    Defendants FBI and DOJ are sued, in their capacity as agencies, for actual damages sustained by Dr. Hatfill and costs and reasonable attorneys fees, as provided for in 5 U.S.C. § 552a(g)(4).

Count IV

(Violation of DOJ Regulations codified at 28 C.F.R. §50.2)

119.   Paragraphs 1 through 100 are realleged and incorporated herein.

120.   Defendant Mr. Ashcroft, Defendant Mr. Harp, and other, as yet unknown, DOJ

employees and FBI agents have knowingly, willfully, and maliciously violated DOJ

regulations, promulgated pursuant to 5 U.S.C. §301, prohibiting the public disclosures

that have injured Dr. Hatfill.  All defendants were acting under color of legal authority

and are sued for injunctive and declaratory relief in their individual and official

capacities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.   Issue a declaratory judgment that defendant's conduct as described above violated
Plaintiff's constitutional rights, the Privacy Act, and DOJ and FBI rules and
regulations;

B.   Issue a permanent injunction prohibiting defendants from further violations of
Plaintiff's constitutional rights, the Privacy Act, and DOJ and FBI rules and
regulations;

C.   Award equitable relief to Plaintiff, in the form of back pay, front pay, restitution,
reinstatement, or other appropriate and reasonable orders, for violations as
described above and interference with Plaintiff's right to work;

D.   Award reasonable and appropriate compensatory damages to Plaintiff, in an
amount to be ascertained at trial, for defendants' unlawful acts described above;

39

E.    Award exemplary and punitive damages to Plaintiff, in an amount to be

ascertained at trial, to deter similar unlawful acts in the future;

F.    Award Plaintiff's costs, expenses, and reasonable attorneys' fees; and

G.    Award such other and further relief as this Court deems necessary and proper.


DATED:  August 26, 2003                 Respectfully submitted,



By: _____
     Thomas G. Connolly, D.C. Bar # 420416
     Mark A. Grannis, D.C. Bar # 429268
     Eric O. Bravin, CA Bar # 214741
     Harris, Wiltshire & Grannis, LLP
     1200 18th Street, N.W.
     Washington, DC 20036
     Phone:  (202) 730-1300
     Fax:      (202) 730-1301


TRIAL BY JURY REQUESTED

40