IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

Steven J. HATFILL, M.D.,                )
                *Plaintiff*                )
                                 )      Civil No. 1:03-CV-01793 (RBW)
          v.                )
                                 )
Attorney General John ASHCROFT, Timothy     )
BERES, Daryl DARNELL, Van HARP,             )
the DEPARTMENT OF JUSTICE, the              )
FEDERAL BUREAU OF INVESTIGATION,            )
*et alia*,                )
                *Defendants*                )

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS**

_____

Thomas G. Connolly, D.C. Bar # 420416
Mark A. Grannis, D.C. Bar # 429268
Eric O. Bravin, D.C. Bar # 483190
Harris, Wiltshire & Grannis, LLP
1200 18th Street, NW
Washington, DC 20036
*Counsel for Plaintiff*

January 20, 2004

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**     ii

**INTRODUCTION**     1

**LEGAL ARGUMENT**     2

    I.    THE STANDARD OF REVIEW     2

    II.    COUNT I STATES A VALID CLAIM FOR DAMAGES UNDER BIVENS     2

      A.    *Count I Alleges a Coordinated Pattern of Conduct, Not a Series of Isolated Events*     *3*

      B.    *The Acts Alleged in Count I Violated Dr. Hatfill's Fifth Amendment Rights*     *6*

      C.    *The Defendants Are Not Immune from Liability Under Count I*     *15*

    III.    COUNT II STATES A VALID CLAIM FOR DAMAGES UNDER BIVENS     17

      A.    *The Coordinated Pattern of Conduct Alleged in Count II Violated Dr. Hatfill's First Amendment Rights*     *17*

      B.    *The Defendants Are Not Immune from Liability Under Count II*     *28*

    IV.    THERE ARE NO "SPECIAL FACTORS" PRECLUDING A BIVENS REMEDY FOR VIOLATION OF DR. HATFILL'S FIRST OR FIFTH AMENDMENT RIGHTS     32

      A.    *The Privacy Act Does Not Preclude a Bivens Remedy for the Actions Alleged in Counts I and II*     *36*

      B.    *There Is No "Ongoing Criminal Investigation" Exception to Bivens*     *39*

    V.    COUNT IV STATES A VALID CLAIM FOR RELIEF     43

    VI.    THE CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER COUNTS I, II, AND IV WILL REMAIN EVEN IF DAMAGES ARE NOT AVAILABLE     44

**CONCLUSION**     **45**

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Davila,* 125 F.3d 148 (3rd Cir. 1997) ................................................ 28, 31, 32

*Bartel v. FAA,* 725 F.2d 1403 (D.C. Cir. 1984) ............................................................. 8, 40

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971).1

*Board of Regents v. Roth,* 408 U.S. 564 (1972) ....................................................... 7, 8, 12

*Bush v. Lucas,* 462 U.S. 367 (1983) ............................................................................... 35

*Chappell v. Wallace,* 462 U.S. 296 (1983) .................................................................... 35

*Conley v. Gibson,* 355 U.S. 41 (1957) ............................................................................. 2

*Correctional Servs. Corp. v. Malesko,* 534 U.S. 61 (2001) ........................................... 37

* *Crawford-El v. Britton,* 523 U.S. 574 (1998) ............................................. 23, 27, 29, 30

* *Dellums v. Powell, 566 F.2d 167 (D.C. Cir. 1977)* .................................... 23, 31, 35

*Doe v. Department of Justice,* 753 F.2d 1092 (D.C. Cir. 1985) ...................... 7, 17, 35, 44

*Duran v. City of Douglas,* 904 F.2d 1372 (9th Cir. 1990) .............................................. 32

*Edwards v. District of Columbia,* 821 F.2d 651 (D.C. Cir. 1987) ................................. 46

*Farmer v. Moritsugo,* 163 F.3d 610 (D.C. Cir. 1998) .............................................. 33, 34

* *Haynesworth v. Miller, 820 F.2d 1245 (D.C. Cir. 1987)* ................................. passim

*Johns v. Town of East Hampton,* 942 F. Supp. 99 (E.D.N.Y. 1996) ...................... 28, 29, 32

* *Kartseva v. Department of State,* 37 F.3d 1524 (1995) ...................................... passim

*Kimberlin v. Quinlan,* 199 F.3d 496 (D.C. Cir. 1999) ............................................. 26, 31

* *Kimberlin v. Quinlan, 774 F. Supp. 1 (D.D.C. 1991)* .............................. 26, 27, 29

*Kugel v. United States,* 947 F.2d 1504 (D.C. Cir. 1991) ......................................... 45, 46

*Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.,* 52 F.3d 373 (D.C. Cir. 1995) ........... 2

*Maloney v. City of Chicago,* 678 F. Supp. 703 (N.D. Ill. 1987) ............................. 28, 32

*Meyer v. Reno,* 911 F. Supp. 11 (D.D.C. 1996) ............................................. 32, 33, 34, 38

*Moore v. Hartman,* 1993 WL 405786 (D.D.C. 1993) ............................................. 29, 31

*Mosrie v. Barry,* 718 F.2d 1151 (D.C. Cir. 1983) ........................................................... 9

*Mountain States Legal Foundation v. Bush,* 306 F.3d 1132 (D.C. Cir. 2002) ................. 2

* *O'Donnell v. Barry, 148 F.3d 1126 (D.C. Cir. 1998)* ........................................ passim

*Orange v. District of Columbia,* 59 F.3d 1267 (1995) ................................................. 11

*Paul v. Davis,* 424 U.S. 693 (1976) ............................................................................ 7, 8

*Pendleton v. St. Louis County,* 178 F.3d 1007 (8th Cir. 1999) ............................. 28, 31

*Saucier v. Katz,* 533 U.S. 194 (2001) ............................................................................ 17

*Schweiker v. Chilicky,* 487 U.S. 412 (1988) ............................................. 38, 39, 41

*Schweiker v. Hansen,* 450 U.S. 785 (1981) ................................................................... 46

*Siegert v. Gilley,* 500 U.S. 226 (1991) ............................................................................ 9

*Smith-Bey v. District of Columbia,* 546 F. Supp. 813 (D.D.C. 1982) ...................... 33, 34

*Suarez Corp. Indus. v. McGraw,* 202 F.3d 676 (4th Cir. 2000) ................................... 25

*Trifax Corp. v. District of Columbia,* 314 F.3d 641 (D.C. Cir. 2003) .......................... 15

*United States v. Jackson,* 390 U.S. 570 (1968) ...................................................... 23, 30

*Waldau v. Coughlin,* 1996 WL 312197 (D.D.C. 1996) ................................................. 34

* Case on which Plaintiff principally relies.

**INTRODUCTION**

Plaintiff Steven J. Hatfill, M.D. hereby opposes the Defendants' Motion to Dismiss Counts I, II, and IV of the Complaint.  The defendants devote almost all their attention to Counts I and II, which arise directly under the U.S. Constitution, on the theory of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971).  Count I sets forth the acts by which the defendants systematically violated Dr. Hatfill's Fifth Amendment right not to be deprived of liberty – in this case, his liberty to work in his chosen field of expertise.  Count II describes the coordinated campaign of harassment, intimidation, and retaliation that the defendants visited upon Dr. Hatfill when he exercised his First Amendment right to proclaim his innocence and protest his mistreatment by the Department of Justice ("DOJ").  The theory of Count IV is that, in their savaging of Dr. Hatfill, the defendants have violated their own official regulations that govern the way they interact with and protect uncharged individuals.

The defendants motion fails to justify the dismissal of any of these claims.  Indeed, the defendants fail the very first requirement on a motion to dismiss, which is to accept the allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor.  Instead, the defendants seem intent on dissecting Counts I and II, and trying to deal with certain elements separately from the whole of which they are a part.  This leads the defendants into doctrinal and factual confusion, and at the end of the day they fail to justify the removal of a single claim from the complaint.

In this opposition, we respond to as many of the defendants' arguments as we can discern in their papers.  With respect to Count I, we rescue the allegations of the complaint from the defendants' caricature, and then show that those allegations adequately state a due process liberty claim under the clearly established law of this circuit.  With respect to Count II, after retrieving

the operative facts from the defendants' distortions, we demonstrate that the defendants' coordinated efforts to chill and punish Dr. Hatfill's exercise of his First Amendment rights violated clearly established law.  We next take up three of the defendants' arguments that "special factors" justify depriving Dr. Hatfill of any remedy for their unconstitutional conduct, even though such remedies have long been available to others.  With respect to Count IV, we urge the court to enforce DOJ regulations by way of a private right of action.  And finally, we point out that Dr. Hatfill is entitled to declaratory and injunctive relief regardless of the merit of the defendants' qualified immunity claims.

## LEGAL ARGUMENT

### I.   The Standard of Review

The Court must deny the motion to dismiss unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132, 1134 (D.C. Cir. 2002).  The Court must accept as true all facts alleged in the complaint, and give the plaintiff the benefit of all reasonable inferences from those facts.  *Id.*; *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995).

In the event factual questions must be settled in order to resolve a claim of qualified immunity, the plaintiff is entitled to discovery on that question.  *Id.*; *Kartseva v. Department of State*, 37 F.3d 1524, 1530 & n.21 (1995).

### II.   Count I States a Valid Claim for Damages Under Bivens

The defendants ground their arguments that Dr. Hatfill's Fifth Amendment claim should be dismissed on several different theories.  All, however, must fail, not only because the arguments are legally flawed, but because the defendants begin each argument with an inaccurate

characterization of the facts as alleged.  Since all allegations are to be taken as true, the defendants find themselves arguing for the dismissal of claims that do not exist in the real world.

The Supreme Court has been unusually explicit about the order in which these questions are to be considered in *Bivens* cases.  In sections II.B and II.C, we address the defendants' arguments in the prescribed order.  First, however, it is necessary to review the allegations of the complaint so that we are once again all discussing the same case.

A.     **Count I Alleges a Coordinated Pattern of Conduct, Not a Series of Isolated Events**

Dr. Hatfill's complaint alleges a "pattern of government abuse . . . which brought about the ruination of Dr. Hatfill's life, including his ability to earn a living," Compl. ¶ 35, in violation of the Fifth Amendment.  For purposes of Count I, three aspects of this pattern of abuse deserve special mention.  First, the complaint alleges a torrent of leaks to the news media by defendants Ashcroft and Harp, and other unknown FBI and DOJ officials, which "have ruined Dr. Hatfill's current and future employment prospects."  *Id.* at ¶¶ 4, 105.  These leaks to the media began when defendant Harp and other FBI and DOJ officials leaked Dr. Hatfill's name in connection with a consensual search of his home conducted on June 25, 2002.  *Id.* at ¶ 34.  The leaks conveyed the false and defamatory impression that Dr. Hatfill was involved in the anthrax attacks, and it is natural to infer that the defendants intended to convey that defamatory message to a national audience.  Defendant Harp and others again tipped off the media regarding the August 1, search of Dr. Hatfill's home.  *See id.* at ¶ 39.  The defamation campaign continued on August 6, when Mr. Ashcroft identified Dr. Hatfill as "a person of interest" in the anthrax investigation on two national television programs.  Use of this novel term defamed Dr. Hatfill by falsely implicating him in the anthrax attacks.  *See id.* at ¶¶ 49, 52.  Once Mr. Ashcroft "singled out Dr. Hatfill as the fall guy and gave his imprimatur to the innuendo that Dr. Hatfill had committed the anthrax attacks," *id.* at ¶ 54, Mr. Harp and other FBI and DOJ officials continued

to leak false and defamatory information about Dr. Hatfill in an effort to link him to the attacks. *See id.* at ¶¶ 76-77, 83-88.  Taken as a whole, the complaint alleges a campaign to defame Dr. Hatfill beginning at least as early as June 25, and continuing through the date the complaint was filed.  The effect of this campaign, specifically alleged in the complaint, has been to obliterate Dr. Hatfill's professional reputation and stigmatize him as a mass murderer, not to mention an inappropriate candidate for work in the field of bio-terrorism prevention, training, and research.

The second component of the plot to foreclose Dr. Hatfill's right to earn a living was more direct.  The complaint alleges that defendants Beres, Darnell, and other unknown FBI and DOJ officials, "under instructions from, or with approval of, Mr. Ashcroft," *id.* at ¶ 43, disqualified Dr. Hatfill from work on DOJ-funded programs and had him fired from his $150,000 per year job at Louisiana State University, *id.* at ¶¶ 41-44, 104, 107.  In the context of the media firestorm, set in motion by the defamation campaign, these defendants communicated to LSU, to others in government, and to the general public (via a DOJ press release about Dr. Hatfill's termination), that Dr. Hatfill was involved in the anthrax attacks and could not be trusted to work on the nation's important business of bio-defense.  Moreover, the public nature of the firing, and the gravity of the charges on which it was presumably based, conveyed to all in the business of bio-defense (government, contractors, universities, etc.):  Do not hire Dr. Hatfill.

The final element of the plot to eliminate Dr. Hatfill's right to work was designed to intimidate any prospective employer who did not get the message.  Unknown FBI agents, presumably at the direction of defendants Harp and Ashcroft, interfered with the one job interview Dr. Hatfill was able to garner by conspicuously videotaping the meeting.  Compl. ¶¶ 99, 106.  The conspicuous government presence was designed to harass Dr. Hatfill and intimidate his prospective employer, and it had its intended effect.  *Id.* at ¶ 99.

As a result of the plot, Dr. Hatfill lost the LSU job he had, *id.* at ¶ 44, and has not been able to secure gainful employment in his field of expertise, *id.* at ¶¶ 35, 105.  The complaint makes clear that Dr. Hatfill's injuries resulted not from leaks and defamatory statements alone, and not from the LSU incident alone, and not from the intimidation of prospective employers alone, but from a concerted, coordinated, and prolonged effort to deprive Dr. Hatfill of his then-current employment *and* his prospects for future employment.  These allegations more than sufficiently state a claim under the Fifth Amendment.

Instead of taking the allegations as true, and drawing all reasonable inferences in Dr. Hatfill's favor, defendants prefer to recast and ignore inconvenient allegations.  Employing a strategy of divide and conquer, they split Dr. Hatfill's Fifth Amendment claim in two, then urge the Court to throw out each half on the ground that neither half is a whole.

According to the defendants, Dr. Hatfill has alleged a deprivation of property based on the LSU firing, and a deprivation of liberty based on the defamatory statements.  Def. Mem. at 27. [1]  However, as the complaint makes clear, the decision to have Dr. Hatfill fired was inextricably intertwined with the alleged defamatory conduct; both the adverse job action and the defamation campaign were alleged as part of a larger scheme to deprive Dr. Hatfill of his ability to work in his chosen field in violation of his right to liberty.

This "divide and conquer" strategy runs throughout the motion to dismiss.  It animates the defendants' argument that Dr. Hatfill has not alleged a Fifth Amendment violation, as well as their various assertions that "special factors" preclude a *Bivens* remedy for the constitutional violations that occurred here.  However, in reading the complaint this way, defendants run afoul

---

[1] Defendants argue the property claim must fail because Dr. Hatfill had no property interest in his LSU employment.  The argument is correct, as far as it goes.  Allegations regarding the LSU firing and disqualification from DOJ-funded projects were never intended to stand alone or to state a separate cause of action.

of the requirement that at this stage all allegations of the complaint must be accepted as true, giving Dr. Hatfill the benefit of all reasonable inferences.  Once that rule of law is observed, the fog of the "divide and conquer" strategy lifts and the arguments for dismissal fall.

**B.**     **The Acts Alleged in Count I Violated Dr. Hatfill's Fifth Amendment Rights**

The D.C. Circuit has recognized at least two distinct actions under the liberty component of the due process clause of the Fifth Amendment.  The first, "usually termed a 'reputation-plus' claim," applies when defamatory government statements are made "in the course of the termination of employment."  *O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998). (internal quotation marks omitted).  The second theory applies when "adverse employment action and a stigma or other disability . . . [have] foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities."  *Id.*  Count I states a claim under both theories.

*1.  Reputation-Plus*

The reputation-plus standard derives from *Paul v. Davis*, 424 U.S. 693 (1976), and *Board of Regents v. Roth*, 408 U.S. 564 (1972).  In *Paul*, the plaintiff alleged that local police chiefs had violated his liberty rights by circulating a flyer identifying plaintiff as an "active shoplifter[]."  424 U.S. at 695.  The Court found that plaintiff's claim of defamation, "standing alone and apart from any other governmental action with respect to him," failed to state a claim.  *Id.* at 694.  In *Roth*, the Court explained that the liberty component of due process did not encompass a university's decision not to rehire a nontenured professor without more.  408 U.S. at 569.  Emphasizing that "without doubt," the liberty guaranteed by the due process clause "denotes . . . the right of the individual . . . to engage in any of the common occupations of life," the Court observed that in Roth's case, the university "did not make any charge against him that might seriously damage his standing and associations in his community.  It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality."

6

*Id.* at 572-73.  "Had it done so," the Court explained, "this would be a different case.  For where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."  *Id.* at 573.

As the D.C. Circuit observed, "*Paul* explicitly recognized that the combination of government defamation plus the failure to rehire or the discharge of a government employee states a liberty interest claim even if the discharge itself deprives the employee of no property interest protected by the fifth or fourteenth amendments."  *Doe v. Department of Justice*, 753 F.2d 1092, 1106-07 (D.C. Cir. 1985).  In *Doe*, the D.C. Circuit had "no difficulty concluding that Doe's liberty interest claim satisfies the *Paul v. Davis* standard," where Doe, a former Justice Department attorney, had been terminated for "unprofessional conduct and dishonesty," and she had alleged that the public dissemination of those charges "stigmatized her professional reputation and foreclosed future employment opportunities."  *Id.* at 1110.

The D.C. Circuit reached the same result in *Bartel v. FAA*, 725 F.2d 1403, 1415 (D.C. Cir. 1984).  Bartel, a former FAA air safety inspector, brought a due process liberty claim against another FAA official under *Bivens*, alleging the latter official had disclosed information damaging to Bartel's professional reputation, and as a result he was denied government employment for which he was qualified.  *Id.* at 1406-07 (also alleging Privacy Act violation because damaging information was contained within an FAA record).  Recognizing that "denial of a government job" in combination with "wrongful dissemination of information which results in injury to reputation" implicates a protected liberty interest, the court vacated the district court's dismissal.  *Id.* at 1414-15.

Count I clearly states a claim under the reputation-plus theory.  To defeat the claim, defendants return to the divide and conquer strategy, which as usual produces a barely

recognizable version of the facts that must be assumed as true.  Ignoring for a moment the allegations regarding the LSU termination/ DOJ disqualification, defendants first maintain that Dr. Hatfill's liberty interest claim must fail because it alleges nothing more than a claim for defamation.  *See* Def. Mem. at 32-33.

Presumably, defendants contend that the allegations lack the "plus" required to make out a reputation-plus claim under *Paul*, *Roth*, and their progeny.  *See Siegert v. Gilley*, 500 U.S. 226, 233-34 (1991) (rejecting liberty interest claim where defamation was not alleged to have been incident to termination of employment).  However, as Part II.A demonstrates, Dr. Hatfill has alleged much more than mere defamation, and the defendants cannot prevail by attempting to obscure what the complaint clearly states.

Unable to paint a convincing picture of Count I as "reputation only," the defendants suddenly acknowledge toward the end of their attack that "Dr. Hatfill pleads both defamation and the loss of a job"; however, they contend, "he does not plead that the defamatory statements occurred 'at the same time' as his alleged loss of employment" as is required to make out a reputation-plus claim.  Def. Mem. at 35 (citations omitted).  They argue Dr. Hatfill does not allege the defamation occurred "in the context of DOJ's directive to LSU." *Id*.

To be sure, "isolated defamatory statements" unconnected to adverse employment action cannot support a liberty interest claim.  *O'Donnell*, 148 F.3d, at 1140.  *See also Siegert* at 234 (rejecting liberty claim where the defamatory letter was written several weeks after Siegert resigned); *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983) (defamation must be "accompanied by" adverse employment action).  But neither *O'Donnell* nor any other case holds that a "reputation-plus" claim fails unless the defamation is uttered in the fleeting instant during which a pink slip changes hands.  The defendants' exaggerated focus on the timing of the

defamation and the employment action is shown by *O'Donnell* itself, which makes clear that the necessary connection between the defamation and the adverse employment action can be either temporal or logical.

Here, the logical connection between the DOJ disqualification and the subject of the defamation was strong and direct.  Leaking Dr. Hatfill's name and the search plans, and linking them to the anthrax attacks, had the defamatory effect of conveying the false impression that Dr. Hatfill was involved in the attacks.  Having him fired on the same day added injury to insult. Together the two-pronged attack on Dr. Hatfill's personal and professional reputation branded him with a badge of disgrace and infamy, conveying that he was untrustworthy and unsuitable for work on government bio-defense contracts.  The complaint alleges that Mr. Ashcroft authorized or directed both the defamation and the termination; the fair inference from the facts alleged is that defendants Beres, Darnell, and Harp carried out their own assignments in full appreciation of the alleged defamatory conduct.

Even under defendants' cramped reading of *O'Donnell* to require a temporal link between the defamation and the adverse employment action, Dr. Hatfill has stated a claim. According to the defendants' reading, the complaint alleges that "defamatory efforts to stigmatize Dr. Hatfill came only later, and then allegedly, in response to Dr. Hatfill's August 11, 2002 public proclamation of innocence."  However, Dr. Hatfill's complaint alleges defamatory statements were made prior to, during, and after the period of his firing.  Most specifically, the complaint alleges that defendant Ashcroft, who is alleged to have played a central role in the decision to disqualify Dr. Hatfill on August 1, 2002, Compl. ¶¶ 43, 107, publicly defamed Dr. Hatfill on August 6, 2002, by naming him as a "person of interest" on two national television programs, Comp. ¶ 49.  More generally, in the context of the two widely publicized searches of

his home, the second on the very day defendants Beres and Darnell communicated their order to disqualify Dr. Hatfill, the connection between the defamation and the job action cannot seriously be doubted.  Presumably, defendants Darnell and Beres explained to LSU officials *why* they should fire Dr. Hatfill, likely defaming him by linking him to the anthrax attacks.  If they did not, it could only have been because the basis for the disqualification would have been obvious – government officials believed Dr. Hatfill committed the anthrax attack, and thus was no longer suitable to work on government contracts.  These are the fair inferences from the facts alleged in the complaint that Dr. Hatfill is entitled to at this stage.  If necessary, discovery should be permitted to flesh out these facts.

This case does not involve a defamatory speech delivered to a high school assembly months before a demotion (*O'Donnell*), or a question of whether a defamatory memorandum regarding professional misconduct was disseminated widely enough to stigmatize plaintiffs' reputations, *see Orange v. District of Columbia*, 59 F.3d 1267, 1274-75 (1995).  This case involves accusations of mass murder – what defendants term "the worst bio-terrorism attacks in the history of the United States," Def. Mem. at 1 – disseminated around the world by every form of media.  In fact, accepting defendants' assertion that "some cases suggest that sufficiently grave attacks on reputation alone can work the required 'alteration of status' to trigger due process protection," *id.*, at 33, it is difficult to imagine this would not be that case.

In sum, Dr. Hatfill has alleged sufficient facts to state a violation of his Fifth Amendment liberty interest under the "reputation-plus" standard.[2]

---

[2] As a fallback, defendants claim that even if Dr. Hatfill has alleged a violation of his liberty interest under the "defamation-plus" rationale, he is entitled to nothing more than a "name-clearing hearing."  *Lyons v. Barrett*, 851 F.2d 406 (D.C. Cir 1988), forecloses this argument.  After finding a liberty interest violation where a public employee's firing was accompanied by rumors of sexual harassment, the court rejected the district court's conclusion that plaintiff was

### 2. *Stigma or Disability*

Dr. Hatfill has also stated a claim under the "stigma or disability" theory.  Under this second liberty claim standard, due process is required when an "adverse employment action and 'a stigma or other disability . . . foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities.'"  O'Donnell, 148 F.3d at 1141 (quoting Roth, 408 U.S. at 573-74) (alteration in original).  The stigma can be proven by showing (or at this stage, alleging) that the challenged conduct either (1) has "formally or automatically excluded [the plaintiff] from work on some category of future [government] contracts or from other government employment opportunities," or (2) has had "the broad effect of largely precluding [the plaintiff] from pursuing her chosen career."  Kartseva v. Department of State, 37 F.3d 1524, 1528 (1995).

*Kartseva* involved a factual scenario similar to the one presented here.  Kartseva, the plaintiff was fired from her job at Statistica, "a private employer doing government contract work, because [the Department of] State declared her ineligible to work on the State contract at Statistica and Statistica had no other work available."  *Id.* at 1525.  The State Department never provided Kartseva with an explanation for its disqualification and never provided her an opportunity to respond to the underlying charges.  *Id.* at 1525, 1526.  Kartseva alleged that because of the State Department disqualification she had been unable to find new employment. *Id.* at 1526.  "The gravamen of these charges," the court explained, was "that State and State employees 'caused plaintiff's employment with Statistica to be terminated, and interfered with her opportunity to obtain future employment in violation'" of the Fifth Amendment.  *Id.* (quoting Kartseva's complaint, at 8-9).

---

limited to a name-clearing hearing, stating that, "[t]he long delay in according [plaintiff] a hearing may have worked a compensable due process injury.  After the name-clearing hearing is held, appellant must have the opportunity to return to district court if he so chooses and to argue that he is entitled to additional remedies, including damages, for the violation of his due process rights."  *Id.* at 408; *see also id.* at 411.

The Court held, "that Kartseva has alleged sufficient facts regarding violation of her liberty interest by State to survive a motion to dismiss." *Id.* at 1527.[3]  In *Kartseva*, largely because the case arose in the context of a motion to dismiss, the court was ill-equipped to resolve the constitutional claim; the scope and effect of the State Department disqualification was unclear despite a letter regarding that issue filed by State at the court's request.  *Id.* at 1527.  The court remanded to permit discovery "on the nature and scope of the State disqualification."  *Id.*

On the basis of *Kartseva* alone, defendants' motion to dismiss the Fifth Amendment claim must be denied.  Most generally, Dr. Hatfill alleged in his complaint that the defendants were personally involved in the decisions and actions that have prevented him "from obtaining employment in his field of expertise, research and training in biowarfare preparedness and countermeasures.  That field consists almost entirely of government and government-funded jobs."  Compl. ¶ 105.  Nowhere in their motion to dismiss do the defendants challenge this basis for sustaining Dr. Hatfill's liberty interest claim.

Instead, they maintain (as best we can divine) that the claim must be dismissed because Dr. Hatfill has failed to allege that the disqualification "has the binding effect of formally or automatically excluding [him] from a category of work for the agency that took the action or

---

[3] The precise analysis underlying the court's recognition of Kartseva's liberty interest claim against State supports her liberty interest claims against the defendants under *Bivens*.  In fact, the court reversed the district court's dismissal of Kartseva's Fifth Amendment *Bivens* claims against unnamed defendants.  *See Kartseva*, 37 F.3d at 1531.  The only reason the court affirmed dismissal of the liberty-based *Bivens* claims against Secretary of State James Baker and Assistant Secretary of State Sheldon Krys was Kartseva's failure to allege Baker and Krys "had participated in any decision or approved any policy that related to the case."  *Id.* at 1524 (internal quotation marks omitted).

As has been detailed above, Dr. Hatfill has alleged direct participation by each individual named and unnamed defendant.  Consequently, the following discussion of *Kartseva*'s liberty-claim analysis applies with full force to the *Bivens* claims presented here.

from other government employment opportunities." [4]  Def. Mem. at 33 (citing *Kartseva*).

*Kartseva*'s alternative bases were disjunctive, and thus Dr. Hatfill's unchallenged assertion that

---

[4] As to this sub-category (debarment) of the "stigma or disability" theory defendants assert that Dr. Hatfill was given all the process he was due.  Def. Mem. at 29.  This claim is unfounded.

As a general matter "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property."  *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original) (citing cases).  Defendants do not dispute Dr. Hatfill's allegation that he received no notice or opportunity to be heard before the DOJ disqualification order was sent to LSU.  *See* Compl. ¶¶ 44-45, 104.  Instead, they argue that no pre-deprivation process of any kind was required because the DOJ disqualification was a "random and unauthorized" act and because the Administrative Procedures Act ("APA") affords adequate post-deprivation process in this case.  Def. Mem. at  29-32.  Neither claim can withstand scrutiny.

The Supreme Court has recognized a rare and limited exception to general rule requiring pre-deprivation process:  where "the deprivation of . . . liberty was unpredictable," where "predeprivation process was impossible," *and* where the conduct was "unauthorized," an adequate post-deprivation process may suffice.  *Id.* at 136, 138 (discussing *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984)).  None of these requirements are met here.  Defendants do not, and cannot, raise any real argument as to the first two requirements.  They attempt to satisfy the third requirement – that their conduct was "unauthorized" – by latching onto Dr. Hatfill's allegation that his disqualification was the result of an "arbitrary process."  Def. Mem. at 30 (quoting Compl. ¶ 104).  However, this is not the type of "unauthorized" action contemplated by the *Parratt* line of cases; if it were, any arbitrary, capricious, or unlawful act would qualify, and the exception would swallow the rule.  *See Zinermon*, 494 U.S. at 138.

Despite the case's surface appeal, defendants' reliance on *Hellenic Neighborhood Action Comm. v. City of New York*, 101 F.3d 877 (2d Cir. 1996), is misplaced.  *See* Def. Mem. at 31.  In a post-*Hellenic* case, the Second Circuit clarified that the "random and unauthorized" exception is ill-suited to cases such as this one, which are based on the abuse of substantial discretion by high-ranking government officials entrusted with broad discretion and through whom the government itself acts.  *DiBlasio v. Novello*, 344 F.3d 292, 302-303 (2d Cir. 2003) ("We have determined, however, that the "random and unauthorized" exception to the requirement of a pre-deprivation hearing does not apply where the government actor in question is a high-ranking official with "final authority over significant matters." (internal quotation marks omitted)).

Here, Dr. Hatfill has alleged the DOJ disqualification was engineered and implemented by high-level officials.  Compl. ¶¶ 15, 18. (Mr. Beres, at the time of disqualification, was Acting Director of the DOJ's Office of Domestic Preparedness).  Defendants' conduct in disqualifying Dr. Hatfill from government work does not fall within the established definition of "random and unauthorized" conduct permitting departure from predeprivation process.

Neither can defendants establish the second requirement necessary to depart from pre-deprivation process, namely "a meaningful post-deprivation remedy for the loss."  *Hudson*, 468 U.S. at 535.  As explained more fully below, the availability of judicial review under the APA regarding the disqualification decision is dubious. *See infra*, Part IV.C.  Moreover, because

he has been precluded from finding work in his chosen field suffices to state a claim under the second basis of the "stigma or disability" liberty standard.  Nevertheless, no one can doubt that the DOJ disqualification at issue here serves as an automatic bar to all the types of government-related work identified in *Kartseva*, and thus Count I suffices under the second basis as well.

This case is nothing like *Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003), on which the defendants rely, *see* Def. Mem. at 33.  There, the court affirmed a Rule 12(b)(6) dismissal of a corporate liberty interest because "Trifax failed to show anything remotely close to 'broad preclusion.'"  *Id.* at 644.  The record demonstrated that Trifax "won some and lost some in retaining and bidding on government contracts" since the alleged liberty infringement. *Id.* Dr. Hatfill hasn't won any since the plot to keep him unemployed was hatched.

Dr. Hatfill has sufficiently alleged that the defendants have both completely disqualified him from employment with the government and government contractors, and precluded him from working in his chosen profession.[5]  Any doubts regarding the effect of the DOJ disqualification must be resolved in Dr. Hatfill's favor at this stage.  Here, as in *Katrseva*, limited discovery may be necessary in order to ascertain facts necessary to resolve the issue of qualified immunity.  *See* 37 F.3d at 1530 n.21 (analogizing the propriety of permitting limited discovery

---

money damages are prohibited under the APA, *see* 5 U.S.C. § 702, it cannot provide the full compensation required under the *Parratt* line of cases.

[5] In the small and highly specialized world of bio-weapons research, training, and prevention, where the government so completely occupies the field, the two inquiries almost collapse into one.  *See Taylor v. Resolution Trust Corp.*, 56 3d 1497, 1506-07 (D.C. Cir. 1995) (plaintiff may establish liberty claim for infringing the right to follow a chosen trade or profession, where plaintiff's work is "highly specialized" and "rendered largely unmarketable" because of government conduct) (comparing *Green v. McElroy*, 360 U.S. 474, 594 (1959)) (exclusion of aerospace engineer from work in all government-sponsored aeronautics facilities infringes constitutional liberty interests), with *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895-96 (1961) (revocation of short-order cook's permission to work on military base does not implicate liberty interest because she "remained entirely free to obtain employment as a short-order cook or get any other job," even with same employer at a different facility.)

14

regarding "*inaccessible*" facts, exclusively within the domain of the government, for purposes of qualified immunity analysis, to discovery permissible for disputed facts).

**C.**   **The Defendants Are Not Immune from Liability Under Count I**

Defendants maintain that they are entitled to qualified immunity "even if Dr. Hatfill has alleged an actual due process violation" because the due process law supporting his claim was not clearly established. Def. Mem. at 35-36.  The doctrine of qualified immunity shields certain government officials from liability for damages insofar as their conduct does not violate clearly established rights. *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).  "The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful . . . but it is to say that in the light of preexisting law the unlawfulness must be apparent."  Id. at 639-40.

The discussion in Part II.B demonstrates that at the time of the defendants' conduct depriving Dr. Hatfill of his due process liberty rights, the law in this circuit was established with sufficient particularity to have made the unlawfulness of that conduct apparent to any reasonable officer.  The defendants do not argue that any of the law establishing Dr. Hatfill's rights here was decided after the events in question.  Instead, they advance many of the same misguided arguments supporting their claim that Dr. Hatfill has not alleged a constitutional violation.  Thus, they maintain that Dr. Hatfill alleged nothing more than defamation, or that the alleged adverse employment action was not sufficiently proximate to the alleged defamatory conduct to make out a claim under the "reputation-plus" theory.  See Def. Mem. at 36.  However, as explained in Part II.B, the defendants' defamatory conduct was both temporally and logically linked to their decision to disqualify Dr. Hatfill from working on the DOJ-funded LSU project.

The defendants place great stock in the O'Donnell court's observation that "'the conceptual basis for reputation-plus claims is not fully clear, '" quoting it twice on one page. Def. Mem. at 36 (quoting 148 F.3d at 1140). Despite the phrase "not fully clear," the observation does nothing to bolster the defendants' qualified immunity argument. The federal courts' "conceptual basis" for recognizing a constitutional right is not the touchstone for qualified immunity analysis. When the caselaw delimits the prohibited conduct with sufficient clarity, government agents who engage in unconstitutional conduct can find no refuge in qualified immunity regardless of the clarity of the conceptual basis supporting the clear legal rule. See *Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (emphasis added)). If the law of this circuit makes clear that breaking down someone's door without a warrant or probable cause violates the Fourth Amendment, it does not matter for qualified immunity purposes whether the conceptual basis for the constitutional right derives from Blackstone's Commentaries, comments of the Framers, or an application of originalist interpretation. Here, O'Donnell itself, along with Doe and other D.C. Circuit cases, defined in detail the scope of the liberty interest protected by the reputation-plus theory.

Moreover, the lack of clarity regarding the conceptual basis of the "reputation-plus" theory says nothing about the "stigma or disability" theory, and, as discussed in Part II.B, the law with respect to the latter theory was clearly established prior to defendants' depriving Dr. Hatfill of his right to work in the field of his chosen profession. In short, prior to the violations alleged in the complaint, controlling law in this circuit specifically prohibited the conduct individual

defendants engaged in to deprive Dr. Hatfill of his due process liberty rights.  Qualified immunity must be denied for all named and unnamed defendants.

## III.   Count II States a Valid Claim for Damages Under Bivens

### A.   The Coordinated Pattern of Conduct Alleged in Count II Violated Dr. Hatfill's First Amendment Rights

The proposition that government officers may not retaliate against a citizen for exercising his First Amendment rights would require little discussion were it not for the fact that the defendants seem to contest the point.  Upon examination, however, it appears that defendants' error on this point stems as much from their artificially constricted view of the factual allegations as from erroneous points of law.  Accordingly, we first review the allegations of the complaint in the light most favorable to the plaintiff, in order to make plain the full extent of the coordinated campaign of intimidation and harassment unleashed against Dr. Hatfill.  Once those facts are clear, the application of the law becomes easy.

   1.   *Dr. Hatfill has alleged a coordinated campaign of intimidation and harassment, not a string of unrelated incidents.*

We agree with the defendants that "it is important to focus on precisely what Dr. Hatfill alleges was done to retaliate for his exercise of protected First Amendment rights," Def. Mem. at 38.  Unfortunately, the defendants fail to take their own advice.  With Count II as with Count I, the defendants give the complaint the most cramped reading they can imagine, splitting up elements of the alleged wrong until they can pretend they are dealing with unrelated acts rather than the coordinated campaign that Dr. Hatfill pleaded.

As alleged in the complaint, Dr. Hatfill was voluntarily cooperating with the Amerithrax investigation in the summer of 2002, despite the defendants' illegal tip-off to the media regarding the June 25, 2002 consensual search of Dr. Hatfill's apartment.  That tip-off had made

17

Dr. Hatfll the *de facto* fall guy for the anthrax attacks (Compl. ¶¶ 31-35).  Nonetheless, Dr.

Hatfill was willing to submit voluntarily to another FBI interview when one was requested in late

July 2002, and his attorney, Mr. Glasberg, suggested that the interview take place during the first

week of August.  However, despite Mr. Glasberg's offer of cooperation, the FBI instead obtained

a search warrant and searched Dr. Hatfill's apartment a second time on August 1, 2002, once

again after defendant Harp and perhaps others tipped off the media that the search would be

conducted (¶¶ 38-39).  Mr. Glasberg immediately protested, both to FBI Special Agent Bob Roth

(to whom Mr. Glasberg had made the offer of cooperation) and to Assistant U.S. Attorney

Kenneth Kohl (¶ 40).

　　　That same day, August 1, 2002, defendant Darnell, with the approval of defendant

Ashcroft, telephoned LSU to insist that Dr. Hatfill be fired from the DOJ-funded project for

which he had been hired (¶ 41).  Defendant Beres confirmed these instructions in writing (¶ 42),

again acting under instructions from, or with the approval of, defendant Ashcroft (¶ 43).

Whether the decision to engineer Dr. Hatfill's termination by LSU was related either to the

protests of Dr. Hatfill's attorney, or to the apparent yet unexplained breakdown in

communications between Messrs. Glasberg and Roth, cannot be known with certainty by the

plaintiff at this stage in the proceeding, but the fact that these two significant actions against Dr.

Hatfill's interests occurred on the same day provides a reasonable basis upon which a factfinder

could infer a connection.

　　　Just five days later, on August 6, 2002, defendant Ashcroft appeared on CBS's "The

Early Show" and NBC's "Today" show, and personally named Dr. Hatfill as a "person of

interest" in the investigation (¶ 49).  Dr. Hatfill reluctantly called a press conference for August

11 to declare his innocence (¶ 68), and protest the government's illegal and disgraceful

misconduct.  However, when news circulated of Dr. Hatfill's intention to make a public statement, the government stepped up its efforts to marginalize and discredit him (¶ 75).  The efforts included the leak of a draft novel which Dr. Hatfill had written about a bioterrorist attack, and which was recovered from Dr. Hatfill's computer during a government search of his apartment.  This novel was leaked to the press approximately one hour before the scheduled press conference (¶ 75).  It would be reasonable to infer that the leak of the novel was intended either to undermine Dr. Hatfill's credibility, or to lead him to cancel the press conference in order to avoid answering questions about it, or both.  There were also, roughly at this time, leaks to *Newsweek* and *The New York Times* that are consistent with an overall campaign to discredit Dr. Hatfill, punish him for his protests against government mistreatment, and intimidate him from speaking out again (¶¶ 76-77).

The defendants' campaign of retaliation against Dr. Hatfill was not limited to press leaks, however.  Immediately after Dr. Hatfill's August 11 statement, federal investigators began showing Dr. Hatfill's photo (and *only* Dr. Hatfill's photo) to residents of Princeton, New Jersey.  This single-photo technique – always unfairly suggestive, but particularly so in a week during which the person pictured has been shown on national television and in a two-page *Newsweek* spread – could not have been reasonably believed to have any legitimate law enforcement value, and so it is reasonable to infer that it was intended to discredit Dr. Hatfill, punish him for his protests against government mistreatment, and intimidate him from speaking out again (¶ 78).

Similarly, the defendants at this time increased the intensity of their "surveillance" of Dr. Hatfill; however they did not conduct surveillance in the proper, covert way that might be expected to detect criminal behavior or yield evidence of a crime (¶ 80).  Instead, they followed Dr. Hatfill around everywhere he went, with a caravan of as many as five to seven FBI agents (¶

95), "surveilling" Hatfill at such close range that on one occasion they frightened away a potential employer, causing him to withdraw his offer of employment (¶ 98), and on another occasion they ran over Dr. Hatfill's foot (¶ 97).  Defendant Ashcroft, or one of his deputies, approved the FBI's installation of electronic eavesdropping equipment in Dr. Hatfill's apartment, and that equipment remained in place for many months despite the fact that the defendants knew as early as fall 2002 that Dr. Hatfill was aware of the equipment and that it therefore served no useful investigatory purpose (¶ 9.b).

Mr. Glasberg's formal protests on Dr. Hatfill's behalf continued, however, with a formal complaint to DOJ's Office of Professional Responsibility on August 13, a supplement to that complaint on August 16, and a request for a Congressional inquiry on August 21 (¶¶ 71-73).  Defendant DOJ eventually closed its half-hearted investigation into the misconduct cited by Mr. Glasberg without identifying any of the persons responsible (¶¶ 90-91), but not before defendant Ashcroft *again* referred to Dr. Hatfill as a "person of interest" during a press conference on August 22 (¶ 49).  The circumstances of this third naming of Dr. Hatfill by the Attorney General of the United States, after the impropriety of such publicity had been specifically pointed out to DOJ and after it had become painfully obvious that such references had the effect of ruining Dr. Hatfill's life as he knew it, make it very hard to infer that this third "person of interest" comment could have been motivated by anything other than an intention to punish and intimidate.

Mr. Glasberg wrote directly to defendant Ashcroft on September 5, protesting yet more leaks as well as the "August 1 blackball of Dr. Hatfill" at LSU (¶ 47).  Defendant Ashcroft never responded to Mr. Glasberg's letter, and the leaks continued, becoming if anything more ominous. A January 9, 2003 report on ABCNEWS.com quoted anonymous officials as saying that Dr. Hatfill was "the man most likely responsible" for the anthrax attacks; that "we may have enough

right now to get an indictment but we don't have anywhere near enough to get a conviction"; and that FBI agents planned to "attempt to rule out anybody else . . .so we can focus entirely on Hatfill" (¶ 85).  A CBSNEWS.com report on May 8, 2003 stated that the FBI agents were saying "they already have their man," referring to Dr. Hatfill, and transmitted the threat that "the government may take the unusual step of bringing charges against Hatfill unrelated to the anthrax attacks at all, if they become convinced that's the only way to prevent future incidents." This was characterized as an Al Capone-style tactic (¶ 86).

It has been necessary to review these allegations at length in order to expose the defendants' strategy of ignoring most of them.  For example, the defendants assert that Dr. Hatfill's "First Amendment-protected activities . . . began on August 11, 2002," Def. Mem. at 39, and from this mistaken premise the defendants suggest that the Court need not concern itself with anything occurring before that date (such as the searches of Dr. Hatfill's apartment, the firing from LSU, and defendant Ashcroft's "person of interest" smears on August 6).  This would be convenient for the defendants, but it is not what the complaint alleges.  In fact, the complaint identifies *many* instances in which Dr. Hatfill or his attorney engaged in protected First Amendment activity,[6] along with *many* examples of abusive conduct toward Dr. Hatfill that were (a) highly unusual; (b) roughly contemporaneous; (c) devoid of any legitimate investigatory purpose; and therefore (d) presumptively part of a coordinated campaign for some *illegitimate*

---

[6] For example, there were Mr. Glasberg's late-July 2002 discussions with Special Agent Roth regarding Dr. Hatfill's cooperation with the investigation; Mr. Glasberg's August 1 protests to Special Agent Roth and AUSA Kohl regarding the August 1 search; Dr. Hatfill's August 11 press conference proclaiming his innocence and protesting the government's misconduct (as well as the earlier announcement that such a press conference would take place); Mr. Glasberg's August 13 and August 16 complaints to DOJ's Office of Professional Responsibility; Mr. Glasberg's request for a Congressional inquiry on August 21, and Mr. Glasberg's protest to Ashcroft on September 5.

purpose.[7]  But the complaint does not cast these allegations as a series of unfortunate but unrelated events, mere accidents in a busy place.  On the contrary, the complaint alleges that these were *purposive elements of a coordinated campaign* of intimidation and harassment.  For purposes of this motion, that is the view of reality the defendants are bound to accept.

> 2.  *The coordinated campaign of intimidation and harassment violated Dr. Hatfill's First Amendment rights.*

"[T]he First Amendment bars retaliation for protected speech."  *Crawford-El v. Britton,* 523 U.S. 574, 592 (1998) (describing this principle as a "general rule that has long been clearly established"); *see also Dellums v. Powell,* 566 F.2d 167, 194-96 (D.C. Cir. 1977) (affirming a jury's liability verdict against police chief in *Bivens* action based on violation of the First amendment).  It is a "settled principle that it is 'patently unconstitutional' to 'penaliz[e] those who choose to exercise' constitutional rights."  *Haynesworth v. Miller,* 820 F.2d 1245, 1257 (D.C. Cir. 1987) (quoting *United States v. Jackson,* 390 U.S. 570, 581 (1968)).  The *sine qua non* of a cause of action arising directly under the First Amendment is the intent either to silence or to punish protected speech – regardless of the means chosen by the wrongdoer.  If, as the Court must assume for purposes of this motion, the defendants (a) conducted an extra search of Dr. Hatfill's apartment, or (b) directed LSU to fire him, or (c) divulged private facts about him (anonymously or otherwise), or (d) attempted to manufacture unreliable evidence implicating him, or (e) intensified their "surveillance" to the point that it constituted harassment, or (f)

---

[7] These include the non-consensual search of Dr. Hatfill's apartment, despite his demonstrated willingness to consent to such a search; the unprecedented DOJ directive to LSU to fire him; the Attorney General's decision to name him on television, in violation of statute, regulation, and good investigatory practice; the flurry of illegal leaks designed to discredit Dr. Hatfill just as he was "going public" with his protests of government misconduct; the attempt to manufacture unreliable evidence against Dr. Hatfill in Princeton; the authorization of round-the-clock harassment very loosely veiled as "surveillance"; the deliberate intimidation of a prospective employer; and the publicized threat to indict Dr. Hatfill on unrelated charges in order to "prevent future incidents," as the FBI did with Al Capone.

deliberately intimidated a prospective employer, or (g) threatened to indict him for unrelated offenses if he protested his treatment in the anthrax investigation – if the defendants did *any* of these things with the intention either of chilling Dr. Hatfill's exercise of First Amendment rights or punishing him for the occasions on which he exercised them, then Hatfill's complaint states a constitutional violation.  As noted above, *all* of these actions are alleged in the complaint, and the intent to intimidate or harass Dr. Hatfill is either directly alleged or can reasonably be inferred.

The defendants seem to challenge the existence of a constitutional violation in a number of ways.  Factually, as noted above, the defendants simply ignore many of the allegations.  They categorically refuse to consider misconduct occurring before August 11, 2002 (Def. Mem. at 39), the date of Dr. Hatfill's press conference, on the theory that prior to August 11 there was nothing against which to retaliate.  However, August 11 was not the first time Dr. Hatfill exercised his First Amendment rights in this case; the complaint makes clear that his lawyer had already protested official misconduct in this case at least as early as August 1.  Furthermore, the complaint clearly alleges that word of the press conference became public before the conference itself was actually held, and that at least some of the defendants' illegal acts of intimidation *were* committed before the press conference (¶ 75).  The defendants seem simply to have missed other elements of the campaign against Dr. Hatfill, completely overlooking for example the published threat to indict him on charges having nothing to do with the anthrax investigation.

The defendants dispute the existence of a constitutional violation by proposing a patchwork of ostensible exceptions to the broad prohibition on attaching penalties or "unconstitutional conditions" to the exercise of First Amendment rights.  For example, the defendants purport to find "widespread agreement" in other jurisdictions that "where a public

official's alleged retaliation is in the nature of speech, in the absence of threat, coercion, or

intimidation intimating that punishment, sanction, or adverse regulatory action will imminently

follow, such speech does not adversely affect a citizen's First Amendment rights, even if

defamatory."  Def. Mem at 39-40 (citing *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 687 (4th

Cir. 2000)).  There may be cases in which the alleged "retaliation" is really just a public

argument, and perhaps in such cases this statement would be unobjectionable.  This, however, is

not such a case.  In this case, we have attempts by the defendants to manufacture evidence

against Dr. Hatfill in Princeton, plus an actual threat of future Al Capone-style prosecution on an

unrelated offense.  These actions must be evaluated in light of the fact that they were combined

with the personal and decidedly negative attention of the Attorney General of the United States

in "one of the largest and most complex criminal investigations in law enforcement history,"

dealing with "the worst bio-terrorism attacks in the history of the United States," Def. Mem. at 1.

Under the circumstances, the defendants' misconduct would be sufficient to chill any "person of

ordinary firmness."  How the defendants can claim that such acts of retaliation and intimidation

are strictly "in the nature of speech" under their proposed *Suarez* rule is a mystery.

Perhaps the broadest of the defendants' arguments is that mere surveillance or mere

investigation can never constitute retaliation because no one has a right not to be investigated or

surveilled.  Def. Mem. at 41.  The fundamental error in this view is illustrated by *Kimberlin v.

Quinlan,* 774 F. Supp. 1 (D.D.C. 1991), *rev'd on other grounds,* 6 F.3d 789 (D.C. Cir. 1993),

*summarily vacated,* 515 U.S. 321 (1995).  Kimberlin was a federal prisoner who gained brief

notoriety for his claim (four days before the 1988 presidential election) that he had once sold

marijuana to Vice Presidential candidate Dan Quayle.  Kimberlin alleged that the Bureau of

Prisons – indeed, the Director of BOP himself – interfered with his access to the press by

canceling interviews Kimberlin had scheduled and placing Kimberlin in administrative detention until after the election was over.  Kimberlin alleged that these actions were politically motivated, in that they were designed both to punish him for speaking out against Quayle and to ensure that it did not happen again before the election.  774 F. Supp. at 2.

Making much the same mistake that the defendants make in this case, the *Kimberlin* defendants argued "that prison inmates do not have a right either to face-to-face press interviews or to telephonic press conferences, and that defendant's actions therefore did not violate plaintiff's rights under the First Amendment."  774 F. Supp. at 3.  The court firmly rejected this attempt to ignore the allegation of unconstitutional motivation:  "[P]laintiff is not claiming that there is or was a general Bureau of Prisons policy banning these methods of press contact, or that such a policy, if it existed, would violate the First Amendment rights of inmates.   Rather, it is his contention that the prison officials cancelled one previously approved face-to-face interview, prevented him from conducting other telephonic interviews, and retaliated against him for his previous contacts with the press – all not because these activities contravened a general prohibition on contacts with the press but *because of the content of what he was expected to say to the journalists.*"  774 F. Supp. at 3 (emphasis added).  Or, as the court summarized elsewhere in the opinion, "if the officials were *motivated by a purpose to keep Kimberlin from speaking to the press because of the content of his expected communications*, their conduct violated a well-established right, and qualified immunity would not attach to their actions."  774 F. Supp. at 3.

In like manner, the fact that surveillance is *usually* proper, or that witness interviews or any other investigative technique are *usually* proper, does not mean that no *Bivens* action will lie when nefarious motives turn "surveillance" into harassment and "interviews" into an attempted frame-up.  On the contrary, a retaliatory motive can convert what would otherwise be mere

inconveniences into constitutional violations.  For example, in *Crawford-El,* a claim was stated by an inmate who alleged that a package containing his belongings had been intentionally misdirected in retaliation for his exercise of First Amendment rights.  523 U.S. 574, 578 (1998).  The rationale was not that the First Amendment embodies a zero-tolerance policy toward misdirected packages, but rather that a subjective intent to punish a "litigious and outspoken prisoner" converts what might otherwise be an entirely legal and entirely innocent act into a constitutional violation.  Similarly, in *Haynesworth,* 820 F.2d at 1256, the plaintiff alleged that he was prosecuted for disorderly conduct only because he refused to waive a civil action against the officers who arrested him; the D.C. Circuit held that this violated the First Amendment, even though the decision to prosecute or dismiss charges is generally discretionary.  The law is clear: government officials violate the First Amendment when they discharge even routine law enforcement functions with an intention to chill or punish the exercise of First Amendment rights.

This principle finds support in other jurisdictions as well.  The Eighth Circuit has held that a constitutional cause of action for violation of First Amendment rights can be stated for an improperly motivated investigation even if there is never any prosecution.  *Pendleton v. St. Louis County,* 178 F.3d 1007, 1009 (8th Cir. 1999); *id.,* at 1011 (firing by private employer at government's behest was unconstitutional retaliation).  The Third Circuit has held that where police "surveillance" is really intended as harassment in retaliation for filing an EEOC complaint, the First Amendment is violated.  *Anderson v. Davila,* 125 F.3d 148, 162-63 (3rd Cir. 1997).  In the Ninth Circuit, frequent low-altitude helicopter surveillance is actionable under the First Amendment if the fly-overs are alleged to be "discrete acts of police surveillance and intimidation directed solely at silencing" the plaintiffs.  *Gibson v. United States,* 781 F.2d 1334,

1338 (9th Cir. 1986).  An attempt to manufacture evidence against a minor whose mother had

filed a complaint against the police states a claim under the First Amendment, *Johns v. Town of*

*East Hampton,* 942 F. Supp. 99, 103 (E.D.N.Y. 1996), as does the hiring of private investigators

to "follow and surveil plaintiff for the sole purposes of harassing and intimidating him."

*Maloney v. City of Chicago,* 678 F. Supp. 703, 705 (N.D. Ill. 1987).

 The defendants also assert that a claim of retaliation for the exercise of First Amendment

rights cannot be based on "ongoing government conduct which otherwise does not implicate the

First Amendment."  Def. Mem. at 42.  But the defendants cite no support for this statement and

plaintiff has located none.  On the contrary, a number of cases make clear that a First

Amendment retaliation claim can be based on official actions that make an existing condition

worse.  In *Haynesworth,* the plaintiff was in custody and was already facing disorderly conduct

charges when D.C. Corporation Counsel tried unsuccessfully to intimidate him into waiving any

right to sue the District over the circumstances of his arrest.  These facts stated a claim for

violation of the First Amendment, even though he was facing the same charges both before and

after the intimidation.[8]

 This circuit no longer applies a heightened pleading requirement wherever improper

intent is an essential element of a constitutional violation, thanks to *Crawford-El,* 523 U.S. at

594.  It is worth noting, however, that the allegations of improper motive in Dr. Hatfill's

complaint satisfy many of the indicia of reliability that have noted by various courts over the

years.  First, the absence of any legitimate law-enforcement purpose for the actions on which

Count II is based supports an inference that the purpose was *illegitimate.  See Kimberlin,* 774 F.

---

[8] 820 F.2d at 1255-57.  *See also McCurdy v. Montgomery County, Ohio,* 240 F.3d 512 (6th Cir. 2001) (unlawful arrest was in retaliation for questioning the officer's previous threat to arrest plaintiff); *Johns,* 942 F. Supp. at 103 ("heightened police patrol" and "increased surveillance").

Supp. at 6; Compl. ¶¶ 58-65.  Second, the ulterior political motive alleged here is one that fits

well when a "high-ranking executive branch official" is one of the defendants.  *See Moore v.*

*Hartman,* 1993 WL 405786 at *6 (D.D.C. 1993).  It is also reasonable to infer that an Attorney

General who bothers to comment three times on a particular case within a space of 16 days has

probably spent some time thinking about the case and has probably communicated some policy

decisions to his staff regarding its handling.  The allegations in this complaint thus "partake[]

from the circumstances enough substance" to state a claim under the First Amendment.[9]

## B.    The Defendants Are Not Immune from Liability Under Count II

The defendants argue that *Harlow* and *Anderson* require dismissal of Count II as to them,

and also that Count II does not adequately allege "personal participation" by each of them in the

wrongs of which Dr. Hatfill complains.  Both arguments are wrong.

### 1.    *The unconstitutionality of the acts alleged in Count II was clearly established well before the defendants violated Dr. Hatfill's First Amendment rights.*

Because the defendants challenged whether the complaint stated a First Amendment

violation *at all,* we have already discussed the contours of the rights the defendants violated.  At

all relevant times, it has been clearly established that "the First Amendment bars retaliation for

protected speech."  *Crawford-El v. Britton,* 523 U.S. 574, 592 (1998).  It is a "settled principle

that it is 'patently unconstitutional' to 'penaliz[e] those who choose to exercise' constitutional

rights."  *Haynesworth,* 820 F.2d at 1257 (quoting *United States v. Jackson,* 390 U.S. 570, 581

(1968)).  Because this type of constitutional violation turns almost exclusively on the defendant's

intent, it is neither necessary nor possible to say much more.  "[A]t least where the First

_____

[9] *Haynesworth,* 820 F.2d at 1257.  *See also Blue v. Koren,* 72 F.3d 1075, 1084 (2d Cir. 1995) (retaliatory intent adequately pled where the plaintiff had been "singled out" for "unusual" treatment); *Nestor Colon-Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32 (1st Cir. 1992) (finding sufficient allegations of retaliatory intent for some claims but not others based in part on whether the action against the plaintiff was in any sense unusual).

Amendment is concerned, the motives of government officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes government action affecting that individual." *Anderson v. Davila,* 125 F.3d 148, 161 (3rd Cir. 1997).

Defendants claim, however, to have been in doubt on two points. First, they claim it was not clearly established that "leaks and false disclosures regarding the anthrax investigation could violate the Constitution." Def. Mem. at 44. The "leaks and false disclosures" part is easy: they violated clearly established law. *See Moore v. Valder,* 65 F.3d 189, 194-95 (D.C. Cir. 1995) (intimidating and coercing witnesses into changing their testimony, and disclosing grand jury testimony to unauthorized third parties, in the context of a retaliatory prosecution); *Pendleton,* 178 F.3d at 1009 (giving investigative information to plaintiff's employers to get plaintiff fired); *Gibson,* 781 F.2d at 1341 (9th Cir. 1986) (passing defamatory information to employer). The additional twist in defendants' characterization – that the leaks and disclosure be "regarding the anthrax investigation" – is of course silly. It is the classic dodge of overspecifying the legal issue to the point of absurdity, and it does not work. *See also Kimberlin v. Quinlan,* 199 F.3d 496, 501-502 (D.C. Cir. 1999) (question was whether inmate's right "to be free from governmental interference with [his] contacts with the press" was clearly established, not whether specific forms of interference like administrative detention or cancellation of press conferences had been treated in prior cases); *Haynesworth,* 820 F.2d at 1257 (variation on *Dellums v. Powell* fact pattern was immaterial).

The second point on which the defendants now claim to have been in the dark is whether "a reasonable official would have been on notice that continuing surveillance of Dr. Hatfill was illegal, even assuming it increased in intensity following his exercise of First Amendment rights." Def. Mem. at 44. The answer is once again yes – if the more intense surveillance was

intended as a form of retaliatory harassment or intimidation. *See Anderson v. Davila,* 125 F.3d at 153 (visual surveillance after EEOC complaint); *Gibson,* 781 F.2d at 1338 (wiretapping and helicopter surveillance); *Johns,* 942 F. Supp. at 103 ("heightened police patrol" and "increased surveillance"); *Maloney,* 678 F. Supp. at 705 ("follow and surveil plaintiff for the sole purposes of harassing and intimidating him"). Even without these specifics, of course, all the defendants had to remember was that it is "patently unconstitutional to penalize" free speech. *Haynesworth,* 820 F.2d at 1254. "Surely, anyone who takes an oath of office knows – or should know – that much." *Duran v. City of Douglas,* 904 F.2d 1372, 1378 (9th Cir. 1990) (no qualified immunity for policeman who pulled over a car after passenger made an obscene gesture).

> 2. *Each defendant participated personally in a coordinated campaign of intimidation and harassment to punish and chill Dr. Hatfill's First Amendment freedom to protest his egregious mistreatment.*

Finally, all the defendants jointly argue that personal involvement has not been adequately alleged as to any of them – which is a paradox, to say the least. The upshot of the defendants' "personal participation" argument, if accepted, would be that *no one* participated in the violation of Dr. Hatfill's rights. Thus, the first clue that the defendants' arguments are meritless is that they cannot be accepted without assuming that the entire complaint is false. This the Court is not permitted to do on a motion to dismiss.

The same conclusion appears from the cases cited by the defendants. It is well settled, as the defendants agree, that the complaint must allege that each defendant "personally participated in the events which gave rise to the plaintiff's claims." *Meyer v. Reno,* 911 F. Supp. 11, 15 (D.D.C. 1996). *See also Smith-Bey v. District of Columbia,* 546 F. Supp. 813 (D.D.C. 1982). But which defendant is this standard supposed to absolve? Defendants Beres and Darnell were directly involved in the August 1 directive to LSU, and almost certainly in related conversations before and after. At this pre-discovery stage in the proceedings, it is reasonable to infer that the

specific wrong they committed was integrally related to the overall campaign of harassment and intimidation.  Defendant Harp is the only "anonymous" leaker who is identified by name in the complaint, and for purposes of this motion the allegation of his responsibility is assumed to be true.

On closer inspection, we find that the cases cited by the defendants are about the circumstances under which *high-level supervisors* can be held responsible for acts that took place within their organizations but without their involvement.  *See Farmer v. Moritsugo*, 163 F.3d 610 (D.C. Cir. 1998) (Medical Director of BOP sued by inmate not under his care); *Meyer,* 911 F. Supp. at 15 (U.S. Attorney General sued by Minnesota inmate based solely on supervisory status); *Smith-Bey,* 546 F. Supp. at 815 (Mayor of Washington sued for failing to exercise adequate supervision over Lorton correctional facility).  Thus, the only person the defendants could hope to extract from this case on the strength of this authority is the Attorney General.

Unfortunately for everyone, defendant Ashcroft's personal participation in this case was substantial.  Defendant Ashcroft personally fed Dr. Hatfill's name to the national news media on at least three occasions, for reasons he has yet to explain but which plaintiff alleges to have been political and retaliatory; defendants' own regulations confirm that these smears served no legitimate law enforcement purpose.  Defendant Ashcroft's demonstrated familiarity with the unusually high-profile investigation, and his willingness to discuss Dr. Hatfill by name in public on three occasions in 16 days, raises a reasonable inference that he was personally involved in at least some important decisions about the case.  (Phrased another way, it would be *un*reasonable to believe that defendant Ashcroft discussed the investigation with Katie Couric but not with the other defendants or his staff.)  In addition, the sheer number and diversity of assaults on Dr. Hatfill, particularly in early August 2002, creates a reasonable inference that the retaliatory

31

conduct was coordinated, and the fact that the LSU termination was executed by DOJ personnel who were *not* on the Amerithrax task force raises a reasonable inference that coordination was achieved at a very high level within the DOJ.  The allegations against defendant Ashcroft are therefore more than sufficient to distinguish this case from *Farmer, Meyer,* and *Smith-Bey.  See also Waldau v. Coughlin,* 1996 WL 312197 at *4 (D.D.C. 1996) (setting forth standard for supervisory liability).

**IV.   There Are No "Special Factors" Precluding a Bivens Remedy for Violation of Dr. Hatfill's First or Fifth Amendment Rights**

As we have seen above, the allegations of Dr. Hatfill's complaint state a claim for violation of Dr. Hatfill's First and Fifth Amendment rights.  Furthermore, because clearly established law proscribed the defendants' conduct they are not entitled to qualified immunity.  However, the defendants contend that there are "special factors" in this case that preclude the availability of a damages remedy for the violation under *Bivens.*

In order to understand the defendants' argument, including its flaws, it helps to observe that the "special factors" doctrine has changed substantially since the phrase was used in *Bivens,* while the vocabulary used to talk about the doctrine has not.  Thus, the defendants argue that there are "'special factors counseling hesitation' in the judicial creation of a remedy" under *Bivens,* Def. Mem. at 8, or that special factors "counsel against extending *Bivens* to allow a First or Fifth Amendment claim," *id.* at 9.  Yet the "creation" or "extension" of a *Bivens* remedy into either area now is quite impossible because the remedy already exists.  In *Dellums v. Powell,* the D.C. Circuit recognized *Bivens* as one of the appropriate remedies for the retaliatory arrest of 1200 anti-war protesters at the U.S. Capitol.[10]  In *Kartseva* and *Doe,* the D. C. Circuit recognized

---

[10]   566 F.2d at 194-95.  *See also Penthouse Int'l v. Meese,* 939 F.2d 1011, 1014 (recognizing *Bivens* claim under First Amendment) (D.C. Cir. 1991); *Haynesworth,* 820 F.2d at 1254 (same).

*Bivens* may support a due process liberty claim for deprivation of the right to work.  Thus, to the extent that the "special factors" affect the creation or extension of *Bivens* to cover the First and Fifth Amendment violations at issue here, it is too late.

However, the confusion here cannot be blamed on the defendants.  The "special factors" doctrine originated in connection with the *creation* of a damages remedy for constitutional violations – thus dealing with whether or not the plaintiff had a cause of action.  But it now functions very much like a defense or an immunity, such that the availability of the *Bivens* remedy in a particular case now depends on specific circumstances like whether Congress has created a comprehensive statutory scheme for protecting the right at stake, *Bush v. Lucas*, 462 U.S. 367, 368 (1983), or whether another branch of government has superior institutional competence.  *Chappell v. Wallace*, 462 U.S. 296, 304 (1983).  Despite the vocabulary of creation and extension, we understand the defendants to be invoking the version of the "special factors" doctrine that appears in *Bush* and *Wallace*.

First, the defendants argue that the Privacy Act is a "comprehensive remedial scheme" that precludes a *Bivens* action based on punitive or retaliatory leaks of confidential information under the First Amendment and defamatory leaks tending to damage employment prospects under the Fifth Amendment (Def. Mem. At 11-13); further, the defendants maintain that the existence of an "ongoing criminal investigation" is a special factor that should preclude a *Bivens* action based on retaliatory investigative techniques under Dr. Hatfill's First Amendment claim (Def. Mem. at 16-22).  None of the arguments succeed, but the even deeper problem lies with the defendants' attempt once again to use the "divide and conquer" method of turning Dr. Hatfill's claims into something they are not.

Simplifying only a little, the defendants want to pretend that Count I consists of Leaks Plus DOJ Disqualification and that Count II consists of Leaks Plus Investigative Actions; that all the Leaks are covered by the Privacy Act and can therefore be ignored; that the APA provides the exclusive remedy for the DOJ Disqualification; and that the Investigative Actions are too sensitive to be open to judicial scrutiny.  In reality, Counts I and II of the complaint allege concerted action and are not so neatly divisible.  Count I accuses the defendants of engaging in a coordinated campaign to deprive Dr. Hatfill of his job and render him unemployable in his field of chosen profession.  Count II accuses the defendants of retaliation against Dr. Hatfill to intimidate, discredit, and punish him for exercising his First Amendment rights.  Some of the acts by which these campaigns were carried out were illegal under the Privacy Act, while others were not.  Indeed, as we have shown above, some of the acts on which Count II is based would be perfectly legal if it were not for the defendants' improper and retaliatory purpose.  Likewise, we have shown above that some of the acts on which Count I is based could not, by themselves, support a due process liberty claim, but in combination they meet the requirements of the reputation-plus and stigmatization standards.  It is the *totality* of the acts, taken together as part of a coordinated campaign to achieve "patently unconstitutional" ends, that supports a First Amendment cause of action under *Bivens.*  Defendants cannot be permitted to defeat Dr. Hatfill's claims by separating out their constituent parts any more than a bootlegger should be permitted to defeat a prosecution by claiming that the moonshine whiskey he made was really only rye grain, sugar, yeast, and water.

Furthermore, even if it were proper for the defendants to break Count II down into its constituent parts, they have once again missed some of the more important elements.[11]  The defendants make no mention, for example, of the defendants' threat to indict Dr. Hatfill on unrelated offenses, thereby giving him the "Al Capone" treatment.  Nor do they tackle the question whether their class of "Investigative Measures" would include actions that their own regulations and manuals describe as having no investigative value.  In other words, even if Count II is to be separated into its parts, it has more parts than just Leaks Plus Investigative Measures.  At the end of the day, therefore, the best the defendants can hope to achieve by this strategy is to rearrange the issues in this case without dismissing any of them.

Finally, to the extent the defendants believe that they can preclude a *Bivens* claim on *all* of Counts I and II by showing that *any* of Count I or II is covered by a remedial statute like the Privacy Act, they are turning *Bivens* upside-down.  "The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations."  *Malesko,* 534 U.S. 61, 70 (2001).  Even recent cases *declining to extend Bivens* to provide for remedies against agencies and private corporations have been based on this deterrence rationale, and on the premise that vicarious liability will *reduce the deterrent effect* because plaintiffs will tend to dispense with the bother of suing the individuals.  *Malesko,* 534 U.S. at 70-71; *FDIC v. Meyer,* 510 U.S. 471, 485 (1994).  Yet the upshot of the defendants' argument here would apparently be that if a federal official wanted to violate a citizen's rights under the First or Fifth Amendment, he could do so with impunity as long as he also released a confidential document so as to create a claim under the Privacy Act.

---

[11] With respect to Count I, the defendants entirely ignore allegations in the complaint regarding their efforts to eliminate Dr. Hatfill's ability to work by intimidating a prospective employer in March 2003.  Compl. ¶99.

For these reasons, then, the Court should reject the defendants' attempt to reconfigure the elements of Dr. Hatfill's claims into something he never alleged.  In addition, the defendants' specific arguments regarding the Privacy Act and the sensitivity of ongoing criminal investigations should be rejected.

A.   **The Privacy Act Does Not Preclude a Bivens Remedy for the Actions Alleged in Counts I and II**

In *Bivens,* Justice Harlan famously wrote, "For people in Bivens' shoes, it is damages or nothing."[12]  Later cases made clear, however, that the availability or unavailability of an alternative remedy was not dispositive.  On the one hand, in *Schweiker v. Chilicky,* the Court held that the Social Security Act precluded *Bivens* remedy for due process violations, even though the remedies available under the Social Security Act were concededly incomplete.[13]  On the other hand, in *Carlson v. Green,* the Court held that a *Bivens* remedy was available under the Eighth Amendment notwithstanding the fact that a parallel remedy was available under the Federal Tort Claims Act.[14]  Similarly, in *Davis v. Passman*, the Court allowed a congressional staffer to pursue a *Bivens* remedy for employment discrimination even though Congress obviously had a *very* comprehensive remedial scheme in Title VII and even though Congressional staffers were specifically excluded from that scheme.  442 U.S. 228, 246-47 (1979).  Thus, the fact that some of the elements of Dr. Hatfill's Constitutional claims would be independently actionable under the Privacy Act raises, but does not answer, the question whether the Privacy Act precludes a *Bivens* remedy under *Bush* and *Chilicky*.

---

[12] *Bivens,* 403 U.S. 388, 410 (1971) (Harlan, J., concurring).
[13] *Schweiker v. Chilicky,* 487 U.S. 412, 424-25 (1988).
[14] 446 U.S. 14, 18-19 (1980).

In *Spagnola v. Mathis,* 859 F.2d 223 (D.C. Cir. 1988), the *en banc* D.C. Circuit analyzed *Bush* and *Chilicky* and distilled the following guidance for courts attempting to determine when *Bivens* is precluded by the existence of an alternative statutory remedy:

> [C]ourts must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has "not inadvertently" omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies.

859 F.2d at 228.  This test suggests that the Privacy Act should not preclude a *Bivens* remedy under the circumstances of this case.

First, although the Privacy Act is "a comprehensive system to administer public rights" – most statutes are – it does not show Congressional attention to the specifically *constitutional* dimension of the problem in the way that the statutes in *Bush* and *Chilicky* did.  In *Bush,* the Court recounted the long history of Congress's "repeated consideration of the conflicting interests involved in providing job security, *protecting the right to speak freely,* and maintaining discipline and efficiency in the federal work force. . . . Constitutional challenges to agency action, *such as the First Amendment claims raised by the petitioner,* are fully cognizable within this system."  462 U.S. at 385-86 (emphasis added).  Similarly, in *Chilicky,* where both the constitutional interest and the statutory alternative were procedural, the Court could be sure that in enacting procedural reforms of the Social Security Act Congress had thought specifically about the constitutional dimension of the problem:  "Congress . . . has not failed to provide meaningful safeguards or remedies for the rights of persons situated as respondents were."  487 U.S. at 425.  Here, however, there is no provision of the Privacy Act that addresses retaliatory use of private information as a way to punish or chill protected speech or the use of defamatory information in conjunction with adverse employment action to squash the right to work.

Second, the connection between free speech in general and the privacy of government records in general is not a strongly intuitive one. A well-pled claim for First Amendment retaliation is distinguished primarily by the retaliatory intent rather than by the means of retaliation. In this case, the retaliation was carried out, in part, by the release of records subject to the Privacy Act, but if no such records had been available for release the defendants' other punitive actions would have sufficed as well. Similarly, with respect to Count I, no natural connection links the general concerns of privacy of government records to those animating the due process liberty right. In fact, to the extent the law has developed to require more than the reputational injury a Privacy Act violation could entail, the Fifth Amendment and the Privacy Act protect different spheres. However, because the legislative history is silent on the subject, it is impossible to say that the absence of any specific remedy for First Amendment violations is "not inadvertent." The legislative history of the Privacy Act does not fill this gap.

Importantly, the D.C. Circuit has previously recognized a *Bivens* action for a due process liberty violation based on the same defamatory government statements on which the plaintiff based his Privacy Act claim. *See Bartel,* 725 F. 2d at 1405. At least one other Court of Appeals has refused to consider the Privacy Act a bar to a Fifth Amendment claim, but the decision predates *Bush* and *Chilicky. Churchwell v. United States,* 545 F.2d 59 (8th Cir. 1976). As the defendants note, a number of courts have recently invoked the Privacy Act as a "special factor" precluding the availability of a *Bivens* remedy. Of these the most relevant is *Chung v. United States Department of Justice,* 2001 WL 34360430 (D.D.C. 2001), *aff'd,* 333 F.3d 273 (D.C. Cir. 2003). However, in *Chung,* the district court found "that all of the plaintiff's claims stem from the alleged leaks – namely the allegedly wrongful disclosure of government records." *Id.,* 2001 WL 34360430 at *12. *See also Downie v. City of Middleburg Heights,* 301 F.3d 688, 696-97 (6th

Cir. 2003) ("Downie's complaint appears *only* to involve a wrong – the intentional and willful creation, maintenance, and dissemination of false records by federal agency employees – for which Congress has already provided a meaningful remedy").  The same distinction applies to the unpublished opinion in *Griffin v. Ashcroft,* 2003 WL 22097940 (D.C. Cir. 2003).  Thus, these cases provide no authority for the defendants' attempt to dismiss *all* of Count I or Count II; at best they support a narrowing of those counts to preclude recovery for acts that are not compensable under the Privacy Act.

Moreover, because the D.C. Circuit did not publish its analysis of the Privacy Act question in *Chung,* there is still no authoritative application of the *Spagnola* test to the Privacy Act.  Indeed, the one-sentence affirmance in *Chung* provides even less guidance than the unpublished opinion in *Griffin v. Ashcroft,* which according to Circuit Rule 36(c) is considered by the appellate panel to have "no precedential value."  Plaintiff therefore urges this Court to make its own analysis of the issue under *Spagnola* and find that the Privacy Act does not preclude a *Bivens* remedy for violations of First or Fifth Amendment rights.

**B.    There Is No "Ongoing Criminal Investigation" Exception to Bivens**

The defendants also argue that the existence of a pending criminal investigation constitutes a "special factor" counseling against permitting a *Bivens* cause of action in this case. Eager to escape accountability for the months and months of harassment and intimidation they have visited upon Dr. Hatfill without the slightest legitimate law-enforcement purpose, they now argue that Dr. Hatfill's claim "pose[s] an acute danger of interfering with and intruding upon the executive branch's investigative and prosecutorial authority."  Def. Mem. at 20.

The defendants propose a rule according to which Dr. Hatfill could not maintain a *Bivens* action for the defendants' retaliatory invasion of his first amendment rights insofar as the invasions occurred during the course of a criminal investigation – at least not until after the

investigation is over.  This rule, for which the defendants do not pretend to have any authority, is justified by reference to "retaliatory prosecution" claims, which according to the defendants may not be brought until the retaliatory prosecution has ended.  This entire argument is breathtakingly disingenuous, on a number of levels.

First, the linchpin of this argument is the defendants' assertion that Count II is "[i]n essence, . . . a civil damages claim for retaliatory prosecution."  Def. Mem. at 20.  But despite all the arm-waving the agency defendants did in their motion to stay Count III, *there is no ongoing or even scheduled prosecution in this case, either of Dr. Hatfill or of anyone else.*  Dr. Hatfill is certainly *not* pursuing a claim for "retaliatory prosecution," because he has not been prosecuted. He *is* pursuing a claim for retaliatory infringement of his First Amendment liberties, because those liberties have been infringed.

Second, the suggestion that criminal investigations are too sensitive to be subject to judicial scrutiny is one that any lawyer should find jarring.  Defendants cite no legal support or logical basis for this theory, and in light of the fact that *Bivens* itself was based on allegations of unconstitutional conduct by law-enforcement officials in the course of a criminal investigation we cannot imagine any exists.

Third, the defendants' proposed rule would make relief *permanently* unavailable to Dr. Hatfill unless he or someone else were actually prosecuted.  This the defendants recognize and no doubt intend, Def. Mem. at 21.  But apart from the way in which this continues this Justice Department's callous disregard for Dr. Hatfill's constitutional liberties, the larger problem is that it would completely invert the deterrence rationale of *Bivens*.  The perverse result of the defendants' proposed "special factor" would be that federal agents, all the way up to the Attorney General of the United States, would be permitted intentionally to abuse their positions

of authority, in order to trample the first amendment rights of any U.S. citizen, *as long as that citizen was so completely innocent of any criminal activity that no charges were ever brought against him.* It would be difficult to imagine a rule of law with less to recommend it.

The defendants certainly cannot wring from the mere *possibility* of future prosecution a ruling that no *Bivens* action can be maintained, or else Bivens himself (who was never prosecuted, and who therefore remained in jeopardy of prosecution every bit as much as Dr. Hatfill now does) could never have maintained *his* action. This suggested "special factor" is meritless.

The APA is not a "special factor" precluding Dr. Hatfill's Fifth Amendment claim. Defendants attempt to knock out the DOJ disqualification order from the due process liberty analysis by asserting judicial review under the APA provided Dr. Hatfill's exclusive remedy. However, as defendants acknowledge, the D.C. Circuit has yet to decide whether a *Bivens* action may be foreclosed by the possibility of judicial review under the APA. Def. Mot. at 14 (citing *Sloan v. Dep't of Housing & Urban Dev.*, 231 F.3d 10, 19 (D.C. Cir. 2000)).

Here, the issue is likely moot, because it is highly doubtful judicial review under the APA is available for Dr. Hatfill's disqualification. As an initial matter, the defendants newfound (and convenient) litigation position, that the decision to disqualify Dr. Hatfill was governed by DOJ regulations enforceable though the APA, *see* Def. Mem. at 30, 32, directly conflicts with the DOJ's earlier position, *see* Compl. ¶ 104 ("[T]he DOJ's Office of Justice Programs 'does not have any laws, rules, policies, standards, or guidelines that focus specifically on the ability of OJP to determine who should or should not work on an OJP-funded grant or cooperative agreement . . .'." (quoting letter from Assistant Attorney General to Senator Grassley)).

Certainly, judicial review is available when agencies incorrectly apply regulatory standards governing substantive rights.  See 5 U.S.C § 706.  However, crediting the OJP's own legal conclusions (expressed in the Grassley letter and alleged in the complaint) regarding the lack of standards governing disqualification decision, it appears the decision to disqualify Dr. Hatfill fell within that class of decisions so inherently discretionary and extremely case-specific as to not be governed by standards.  Such actions fall under the exception to APA judicial review applicable when "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  "Under § 701(a)(2), review is precluded 'if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"  United States Information Agency v. Krc, 905 F.2d 389, 396 (D.C. Cir. 1990) (quoting Webster v. Doe, 486 U.S. 592, 600 (1988)); cf. Kartseva, 37 F.3d at 1525, 1528 & n.16 (finding regulations pertaining to formal debarment inappropriate though State Department disqualification may have worked de facto debarment, and permitting plaintiff's Fifth Amendment liberty claim to proceed under Bivens where APA claim had been dismissed).

As discussed above, this case presents a factual void as to the nature and scope of the disqualification order and the legal basis on which it was given.  See Part II.B.2, supra. At this juncture, any doubt must be resolved in Dr. Hatfill's favor.  The court should not assume the availability of judicial review under the APA under these disputed and highly dubious circumstances.  Factual uncertainties about the disqualification make this case a particularly inappropriate vehicle to explore the novel issue of APA preclusion.  However, if the court elects to engage this complicated inquiry, it should be mindful that the remedy available under the APA is substantively inadequate to compensate for the constitutional harm.  See 5 U.S.C. §702 (excluding money damages under the APA).  The court must consider whether Congress

42

intended to preclude money damages for a due process liberty violation, where intentional

government action renders an individual unable to work in his chosen field of profession.  See

Spagnola, 859 F.2d at 228 (in determining whether alternative remedial scheme supplants a

Bivens action court must consider whether Congress has "inadvertently" omitted damages

remedies).  Plaintiff submits Congress did not intend, through the APA, to preclude appropriate

relief under the Fifth Amendment for someone, like him, who has been rendered unemployed

and unemployable and had his good name and professional reputation tarred by intentional and

concerted conduct of government officials.  Cf. Lyons, 851 F.2d at 411 (substantial delay in

name-clearing hearing "may constitute a compensable due process injury").

## V.    Count IV States a Valid Claim for Relief

The defendants move to dismiss Count IV because DOJ regulations codified at 28 C.F.R.

§ 50.2 "create no duty in favor of the general public, and there is no private cause of action for

their violation."  Def. Mem. at 45.  These assertions do not establish that Count IV should be

dismissed; they merely beg the question.

The defendants rely on *Kugel v. United States*, 947 F.2d 1504, 1507 (D.C. Cir. 1991), but

Kugel concerned a negligence action under the FTCA in which the plaintiff proposed to borrow

a standard of care from a DOJ "intra-office manual."  The court held that "intra-office manuals,

*unlike official regulations*, have no legal force."  *Id.* (emphasis added) (citing *Schweiker v.*

*Hansen,* 450 U.S. 785, 789 (1981).  *Kugel* is thus doubly inapposite, as it is not about private

causes of action and not about official regulations.

There are good reasons to imply a right of action.  First, the regulations at issue here

identify a "class [of persons] for whose *especial* benefit" the regulation was promulgated (people

criminally accused by DOJ).  *Edwards v. District of Columbia*, 821 F.2d 651, 654 (D.C. Cir.

1987).  Second, they suggest on their fact that compliance is very important, dictating specific action and casting prohibited behavior in terms of its effect upon the protected class.

Furthermore, we know of no authority forbidding such an implication, and the purposes for which the regulation was promulgated would certainly be furthered by a private right of action, particularly in light of the fact that the Privacy Act does not permit civil remedies against individual employees responsible for leaking confidential information. For that reason, we ask the Court to deny the motion to dismiss Count IV.

## VI.   The Claims for Declaratory and Injunctive Relief Under Counts I, II, and IV Will Remain Even if Damages Are Not Available

Defendants maintain that Dr. Hatfill's claims for injunctive and declaratory relief should be dismissed because he has failed to allege a constitutional violation and, alternatively, declareatory and injunctive relief are unavailable to him because he has an adequate remedy at law.

First, as detailed above, Dr. Hatfill has alleged sufficient facts to state a claim under each count. Second, defendants' argument about the availability of an adequate remedy at law fails as a matter of law regarding declaratory relief and as a matter of fact regarding injunctive relief.

The availability of an alternative remedy is irrelevant to the court's power to order declaratory relief.  The Declaratory Judgment Act, 28 U.S.C. § 2201(a), states that declaratory judgment may be granted "whether or not further relief is or could be sought."  Federal Rule of Civil Procedure 57 confirms that the existence of "another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."

As to Dr. Hatfill's request for injunctive relief, the conduct of government officials since the filing of the complaint calls into question the defendants' assertion that he has an adequate remedy at law.  Dr. Hatfill requests that the court enjoin the defendants from continuing to violate his constitutional rights and DOJ and FBI regulations.  To provide just one example,

since the filing of Dr. Hatfill's complaint, there have been more than a few news reports quoting anonymous law enforcement officials that connect Dr. Hatfill to the anthrax investigation.  After more than a year-and-a-half of abuse at the hands of the defendants, it has become clear that in the absence of injunctive relief, backed up by this Court's contempt power, there is no hope for these violations to cease.  No adequate remedy at law exists and injunction relief is appropriate. See Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2944.

## CONCLUSION

WHEREFORE, Plaintiff respectfully asks the Court to DENY the requested relief.


DATED:  January 20, 2004                          Respectfully submitted,


                                   By:    Thomas G. Connolly, D.C. Bar # 420416
                                          Mark A. Grannis, D.C. Bar # 429268
                                          Eric O. Bravin, D.C. Bar # 483190
                                          Harris, Wiltshire & Grannis, LLP
                                          1200 18th Street, NW
                                          Washington, DC 20036

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Steven J. HATFILL, M.D., | ) | |
| *Plaintiff* | ) | |
| | ) | Civil No. 1:03-CV-01793 (RBW) |
| v. | ) | |
| | ) | |
| Attorney General John ASHCROFT, Timothy | ) | |
| BERES, Daryl DARNELL, Van HARP, | ) | |
| the DEPARTMENT OF JUSTICE, the | ) | |
| FEDERAL BUREAU OF INVESTIGATION, | ) | |
| *et alia,* | ) | |
| *Defendants* | ) | |

## ORDER

The Court has considered the Individual Defendant's Motion to Dismiss Counts I, II, and

IV of the Complaint, the Memoranda of Points and Authorities in support thereof, and the

Memorandum of Points and Authorities in Opposition, which was submitted by plaintiff Steven

J. Hatfill, M.D.  After consideration of all the parties' arguments, the Court finds that in his

Complaint Dr. Hatfill's has alleged facts sufficient to support Counts I, II, and IV.  Accordingly,

IT IS HEREBY ORDERED:

That the Individual Defendants' Motion to Dismiss is hereby DENIED.

Dated _____, 2004                    _____

Hon. Reggie B. Walton
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Steven J. HATFILL, M.D.,                    )
          *Plaintiff*                      )
                                            )         Civil No. 1:03-CV-01793 (RBW)
          v.                             )
                                              )
Attorney General John ASHCROFT, Timothy      )
BERES, Daryl DARNELL, Van HARP,              )
the DEPARTMENT OF JUSTICE, the               )
FEDERAL BUREAU OF INVESTIGATION,             )
*et alia,*                                   )
          *Defendants*                    )

## NOTICE OF REQUEST FOR HEARING

PLEASE TAKE NOTICE that the plaintiff, Dr. Steven J. Hatfill, respectfully requests a

hearing on his Opposition to the Individual Defendants' Motion to Dismiss Counts I, II and IV of

the Complaint at a date convenient to the Court.

DATED:  January 20, 2004               Respectfully submitted,

                                      By:   Thomas G. Connolly, D.C. Bar # 420416
                                            Mark A. Grannis, D.C. Bar # 429268
                                            Eric O. Bravin, D.C. Bar # 483190
                                              Harris, Wiltshire & Grannis, LLP
                                            1200 18th Street, NW
                                            Washington, DC 20036