IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEVEN J. HATFILL, M.D.,<br><br>    *Plaintiff,*<br><br>v.<br><br>JOHN ASHCROFT, in his individual capacity; ATTORNEY GENERAL ALBERTO GONZALES, in his official capacity; U.S. DEPARTMENT OF JUSTICE; FEDERAL BUREAU OF INVESTIGATION; TIMOTHY BERES, in his individual and official capacities; DARRELL DARNELL, in his individual and official capacities; VAN HARP, in his individual capacity; TRACY HENKE, in her individual and official capacities; an unknown number of UNKNOWN EMPLOYEES OR AGENTS OF THE FEDERAL BUREAU OF INVESTIGATION; and an unknown number of UNKNOWN EMPLOYEES OR AGENTS OF THE DEPARTMENT OF JUSTICE,<br><br>    *Defendants* | **Civ. A. No. 03-1793 (RBW)**<br>**(Judge Walton)** |

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      This case involves a sustained course of willful and intentional misconduct by law enforcement officials who placed the public image of their agencies above their duty to respect the privacy and liberty of an innocent U.S. citizen. The context for the defendants' illegal and unconstitutional actions was the government's official investigation into the deadly anthrax mailings of 2001 – an investigation that was code-named "Amerithrax."

2.     With our nation still shaken by the terror attacks of September 11, 2001, the anthrax mailings created enormous public anxiety, as well as considerable political pressure to identify and bring the mailers to justice.  Unfortunately, the government has failed to make any substantial progress in solving the case in more than four years.  No one could possibly be more disappointed about that than Dr. Steven Hatfill.

3.     Beginning in the late winter and spring of 2002, the FBI and Department of Justice became increasingly concerned about the widespread perception that they were incapable of solving the anthrax attacks.  As a consequence, they intentionally and willfully leaked to innumerable reporters information about the plaintiff, Dr. Steven Hatfill, and about investigative interest in Dr. Hatfill.  These leaks – which have certainly numbered in the hundreds since 2002 and which have continued even into this year – were calculated to create in the public mind the impression that the defendants were making progress in solving the anthrax case.  Because these hundreds of leaks disclosed information that was protected from disclosure under the Privacy Act of 1974, they were unlawful as well as unjust.

4.     In addition, the defendants conducted a highly visible campaign to curtail Dr. Hatfill's liberty without due process of law.  This they achieved not only by repeatedly leaking sensitive information about him to the news media, but also by going out of their way to make their investigation of Dr. Hatfill as conspicuous as possible to the general public.  For many months the defendants subjected Dr. Hatfill to "surveillance" that was so conspicuous as to be inconsistent with any genuine desire to obtain useful evidence.  The defendants also contrived to have Dr. Hatfill fired from his job training first responders at Louisiana State University ("LSU"); thereafter, Dr. Hatfill's hopes of new employment were dashed when the team

2

"surveilling" him ambushed the potential employer in the hotel where the interview was taking place.

5.      Despite their awareness of these abuses, senior DOJ and FBI officials have consistently failed to prevent, punish, condemn, or even seriously investigate the injustices done to Dr. Hatfill.  Indeed, after the defendants' leaks put Dr. Hatfill at the center of the media's coverage of the investigation, defendant Ashcroft poured gasoline on the fire by going on national television and naming Dr. Hatfill a "person of interest" in the investigation.  This action, by the nation's highest ranking law enforcement officer, was tantamount to an official declaration of open season on Dr. Hatfill.  In the hierarchical culture of the FBI and DOJ, the Attorney General's personal participation was sufficient to eliminate any hesitation that some subordinates might otherwise have felt about discussing Dr. Hatfill's status in the investigation publicly.  Indeed, on the one occasion when an FBI official criticized the public disclosure of "persons of interest," that official was *reprimanded* by FBI Director Mueller for having even implied that Attorney General Ashcroft had acted improperly.  By refusing to implement any remedial measures either to prevent disclosure of Amerithrax information or to mitigate the damage caused by such disclosures, the defendants sustained and encouraged the pattern of abuse and misconduct described herein.

**JURISDICTION AND VENUE**

6.      This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution, 28 U.S.C. §§ 1331 & 1343(a)(3), and 5 U.S.C. § 552a(g)(1)(C), (g)(1)(D), and (g)(4). Plaintiff seeks actual damages as well as fees and costs against the DOJ and the FBI for the

intentional and willful violation of the Privacy Act, 5 U.S.C. § 552a(g)(4). The Court has

authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201

*et seq.* The Court has authority to grant injunctive relief under the federal courts' inherent

equitable powers. Plaintiff also seeks monetary damages against federal employees acting under

color of legal authority, in their individual capacities, under *Bivens v. Six Unknown Agents of

Fed. Bureau of Narcotics,* 403 U.S. 388 (1971). However, in accordance with the Court's

September 2005 order dismissing the *Bivens* claims, plaintiff includes them herein only for the

purpose of preserving the claims for appeal if any of his damages remain uncompensated after

the trial of this matter.

7.      Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C.§

552a(g)(5).


**PARTIES**

8.      Plaintiff Dr. Steven J. Hatfill is a citizen of the United States. Dr. Hatfill is a

medical doctor and a scientist who has devoted a significant portion of his professional life to

protecting the United States, its citizens, and its military and civilian officers from the dangers of

infectious diseases. He has acquired expertise in issues pertaining to biological warfare. As a

result of defendants' unconstitutional, illegal, and unethical acts, Dr. Hatfill has been unable to

secure full-time employment since August 2002 and has suffered severe emotional distress.

9.      During times relevant to this First Amended Complaint, defendant John Ashcroft

was the Attorney General of the United States. In that capacity, he headed the United States

Department of Justice, which is the agency of the United States government responsible for

enforcement of federal criminal laws and domestic terrorism investigations. Mr. Ashcroft had

ultimate authority for supervising all of the operations and functions of the Department of

Justice, including the FBI, which is the principal investigatory arm of the Department of Justice. Defendant Ashcroft retired in 2004 and was replaced by Defendant Alberto Gonzales, the current Attorney General of the United States. Defendants Ashcroft and Gonzales were, in their respective turns, the highest-ranking law enforcement officers in the United States.

10.     It is the Attorney General's responsibility not only to enforce the laws but also to follow them. When he took the oath of office, defendant Ashcroft swore to faithfully uphold and defend the Constitution and the laws of the United States. In his conduct and action regarding Dr. Hatfill, Mr. Ashcroft has repeatedly and flagrantly violated that oath. Defendant Ashcroft is sued in his individual capacity for money damages, declaratory relief, and injunctive relief. Defendant Gonzales, as the federal official ultimately responsible for correcting the abuses described herein, is sued in his official capacity for declaratory and injunctive relief.

11.     During times relevant to this First Amended Complaint, defendant Van Harp was the Assistant Director in Charge of the FBI's Washington, D.C. Field Office, out of which the Amerithrax investigation was based. In May 2003, he retired from the FBI. Reporters, however, have continued to call defendant Harp to ask for information about the anthrax investigation, even after his retirement. Defendant Harp is sued in his individual capacity for money damages, declaratory relief, and injunctive relief.

12.     During times relevant to this First Amended Complaint, defendant Tracy Henke was Principal Deputy Assistant Attorney General for the Office of Justice Programs within DOJ. She is currently the Deputy Associate Attorney General in the Office of the Associate Attorney General. She is sued in her individual capacity for money damages, and in her individual and official capacities for declaratory and injunctive relief.

13. During times relevant to this First Amended Complaint, defendant Timothy Beres served as Acting Director of DOJ's Office for Domestic Preparedness. On or about March 1, 2003, the Office of Domestic Preparedness became part of the Department of Homeland Security, where Mr. Beres continues to work. Defendant Beres is sued in his individual capacity for money damages, and in his individual and official capacities for declaratory and injunctive relief.

14. During times relevant to this First Amended Complaint, defendant Darrell Darnell was an employee of the Department of Justice who also worked in the Office for Domestic Preparedness. On or about March 1, 2003, the Office of Domestic Preparedness became part of the Department of Homeland Security, where defendant Darnell now works in the Infrastructure Protection Division. Defendant Darnell is sued in his individual capacity for money damages, and in his individual and official capacities for declaratory and injunctive relief.

15. The true names and capacities of the individual defendants sued as Unknown Employees or Agents of the DOJ and Unknown Employees or Agents of the FBI are unknown to the plaintiff. On information and belief, plaintiff alleges that such defendants are legally responsible for each of the acts and/or omissions causing the claimed damages. The identities of the Unknown Employees or Agents of the DOJ and Unknown Employees or Agents of the FBI defendants will be determined after a reasonable opportunity for discovery. At all times relevant to this Complaint said defendants were acting under color of legal authority and in their official capacities as employees of the DOJ or agents of the FBI. Said defendants are sued in their individual and official capacities.

16. Defendant FBI is a federal agency within the meaning of 5 U.S.C. § 552a(a)(1).

17. Defendant DOJ, the parent agency of Defendant FBI, is also a federal agency within the meaning of 5 U.S.C. § 552a(a)(1).

## FACTS

18. The following facts are alleged on information and belief:

**The Anthrax Attacks and the Early Phase of the Investigation**

19. In October 2001, the nation learned that someone had mailed letters containing the deadly pathogen anthrax to members of the press and to two United States senators. These letters were apparently dropped in a postal box in Princeton, New Jersey, with the letters to the media mailed on or about September 18, 2001, and those to Senators Thomas A. Daschle and Patrick J. Leahy mailed on or about October 9, 2001. Five people died, many others took ill, and panic seized the nation as a result of the anthrax mailings.

20. In November 2001, the FBI released "linguistic and behavioral assessments" – more commonly known as a "profile" – of the anthrax killer. (The FBI assumed there was only one.) This first and only official profile hypothesized that he was likely to be (among other things) an adult male who had access to laboratory equipment, was comfortable working with hazardous material, had access to a source of anthrax, and knew how to refine it. The FBI's profile was very influential in shaping the investigation. It created a relatively narrow universe of persons to investigate, numbering perhaps in the hundreds. In keeping with the profile, the FBI began interviewing hundreds of scientists working in fields relating to biological weapons.

21. To prioritize the various leads that needed to be investigated, the FBI created a formal list of "persons of interest." This term – which was invented specifically for this investigation by Special Agents John Kerr and Bob Roth – was a way of classifying persons who

met one or more specific criteria that justified further investigative scrutiny. Generally speaking, the more criteria a person happened to meet, the higher that person would be on the constantly changing list. The reason a new term was invented was that the "persons of interest" list was intended by the FBI to include people who were very definitely *not* "suspects" or "subjects"; indeed, agents recognized from the start that the vast majority of "persons of interest" were innocent of any wrongdoing, and in many cases entirely above suspicion. The agents also recognized, however, that if the names of these "persons of interest" were made public, it would be bad for the investigation and even worse for the people named. Among other things, publication of someone's "person of interest" status had the potential to stigmatize and humiliate that person, subject him to a risk of physical harm, and interfere with his employment and other relationships. It could also compromise the investigation by providing the perpetrator(s) with a "roadmap" of how the investigation was proceeding, or by influencing statements made to investigators, or by helping associates of the persons of interest evade questioning. For these reasons, the "person of interest" list was designed only for internal FBI use.

22. The guidelines for classifying and prioritizing "persons of interest" were promulgated to the Amerithrax team on or about December 3, 2001. However, a few days later a follow-up memo stated, "The divisions are reluctant to add names to the "Persons of Interest" list for many reasons. . . . [T]he list is widely disseminated in the FBI and DOJ, and based on past experience, there is a probability that it will be leaked or accidentally fall into the hands of the national media. This would end any covert investigation into the potential people involved. This list has the potential to be a major detriment to the case, yet has no apparent investigative value."

23. Despite this prescient warning, the "persons of interest" list was compiled, maintained, and updated in the FBI's Automated Case Support computer database. Furthermore,

the FBI failed to take any precautions to restrict access to this list or to other Amerithrax records. In particular, the FBI could have implemented password protection to safeguard the "persons of interest" list and other Amerithrax records in the Automated Case Support database, but it chose not to do this. The result was that literally tens of thousands of people – hundreds of times more than had any need to know Amerithrax information – could log onto the Automated Case Support system and call up Amerithrax records.

24.     One of the FBI's many "persons of interest" was Dr. Hatfill. Although he had never worked with anthrax and knew that he probably had little to offer, Dr. Hatfill willingly cooperated with the FBI. Over several months, the FBI interviewed Dr. Hatfill several times. He volunteered to take a polygraph examination and was informed by the examiner that he had passed, indicating that he had no involvement in the anthrax mailings.

25.     As time went by without any announcement of a breakthrough in the Amerithrax investigation, a number of armchair detectives began to advance their own theories about likely perpetrators. Among these amateur investigators was Barbara Hatch Rosenberg, a professor of Environmental Science at the State University of New York, at Purchase. Professor Rosenberg published her own profile of the anthrax mailer, in which she speculated that the perpetrator not only "fit[] the FBI profile" but was also a "[m]iddle-aged American" who "[w]orks for a CIA contractor in [the] Washington, DC area," "[w]orked in USAMRIID laboratory in the past," and "[k]nows Bill Patrick and has probably learned a thing or two about weaponization from him, informally." Professor Rosenberg's "Possible Portrait of the Anthrax Perpetrator," which she published on the Internet, described Dr. Hatfill.

26.     Despite her best efforts to implicate Dr. Hatfill, Professor Rosenberg's suggestions initially fell on deaf ears at the FBI. Her profile was crudely done and implausibly specific, and

investigators knew there was no basis for many of her speculations.  In addition, FBI agents resented the unrealistic expectations she was creating for them in the public mind by spreading rumors that an arrest was imminent.  In February 2002, the FBI even took the unusual step of issuing a press release in response to Professor Rosenberg's public statements, in which the FBI stated that it had "interviewed hundreds of persons, in some instances, more than once.  It is not accurate, however that the FBI has identified a prime suspect in this case."

27.     In April 2002, Rosenberg met with another academic from New York whose expertise was even farther afield than her own:  English professor Donald Foster of Vassar College.  Professor Foster had also been submitting his theories to the FBI, where they were also falling on deaf ears.  Professor Foster's early submissions to the FBI had nothing to do with Dr. Hatfill, but he began to share Professor Rosenberg's suspicions and by April his submissions to the FBI implicated Dr. Hatfill.

28.     As the investigation wore on without an arrest, public criticism of the FBI began to mount.  On May 24, 2002, Nicholas Kristof wrote a column in *The New York Times* in which he criticized the FBI for its failure to solve the case.  In particular, Mr. Kristof criticized the FBI's failure to investigate "one middle-aged American who has worked for the United States military bio-defense program and had access to the labs at Fort Detrick, Md.  His anthrax vaccinations are up to date, he unquestionably had the ability to make first-rate anthrax, and he was upset at the United States government in the period preceding the anthrax attack."  Kristof later admitted in print that the person he was describing was Dr. Steven Hatfill.

29.     Meanwhile, Professor Rosenberg continued her efforts to finger Dr. Hatfill.  On June 18, 2002, Professor Rosenberg received an audience with members of the staffs of Senators Leahy and Daschle, the two senators to whom anthrax-laden letters were addressed.  Defendant

Van Harp, then the Assistant Director in Charge of the Washington Field Office out of which the Amerithrax investigation was based, also attended this meeting – at the insistence of Senate staff. In this meeting, Professor Rosenberg, who had no official authority, no investigative experience, and most significantly no access to the forensic tests conducted on the anthrax letters or the FBI's investigative file, made clear to the Daschle and Leahy staffs that her suspicions rested on Dr. Hatfill as the person most likely responsible for the mailings.

30.     Assistant Director Harp was openly skeptical of Rosenberg's claims during their meeting, so much so that a Senate staffer later instructed him to call Professor Rosenberg and apologize, which he did.  Harp and his superiors were anxious to placate the senators because at that time many senators had made it publicly known that they were displeased at how the FBI had handled terrorism investigations generally and the Amerithrax investigation in particular. Some had remarked that it was time to think about revoking the FBI's responsibility in investigating domestic terrorism and to consider turning those responsibilities over to another government agency.

**June 25, 2002:  The First Search of Dr. Hatfill's Apartment**

31.     Within a week of Professor Rosenberg's meetings on Capitol Hill, the FBI searched Dr. Hatfill's apartment under the white-hot glare of the national press.  On June 25, 2002, the day of the search, Dr. Hatfill had agreed to meet with FBI special agents assigned to the Washington Field Office.  The meeting was held at an office leased by the FBI in Frederick, Maryland, approximately 50 miles from Washington, D.C.  At the conclusion of the meeting, Dr. Hatfill consented to have FBI agents search his Frederick, Maryland apartment.

32.     After Dr. Hatfill consented to the search, he and the FBI special agents drove to the apartment, a drive of less than ten minutes.  Almost immediately, Dr. Hatfill's apartment

complex was surrounded by news helicopters and television vans filming the search. According to one FBI agent on site at the time, the camera crews came from Washington and Baltimore, and arrived so quickly that it was obvious they had been tipped off in advance of the search by someone who knew that the FBI had planned a search for that day.

33.     This was not the way that consensual searches are ordinarily handled by the FBI, and it was not the way Dr. Hatfill had been told the search would be conducted. In fact, it was a remarkable departure from sound investigative practice, which dictates as much secrecy as possible regarding planned searches so as not to alter the behavior of any potential subjects of an investigation, or to alert them to the nature of the evidence investigators may be collecting. In addition, such a public display violates the privacy interests of the person whose premises are being searched, creating a strong possibility for stigmatization, humiliation, and even risk of physical injury.

34.     The search of Dr. Hatfill's apartment was televised live on network and cable news channels. Although the FBI had spoken to hundreds of scientists in the Amerithrax investigation, and had searched many scientists' homes with their consent, this was the first time that the name of any of these scientists had been purposely leaked to the media.

35.     Live television coverage of the June 25, 2002 search generated a huge number of follow-up articles in which Dr. Hatfill's name was consistently and disparagingly linked with the anthrax investigation. These follow-up articles often contained new details about the investigation that were themselves leaked in violation of the Privacy Act. In this way, each leak seemed to lead to additional leaks.

36.     It would be not just pointless but hopeless to try to catalog here all of the relevant news reports published during this period that appear to contain illegal disclosures, but they include at least the following:

a.   Brian Ross (reporting), ABC News, *World News Tonight*, "FBI may have lead in connection with anthrax scare," June 25, 2002 broadcast;

b.   Brian Ross (reporting), ABC News, *Good Morning America*, "FBI searches scientist's home in Maryland looking for connection to anthrax mailings; FBI questions man who may have lived with two of September hijackers," June 26, 2002 broadcast;

c.   David Kestenbaum (reporting), National Public Radio, *Morning Edition*, "Ongoing investigation into the anthrax that was released in the US last fall," June 26, 2002 broadcast;

d.   Brian Ross (reporting), ABC News, *World News Tonight*, "FBI looking into government scientist who wrote report describing an anthrax attack carried out through mail," June 27, 2002 broadcast;

e.   Gretchen Parker, *Associated Press*, "Spokesman: Bio researcher whose home was searched commissioned 1999 anthrax mail attack study," June 27, 2002;

f.   Scott Shane, *Baltimore Sun*, "Scientist theorized anthrax mail attack; FBI searched apartment of expert linked to study," June 27, 2002;

g.   Dave Altimari, Jack Dolan, and David Lightman, *Hartford Courant*, "The case of Dr. Hatfill: Suspect or pawn; FBI scrutiny of the ex-Army microbiologist intensifies in its anthrax probe, and speculation grows about why the agency is looking at him," June 27, 2002

h. Dave Altimari and Jack Dolan, *Hartford Courant*, "Hatfill teaching bioterrorism course; Scientist in FBI anthrax probe works for government-funded program," June 28, 2002;

i. Nicholas D. Kristof, *New York Times*, "Anthrax? The F.B.I. Yawns," July 2, 2002;

j. Nicholas D. Kristof, *New York Times*, "The Anthrax Files," July 12, 2002; and

k. Nicholas D. Kristof, *New York Times*, "Case of the Missing Anthrax," July 19, 2002.

37. Importantly, the leaked information was frequently wrong by the time it appeared in news stories, though plaintiff is unable to say whether the factual errors arose during the leaking or whether the information is wrong in the government's records. However, on information and belief plaintiff alleges that DOJ and FBI records contain some version of each of the following facts or purported facts, all of which can be retrieved by the name of Dr. Hatfill or by some identifying particular assigned to Dr. Hatfill, and all of which were disclosed to the press during this period:

a. that the FBI searched Dr. Hatfill's apartment on June 25, 2002;

b. that Dr. Hatfill consented to the search of his apartment;

c. that "evidence" was removed from Dr. Hatfill's apartment;

d. the results of the search of Dr. Hatfill's apartment;

e. that Dr. Hatfill was a former government scientist who used to work in the biological weapons defense program at Fort Detrick;

f. that Dr. Hatfill worked for the National Institutes of Health;

g. that Dr. Hatfill was a "person of interest" in the anthrax investigation;

h. that the FBI had interviewed Dr. Hatfill as early as December 2001;

14

i.   that the FBI had Dr. Hatfill under scrutiny;

j.   that Dr. Hatfill had or may have had access to anthrax while working at Fort Detrick;

k.   that Dr. Hatfill attended medical school in Zimbabwe/Rhodesia;

l.   that Dr. Hatfill may have lived in or near a town, suburb, or school known as "Greendale" while attending medical school;

m.  that the FBI was looking closely at a 1999 bioweapons report about mailed anthrax that was commissioned by Dr. Hatfill from a leading bioweapons expert;

n.   that the amount and quality of anthrax used in the Leahy and Daschle letters were similar to what was described in the 1999 report;

o.   that the FBI searched a storage shed maintained by Dr. Hatfill in Ocala, Florida;

p.   that the FBI removed boxes from a refrigerated storage facility rented by Dr. Hatfill;

q.   that Dr. Hatfill's security clearance expired and was never renewed;

r.   whether Dr. Hatfill is or is not considered a suspect;

s.   that the FBI searched Dr. Hatfill's car; and

t.   that Dr. Hatfill possesses the expertise to handle deadly pathogens.

38.     In addition, the leaks seem to have emboldened some armchair detectives who were telling the FBI what to do rather than asking the FBI what it was doing.  For example, Nick Kristof wrote three more op-ed pieces about the Amerithrax investigation in July, which contained fresh falsehoods about Dr. Hatfill and which were critical of the FBI – mostly for not investigating Hatfill quickly enough or thoroughly enough.

**August 1, 2002:  The Second Search of Dr. Hatfill's Apartment**

39.     In May 2002, Dr. Hatfill had secured a position as associate director of the

National Center for Biomedical Research and Training at Louisiana State University in Baton

Rouge.  He was hired to train state and local first responders to identify and react to biological

attacks.  His appointment was effective July 1, 2002.

40.     According to press reports, in late July 2002, FBI agents observed Dr. Hatfill

throwing trash into a dumpster outside of his apartment building.  This activity was natural

enough for a man who was packing and preparing to move to his new job in Baton Rouge, and as

such should not have aroused any suspicions.  Though investigators had found nothing of interest

during the first search, Dr. Hatfill's trip to the trash apparently heightened their interest in him and

motivated them to search his apartment again.

41.     In late July 2002, FBI Supervisory Special Agent Bob Roth phoned Dr. Hatfill

and requested an interview with him.  Dr. Hatfill referred the request to his civil attorney, Victor

M. Glasberg.  Mr. Glasberg called Special Agent Roth immediately and left a voicemail

indicating that Dr. Hatfill would happily cooperate, as he had previously when the FBI had

requested to interview him, administer a polygraph examination, and search his home and other

property.  Mr. Glasberg suggested an interview on August 5, 6, or 7. Though he received the

message, Special Agent Roth never responded to it.

42.     Instead, government agents obtained a search warrant, and on August 1, 2002,

they once again searched Dr. Hatfill's Frederick apartment.  Despite the media circus that their

June 25 search had become, and despite the increased interest from news organizations which the

June 25 search had generated, the FBI followed essentially the same game plan for the August 1

search.  Once again, the news media were there to cover the search as it happened.  Once again,

someone who was privy to the FBI's search plan had tipped off major news organizations in advance of the search.

43.     Upon learning from Dr. Hatfill that the search was underway, Mr. Glasberg phoned Special Agent Roth to ask why he had ignored his voicemail message offering to cooperate.  Special Agent Roth acknowledged listening to the phone message, but contended he did not understand the offer of cooperation.  Mr. Glasberg requested that Special Agent Roth save the voicemail message to settle the issue of its content.  Special Agent Roth refused to guarantee the safekeeping of the voicemail.  Mr. Glasberg then wrote to Mr. Kenneth Kohl, the Assistant United States Attorney for the District of Columbia assigned to the anthrax investigation, to alert him to the situation and request the voicemail message be secured.  Mr. Kohl never responded to Mr. Glasberg's letter.  Dr. Hatfill does not know whether the government preserved or destroyed this evidence.

44.     Following the August 1, 2002, it was widely reported that the search had been conducted pursuant to a search warrant, and that agents had sought a search warrant because Dr. Hatfill had refused to consent to a second search.  Debra Weierman, media representative in the FBI's Washington Field Office, admits that she revealed this information to the press. According to Weierman, someone in the Washington Field Office specifically authorized her to reveal the existence of the search warrant.

**The Leaks Cost Dr. Hatfill His Job**

45.     On August 1, 2002, defendant Darrell Darnell was sitting in his office in DOJ's Office of Domestic Preparedness, watching television, when he saw the second search of Dr. Hatfill's apartment being broadcast live on cable news channels.  Part of Darnell's job was to

oversee a government-funded program at Louisiana State University to provide training to first responders about incidents involving biological weapons (hereafter the "LSU First Responder Training Program"). He was aware, and had been aware since at least June of that year, that Dr. Hatfill had been hired to provide that training. After seeing the August 1 search broadcast live on television, defendant Darnell telephoned Dr. Steven Guillot at LSU and ordered Guillot to remove Dr. Hatfill from the LSU First Responder Training Program. At that time, Dr. Hatfill had not been arrested, he had not been charged and, according to official statements made by law enforcement officials, he was not even a suspect in the anthrax investigation. Darnell took this action because he thought his office "would look sort of foolish" if the public learned that one part of DOJ was investigating Dr. Hatfill while another part was using him "on a project that was if not directly at least tangentially related to what was occurring on the television."

46.     This was not, of course, the first time that Dr. Hatfill's apartment had been searched on national television. Nor was it the first time that the FBI had shown investigative interest in any of the instructors who were hired to perform work funded by the Office of Domestic Preparedness. On the contrary, defendant Darnell has testified that "because of the nature of the courses that we were working on, practically everybody that we worked with at Dugway Proving Ground, at LSU, with the Department of Agriculture, those scientists were being interviewed and investigated and taking polygraphs from the FBI." The difference this time was simply and solely that the press was reporting that the search had been conducted pursuant to a warrant.

47.     Meanwhile, defendant Tracy Henke also watched televised coverage of the search of Dr. Hatfill's apartment. She called Darnell to tell him that she wanted him to call LSU and have Dr. Hatfill removed from the LSU First Responder Training Program. Darnell informed

her that he had already done so.  Henke informed her boss, Assistant Attorney General Deborah

Daniels, about the decision to remove Hatfill; Daniels (who could have countermanded the

order) approved of the removal.

48.     After discussing Dr. Hatfill's termination from the LSU First Responder Training

Program with Darnell and defendant Timothy Beres, Acting Director of the Office of Domestic

Preparedness, defendant Henke directed Beres to send an e-mail to LSU to confirm the

instruction to remove Dr. Hatfill.  Beres confirmed Darnell's instructions by e-mail to Dr. Guillot,

Dr. Hatfill's boss.  Defendant Beres wrote:  "I want to reiterate that the Office of Justice

Programs/Office for Domestic Preparedness directs that the Louisiana State University Academy

of Counter-Terrorist Education immediately cease and desist from utilizing the subject matter

expert and course instructor duties of Steven J. Hatfill on all Department of Justice funded

programs."  As Dr. Hatfill had been hired specifically for these duties, DOJ was effectively

ordering the employer of a presumptively innocent Dr. Hatfill to terminate him from his

employment.  In fact, the Provost of LSU admitted that the Justice Department's edict effectively

ended Hatfill's employment at LSU because he was hired to run the entire program that was

almost entirely funded by federal grants.  No one within the Department of Justice, including

Assistant Attorney General Daniels and at least two Assistant United States Attorneys who were

notified of this action, ever expressed any disagreement with or regret about DOJ's directive to

remove Dr. Hatfill from the program.

49.     The next day, August 2, 2002, having received its order from the Department of

Justice, LSU placed Dr. Hatfill on 30-day administrative leave.  Dr. Hatfill was not informed of

the basis for this decision, nor given an opportunity to challenge it.  At the end of the 30-day

period Dr. Hatfill was terminated, still without having been officially advised of the basis for this decision nor provided an opportunity to appeal.

**Life as a Person of Interest**

50.     Although Dr. Hatfill's removal from the federally funded grant at LSU remained unknown to the press for a few weeks, almost every other facet of Dr. Hatfill's life was laid bare during the weeks following the August 1, 2002 search of his apartment.  This new and more damaging wave of coverage followed essentially the same pattern as its predecessor:  a big leak generated a plethora of follow-up stories, and many of the follow-ups contained brand new leaks.

51.     In the wake of the media circus *redux* that followed the August 1 apartment search, defendant Ashcroft personally joined the ranks of those who publicly stigmatized Dr. Hatfill by illegally disclosing sensitive information about Hatfill's status in the investigation.  On August 6, 2002, Mr. Ashcroft appeared on some morning television shows.  On CBS's "The Early Show," Mr. Ashcroft identified Dr. Hatfill as "a person of interest" in the Amerithrax investigation.  On NBC's "Today Show," Mr. Ashcroft stated that Dr. Hatfill was "a person that – that the FBI's been interested in" in its investigation.

52.     At the time he made these disclosures, defendant Ashcroft knew that the term "person of interest" was a term of art in the Amerithrax investigation because he had been briefed about the "persons of interest" list.  He also knew that whether someone was a "person of interest" was not a subjective judgment but rather an official status that was based on specified guidelines and was duly recorded in records that are maintained in the FBI's Automated Case Support system of records.  Attorney General Ashcroft's willful and intentional disclosure of the

fact that Dr. Hatfill was considered a "person of interest" therefore violated Dr. Hatfill's rights under the Privacy Act.

53.     More fundamentally, however, defendant Ashcroft's use of this unfamiliar term – without any attempt to explain what it meant or to warn the press away from considering it as an indicator of complicity in the anthrax attacks – was unfathomably irresponsible.  During his public appearances, Mr. Ashcroft could have truthfully explained that the "persons of interest" category was invented for the express purpose of describing people who had relevant information but were in all likelihood innocent.  Mr. Ashcroft could have truthfully stated that Dr. Hatfill had fully cooperated in all phases of the FBI's investigation.  Mr. Ashcroft could have truthfully explained that it would be natural for the FBI to interview (and seek consent to search from) anyone with Dr. Hatfill's expertise, as it had with dozens of other eminent scientists.  Mr. Ashcroft could have truthfully stated that the FBI had no evidence whatsoever linking Dr. Hatfill to the anthrax mailings.  Mr. Ashcroft could have truthfully stated that Dr. Hatfill was presumed innocent and that the FBI's interest in continuing to talk to him should not lead anyone to conclude that Dr. Hatfill had any involvement in the anthrax attacks.  Mr. Ashcroft elected not to speak any of these truths.

54.     In addition, defendant Ashcroft's singling out of Dr. Hatfill as the *only* person so identified was fundamentally unfair to Dr. Hatfill in light of the fact that there were, had been, and would be many other persons of interest during the course of the investigation.  In fact, federal law enforcement officials consistently refuse to provide the names of other such persons of interest, claiming that such information is extremely sensitive, is compiled for law enforcement purposes, and is privileged from disclosure.  Even if there had been any defensible public purpose in disclosing this information at all in reference to Dr. Hatfill, then surely the

information disclosed should have been not merely true, but true and complete, as required by the Privacy Act. Defendant Ashcroft violated this requirement of the law.

55. Finally, in light of the journalistic feeding frenzy that his own agency had created, Mr. Ashcroft could and should have decried the fact that the name of a presumptively innocent American citizen had been leaked, unethically and illegally, to the press, subjecting that citizen to enormous public suspicion, if not scorn and hatred. Indeed, under the circumstances of post-9/11 America, any fair-minded individual might have expressed concern for Dr. Hatfill's personal safety, taken the news media to task for their recklessness, and castigated his subordinates for setting this sequence of events in motion. Instead, Mr. Ashcroft abdicated his duty to condemn the leaks. Worse, he abdicated his duty to stop the leaks and, in so doing, he encouraged his subordinates to provide the deluge of leaks that was to come.

56. As with earlier news reports containing illegal disclosures, it is impossible to catalog here all of the relevant news reports published during this period that appear to contain illegal disclosures, but they include at least the following:

a. Kelli Arena (reporting), CNN, *Newsnight with Aaron Brown*, "Anthrax Investigation Focuses on One Man; Two Americans Go Home in Caskets After Jerusalem Bombing; California Teens Are Rescued From Abduction," August 1, 2002 broadcast;

b. Kelli Arena, CNN, "FBI searches apartment in anthrax probe," August 1, 2002;

c. Kelli Arena (reporting), *CNN Live on Location*, "Washington-area Scientist's Residence Searched," August 1, 2002 broadcast;

d. P. Mitchell Prothero, *United Press International*, "FBI searches home in anthrax case," August 1, 2002;

22

e. Frank D. Roylance, *Baltimore Sun*, "Scientist's rooms searched again; Anthrax investigators focus on researcher who worked at Fort Detrick," August 2, 2002;

f. Josh Meyer and Megan Garvey, *Los Angeles Times*, "FBI returns to Md. Home in Anthrax Probe; Inquiry: Agents spend several hours in a second search of a former Army scientist's apartment," August 2, 2002;

g. Eric Rosenberg, *The Times Union* (Albany, N.Y.), "Apartment a focus in anthrax inquiry," August 2, 2002;

h. Pete Williams (reporting), CNBC, *The News with Brian Williams*, "FBI re--searches Dr. Steven Hatfill's apartment," August 5, 2002 broadcast; and

i. Dan Abrams, MSNBC, *The Abrams Report*, "FBI Goes to Israel to Investigate Terror Attack; Man Convinces Judge to Stop His Ex--Girlfriend From Having an Abortion; Interview With Tamara Brooks, Jackie Marris," August 5, 2002 broadcast.

57. On information and belief, plaintiff alleges that DOJ and FBI records contain some version of each of the following facts or purported facts, all of which can be retrieved by the name of Dr. Hatfill or by some identifying particular assigned to Dr. Hatfill, and all of which were disclosed to the press during this period:

a. that the FBI searched Dr. Hatfill's apartment on August 1, 2002;

b. that the June 25, 2002 search was consensual but the August 1, 2002 search was conducted pursuant to warrant;

c. that the search warrant was based on new information in the case;

d. that Dr. Hatfill refused to consent to the August 1, 2002 search;

e. that the FBI also searched the residence of a friend of Dr. Hatfill;

f.   that Dr. Hatfill was a person of interest;

g.   that Dr. Hatfill was a potential suspect;

h.   that the FBI interviewed and polygraphed Dr. Hatfill;

i.   that Dr. Hatfill worked at Fort Detrick until 1999;

j.   that Dr. Hatfill had access to the Ames strain of anthrax at Fort Detrick;

k.   that Dr. Hatfill worked with a Pentagon contractor;

l.   that Dr. Hatfill lost his security clearance;

m.   that Dr. Hatfill's polygraph results were inconclusive;

n.   that the FBI was searching for traces of anthrax on June 25, but was searching for something else on August 1;

o.   that the FBI searched trash bins outside Dr. Hatfill's apartment;

p.   that some sources were calling Dr. Hatfill a potential suspect but he was not an official suspect;

q.   that Dr. Hatfill was fired from his job at S.A.I.C. in March 2002;

r.   that SAIC colleagues claimed to have seen him remove biological material carriers from the facility;

s.   that investigators armed with a search warrant also returned to Dr. Hatfill's rented storage facility in Ocala, Florida;

t.   that Dr. Hatfill fit the FBI's profile of the anthrax mailer in some respects but not in others;

u.   that the FBI had become far more suspicious of Dr. Hatfill;

v.   that the FBI used bloodhounds to investigate Dr. Hatfill;

24

w.  that specially trained bloodhounds showed reactions to scents at Dr. Hatfill's apartment and the apartment of his girlfriend;

x.  that the bloodhounds did not show any reaction at places associated with dozens of other people the FBI was investigating;

y.  that one of the bloodhounds ran over to Dr. Hatfill and was practically sitting in his lap; and

z.  that the dogs' reactions were used as the basis for the warrant to search Dr. Hatfill's apartment.

**Dr. Hatfill Tries to Salvage His Name and Reputation**

58.  On Sunday, August 11, 2002, Dr. Hatfill made his first public statement. He did so reluctantly, and only because the unrelenting media fire storm fueled by government leaks was destroying his life. Dr. Hatfill declared publicly what he had told investigators repeatedly – that he had nothing to do with the anthrax attacks.

59.  Dr. Hatfill tried to set the record straight and correct the misinformation being disseminated by the defendants. He explained that he had cooperated all along with investigators. He had sat for several interviews and a polygraph test, which he had been told he passed. Afterward, FBI officials informed Dr. Hatfill that he was not a suspect. Dr. Hatfill explained the renewed interest in him after the Rosenberg meeting on Capitol Hill; and he explained that he had consented to FBI requests to search his apartment, car, and other belongings.

60.  Dr. Hatfill described his shock and dismay at discovering the media events at the searches of his apartment. He explained that he had never worked with anthrax, that he did not have a current inoculation against anthrax, and that his expertise was not bacteriology (which

encompasses the study of anthrax), but in virology.  Finally, Dr. Hatfill challenged the

government to stop the campaign of media leaks that were destroying his life by unfairly and

falsely conveying that he had committed the anthrax attacks.

61.     The news media, not surprisingly, covered Dr. Hatfill's public statement

extensively.  But the bell could not be unrung, and inevitably many of these same reports

contained new leaks of information protected by the Privacy Act, dutifully solicited by the

reporters and willingly provided by federal investigators who were anxious to have the public

believe that they were making progress in solving the anthrax case.

62.     In one particularly offensive case, *Newsweek* published a single story containing

all of the following disclosures:

    a.  FBI agents gave bloodhounds "scent packs" lifted from the anthrax-laden envelopes

        sent to Senators Daschle and Leahy (after decontaminating them) and brought the

        dogs to locations frequented by a dozen people they considered possible suspects;

    b.  in place after place, the dogs had no reaction, but "[t]hey went crazy" when they

        approached Dr. Hatfill's apartment;

    c.  the dogs also jumped and barked at the apartment of Dr. Hatfill's girlfriend, and at a

        Denny's where Dr. Hatfill had eaten the day before;

    d.  the dogs' reaction led agents to believe they were on the verge of a breakthrough;

    e.  the government suspended Dr. Hatfill's security clearance after he failed questions on

        a polygraph exam he took while applying for a job at the CIA;

    f.  agents surveilling Dr. Hatfill's apartment watched him pitch loads of his belongings

        into a dumpster, and wondered whether he were getting rid of evidence;

g.  the dogs and the dumpster incident led agents to obtain a criminal search warrant for Dr. Hatfill's apartment, "to turn up the heat";

h.  when the agents brought the dogs to Dr. Hatfill's apartment, one of them excitedly bounded right up to him;

i.  Dr. Hatfill was one of around 12 people investigators were "looking at";

j.  investigators were being "very careful" to say that Dr. Hatfill was not a suspect or a target because "[t]he Bureau [was] still haunted by its botched investigation of Richard Jewell, the falsely suspected Olympic bomber who was all but convicted in the press by anonymous leaks from government agents, who were sure he was guilty";

k.  Dr. Hatfill had received prescriptions for Cipro (the antibiotic famously used to treat anthrax cases in the weeks after the anthrax mailings) from his doctor; and

l.  the hard drive of Dr. Hatfill's computer contained a draft novel centered on a fictional bioterror attack.

Defendant Harp willfully and intentionally confirmed these factual assertions in a telephone call with Eleanor Clift of *Newsweek,* telling her that the article contained "pretty accurate information."

63.     Not even the Attorney General would mend his ways.  On August 22, 2002, during a press conference at the Peter Rodino Federal Building in Newark, New Jersey, Mr. Ashcroft tarred Dr. Hatfill a third time as "a person of interest to the Department of Justice."

64.     As noted above, many of the reports based on the defendants' leaks were in fact incorrect – muddled either in the leaking or in the reporting, but muddled in any event.  When these inaccuracies tended to make the FBI or the Department of Justice look bad, FBI and DOJ

officials actively sought out reporters and attempted to place the agencies in a better light, sometimes disclosing additional information that should, according to the Privacy Act, have been protected from disclosure.  However, FBI and DOJ officials never sought out reporters to correct reports about Dr. Hatfill that they knew to be false.  On the contrary, on various occasions when the press criticized the defendants' treatment of Dr. Hatfill, the defendants responded by leaking additional information that was expressly designed to justify their treatment of Dr. Hatfill.  On no occasion did FBI or DOJ officials make any attempt to correct aspects of news reports that might falsely or misleadingly suggest that Dr. Hatfill was responsible for the anthrax mailings.

65.      A partial list of other news reports published during this period that appear to contain illegal disclosures includes at least the following:

a.   Brian Ross (reporting), ABC News, *World News Tonight*, August 11, 2002 broadcast;

b.   Brian Ross (reporting), ABC News, *World News Tonight with Peter Jennings*, "Anthrax Investigation FBI Has Questions For Hatfill," August 12, 2002 broadcast;

c.   Lisa Getter and Josh Meyer, *Los Angeles Times*, "Scientist Angrily Denies Role in Anthrax Attacks; Investigation: Steven J. Hatfill denounces FBI for its handling of his case.  He is not an official suspect, but a 'person of interest,' bureau says," August 12, 2002;

d.   Mark Miller and Daniel Klaidman, *Newsweek*, "The Hunt for the Anthrax Killer," August 12, 2002;

e.   Mark Miller, *Newsweek*, "A 'Person of Interest,'" August 12, 2002; and

f.   Nicholas D. Kristof, *New York Times*, "The Anthrax Files," August 13, 2002.

66.      On information and belief, plaintiff alleges that DOJ and FBI records contain some version of each of the following facts or purported facts, all of which can be retrieved by

the name of Dr. Hatfill or by some identifying particular assigned to Dr. Hatfill, and all of which were disclosed to the press during this period:

    a.   investigative theories about whether Dr. Hatfill had a motive for taking some kind of revenge on the government;

    b.   investigative theories about whether Dr. Hatfill could make weaponized anthrax;

    c.   that Dr. Hatfill was in England at the time an anthrax hoax letter was sent to Senator Daschle from England;

    d.   that Dr. Hatfill was attending a United Nations-sponsored bioweapons training session while he was in England;

    e.   that the FBI has aggressively investigated Dr. Hatfill;

    f.   that the FBI has investigated Dr. Hatfill more extensively than anyone else;

    g.   that the FBI found an unusual type of glove, as well as other items they associated with laboratory paraphernalia, in Dr. Hatfill's dumpster;

    h.   that testing for anthrax on the glove and laboratory paraphernalia was negative;

    i.   that Dr. Hatfill agreed to take a polygraph test and the examiner told him he passed;

    j.   that some agents were suspicious of Dr. Hatfill in part because of his apparently padded résumé;

    k.   that some agents were suspicious of Dr. Hatfill in part because of comments he had made about the dangers of biological attacks against the United States;

    l.   that Dr. Hatfill "boasted" of having fought with the Selous Scouts;

    m.   that Dr. Hatfill received his medical degree from the University of Zimbabwe;

    n.   that Dr. Hatfill did post-graduate work in South Africa;

o.   that Dr. Hatfill once lived near a neighborhood in Harare, Zimbabwe, known as
     "Greendale";

p.   the so-called "bloodhound evidence" described in paragraph 62;

q.   that the bloodhound evidence does not justify an arrest warrant for Hatfill, but
     provides a lead that cannot be overlooked;

r.   that the government suspended Dr. Hatfill's security clearance;

s.   that agents surveilling Dr. Hatfill's apartment watched him pitch loads of his
     belongings into a dumpster, and wondered whether he were getting rid of evidence;

t.   that the dogs and the dumpster incident led agents to obtain a criminal search warrant
     for Dr. Hatfill's apartment, "to turn up the heat";

u.   that Dr. Hatfill had received prescriptions for Cipro (the antibiotic famously used to
     treat anthrax cases in the weeks after the anthrax mailings) from his doctor;

v.   that the hard drive of Dr. Hatfill's computer contained a draft novel centered on a
     fictional bioterror attack;

w.   that Dr. Hatfill was a "person of interest";

x.   that Dr. Hatfill had failed polygraphs; and

y.   that Dr. Hatfill had canceled plans for a polygraph in late July or early August.


**Retaliation and Harassment**

67.     Unfortunately, in the aftermath of Dr. Hatfill's public statement, the steady stream
of leaks from the defendants' records was no longer Dr. Hatfill's only problem.  During the
period when the illegal leaks were most frequent and most damaging, the defendants went out of

their way to make their investigation of Dr. Hatfill as conspicuous to the general public as possible. They did this not only through the illegal leaks themselves, but with highly public actions that implicitly communicated a strong suspicion of Dr. Hatfill's guilt.

68.     For example, immediately after Dr. Hatfill's public statement, federal investigators began showing a single photo of Dr. Hatfill to residents of Princeton, New Jersey in the hope that someone would place him at the scene of the anthrax mailings. The presentation of a single photo instead of an array of photos, in dereliction of FBI protocol, is so unfairly suggestive – particularly during a week in which Dr. Hatfill's face appeared frequently on television and in major newspapers and magazines – that no criminal investigator could reasonably believe it to have a proper law enforcement function. Instead, it was designed to punish Dr. Hatfill, stigmatize him as the culprit, and yield public relations fodder for the government by providing an opportunity to leak to the media that Dr. Hatfill had been "identified" as being present in Princeton. However, even under those grossly suggestive conditions, not one credible witness claimed to have seen Dr. Hatfill in Princeton. (In fact, Dr. Hatfill has never been to Princeton, New Jersey.)

69.     Also in August 2002, FBI agents approached Virginia Patrick – a friend of Dr. Hatfill's and the wife of bioweapons expert William C. Patrick – as she was shopping. The agents requested that she return to her home with them immediately. When they arrived there, the agents told her that Dr. Hatfill was the anthrax killer, that they had a "smoking gun" to prove it, and that the "smoking gun" was that bloodhounds had identified Dr. Hatfill has the murderer. When Mrs. Patrick told the agents she didn't believe them, and mentioned offhandedly that she would like to see the bloodhounds in action, the agents immediately took her up on her offer, and within minutes dog handlers and their dogs were on her property. It was obvious to her that the

31

dogs and handlers had been stationed nearby for the express purpose of providing her with a demonstration.

70.     In addition, for many months the defendants subjected Dr. Hatfill to "surveillance" that was so conspicuous as to be inconsistent with any genuine desire to obtain useful evidence.  This was not true surveillance in the proper sense, *i.e.,* covert observation to detect criminal behavior or evidence of a crime.  Instead, the defendants subjected Dr. Hatfill to *faux* surveillance – a constant, in-your-face government presence that could have no other purpose than to punish and harass.  These activities, together with the sheer number of press leaks, demonstrate beyond a doubt that the defendants' public stigmatization of Dr. Hatfill was undertaken willfully and intentionally, and was in no way inadvertent.

**Selective Leaking as a Conscious Strategy for Deceiving the Public**

71.     The defendants knew by this time that if they wanted to mislead the public with half-truths that cast Dr. Hatfill in a bad light, they would always be able to find an overly credulous reporter to spread the misinformation far and wide.  A clear example of the defendants' conscious reliance on such a pre-planned leak strategy arose out of the LSU debacle.

72.     DOJ's insistence that Dr. Hatfill be removed from the LSU First Responder Training Program had not been reported by the press when it happened on August 1, 2002.  However, on or about September 4, 2002, newspapers reported that Dr. Hatfill had lost his job at LSU because of DOJ's directive that he be removed from all DOJ-funded programs there.  Later that day, DOJ officials learned that the *Washington Post* was planning an editorial that was expected to be hostile to the DOJ's apparent decision to have Dr. Hatfill terminated without proof that he did anything wrong.  DOJ Director of Public Affairs Barbara Comstock

characterized the potential for negative press exposure as "somewhat of an emergency," and sent "May Day" e-mails about the matter to very senior DOJ officials.

73.     According to defendant Henke, the Department of Justice does not comment publicly on specific personnel decisions because of confidentiality concerns.  Nonetheless, for a little more than three hours on the afternoon and evening of September 4, some of DOJ's most senior officials carried on a remarkable correspondence about the statement DOJ should release to counter this negative coverage.  In addition to Comstock, the e-mail chain included (among others) Assistant Attorney General Daniels, Assistant Attorney General Michael Chertoff, Deputy Deputy Attorney General Christopher Wray, Deputy Assistant Attorney General Alice Fisher, and the Attorney General's own Chief of Staff and Deputy Chief of Staff, David Ayres and David Israelite.  Instead of simply stating truthfully that they had terminated Dr. Hatfill because their own public relations instincts had been much stronger than their commitment to every citizen's presumption of innocence, DOJ officials considered various pretextual justifications they knew to be false.  Eventually, at 8:08 pm that evening, DOJ would release a "Statement of Deborah Daniels, Assistant Attorney General for the Office of Federal Programs." As that statement was nearing completion, Ms. Comstock observed, "[W]e don't in any way answer 'why' we did this, just say we CAN."  Assistant Attorney General Daniels replied, "We don't think you need to address that in this written statement.  They will follow up anyway, and then someone can tell them that it would have been disruptive to the program and conducive to a learning environment; possibly could have cast program into disrepute if he turned out to be in fact the anthrax terrorist . . . ."  None of the thirteen DOJ officials who received this e-mail ever expressed any disapproval of this deceptive, abusive, and illegal press strategy.  None ever told Daniels that whatever DOJ had to say on the matter ought to be included in the official

33

statement.  None ever told her that DOJ officials should not be giving the public one story for official attribution and another story (or stories) in a pre-planned, not-for-attribution leak.  None ever told her that an attorney, let alone an assistant attorney general, should know better than to speculate in anonymous background conversations with reporters that an uncharged individual might "turn[] out to be in fact the anthrax terrorist."

74.     This was far from the last time the defendants resorted to a mixture of on-the-record and off-the-record disclosures to create press accounts that combined "ho hum" facts with explosive speculations.  On January 9, 2003, the actual facts reported by ABCNEWS.com were primarily that there was no physical evidence against Dr. Hatfill and that a recent search of a pond near Frederick, Maryland had turned up "nothing of any significance."  But the *headline* – "Anthrax Probe Zeroes in on Scientist" – owed its very different slant to the anonymous comments of "several officials who attended a recent [domestic terrorism] task force summit meeting in Washington."  Those officials told ABC that Dr. Hatfill was "the man most likely responsible" for the anthrax attacks and that "we may have enough right now to get an indictment but we don't have anywhere near enough to get a conviction."  Despite the fact that the pond search had turned up "nothing of any significance," one anonymous official felt free to say "the search was triggered by credible information that Hatfill may have disposed of laboratory equipment in the ponds and that additional dives are planned."  Finally, ABCNEWS reported that "[o]fficials attending the meeting" said that FBI agents are planning to interview other persons of interest in an "attempt to rule out anybody else who has come across our radar . . . so we can focus entirely on Hatfill."

75.     Similarly, on May 8, 2003, CBSNEWS.com expressly drew the distinction between the public and non-public information coming out of the FBI.  "Publicly, not much at all

has happened in the FBI's anthrax investigation since the search last winter of a small pond in

upper Maryland.  Divers went to the bottom but came up empty handed.  Privately, however,

agents say it would only have been icing on the cake because they believe they already have their

man," referring to Dr. Hatfill.  The report also noted that sources suggested "the government may

take the unusual step of bringing charges against Hatfill unrelated to the anthrax attacks at all, if

they become convinced that's the only way to prevent future incidents."  This was characterized

as an Al Capone-style tactic.  Remarkably, when this report was broadcast on the *CBS Evening

News,* Assistant Director Harp actually told CBS on the record that the government had "made

progress" in the case against Hatfill, but that "It's frustrating that it took so long."

    76.    On May 11, 2003, a front-page *Washington Post* article was littered with FBI

and/or DOJ leaks regarding evidence, theories, and future investigative plans in the anthrax case.

Specifically, the leaks centered on items the FBI discovered in a search of a pond in Frederick,

Maryland (based on a tip, FBI sources leaked), and government plans to drain the pond. "These

investigators contend that the water theory is the result of the FBI's interest in one subject,

Steven J. Hatfill," the *Post* reported.

    77.    These rampant leaks reflect the efforts of DOJ and FBI personnel to keep Dr.

Hatfill at the center of the tempest.  More fundamentally, identification of the pond as a place the

FBI intended to search within the upcoming two months risked compromising the investigation

and the reliability of any evidence it revealed.  FBI agents have confirmed that no credible law

enforcement organization announces in advance its plan to search a potential crime scene.  Yet in

this case the FBI publicly announced its intention to search the Maryland pond, two months

before it actually conducted its search.  Announcing the search in advance was an open invitation

to any fanatic hooked on the anthrax investigation to throw manufactured evidence into the unsecured pond.

78.     "The $250,000 and three weeks draining 1.45 million gallons of water from the pond in a search for evidence" turned up nothing but junk, the *Washington Post* reported August 1, 2003.

79.     To appreciate the seriousness of this misconduct, it is important to understand – as every FBI and DOJ official must – that DOJ policy generally prohibits any prosecutor or law enforcement officer from making public comments on investigative procedures and evidence outside of formal criminal processes.  The obvious purpose of the prohibition is to protect the name and reputation of those not yet charged or convicted of crimes, and those who never will be.  The prohibition on public comment also serves another purpose: to protect the integrity of an investigation and potential prosecution.  Releasing this kind of information compromises an investigation by providing opportunities to plant evidence, tamper with a crime scene, or manufacture an alibi.  It also compromises potential prosecutions by tainting the jury pool and creating prejudice against a future criminal defendant.  In Dr. Hatfill's case, the Attorney General and his subordinates ignored all that, repeatedly violating their own regulations by providing to the media scores of anonymous leaks detailing specific investigative procedures, including the times and places of searches; subjective observations about Dr. Hatfill's character; opinions about his guilt; and an array of alleged "evidence" in the case.  By leaking false and misleading information to the press (and in some cases by making false and misleading public statements), while withholding facts tending to show Dr. Hatfill's innocence, the Attorney General and his subordinates succeeded in using the news media to deflect congressional and media scrutiny of the FBI's competence and effectiveness in the fight against domestic terrorism.

They also misled an anxious public into thinking that the Attorney General and his subordinates were making progress in the investigation of the anthrax mailings. The truth is that there has never been any credible evidence linking Dr. Hatfill to the anthrax mailings and investigators have made little or no progress toward identifying and apprehending the mailer(s).

**The Buck Never Stops**

80. On August 13, 2002, Dr. Hatfill's attorney, Victor Glasberg, filed a formal complaint on Dr. Hatfill's behalf with the FBI Office of Professional Responsibility and the DOJ Office of Professional Responsibility. The complaint focused on several issues: (1) improper government leaks to the media of details regarding the searches of Dr. Hatfill's apartment (noting that Dr. Hatfill's father had received a telephone call from a reporter the day before the second search informing him that the FBI intended to conduct another search); (2) an improper government leak of evidence from the search of Dr. Hatfill's apartment to ABC News, one hour prior to Dr. Hatfill's August 11, 2002 public statement; (3) the violent, destructive, and threatening manner in which federal agents conducted the search of the home of Dr. Hatfill's girlfriend on August 1, 2002; (4) Special Agent Roth's misrepresentation to superiors regarding Dr. Hatfill's willingness to cooperate in the investigation (along with another request to secure the voicemail message in which Mr. Glasberg offered Dr. Hatfill's continued cooperation); and (5) improper and highly prejudicial government leaks appearing in the August 12, 2002 issue of *Newsweek* concerning investigative procedures and their results, government officials' bases for focusing on Dr. Hatfill, statements concerning evidence, and witness statements. On August 16, 2002, Mr. Glasberg supplemented his formal complaint, adding a request that the professional responsibility officers at the FBI and DOJ look into still more improper government leaks about investigative procedures and results.

81.     On August 21, 2002, Mr. Glasberg made a request to congressional representatives for an inquiry into the unfair and illegal campaign being waged against Dr. Hatfill by Mr. Ashcroft and others at the DOJ and FBI.  He requested an inquiry into Mr. Ashcroft's novel use of the term "person of interest" to incriminate Dr. Hatfill.  He objected to the FBI's presentation of a single photo, of Dr. Hatfill, to Princeton, New Jersey residents in an effort to place Dr. Hatfill at the scene of the crime.  He objected to the FBI's harassing surveillance of Dr. Hatfill.  And, he protested the rampant government leaks.  The consequences of these improper actions, the letter explained, included the loss of Dr. Hatfill's employment and future prospects for employment, as well as the loss of his personal life as he knew it.

82.     On September 18, 2002, Senator Charles Grassley, a member of the Senate Judiciary Committee's Subcommittee on Crime and Drugs, inquired into the DOJ's standards, processes, and historical practice with respect to having someone disqualified to work on a DOJ-funded project.  In response, Assistant Attorney General Daniel J. Bryant acknowledged that the DOJ has no standards at all governing how it exercises its power to disqualify private citizens from work.  Mr. Bryant further acknowledged that the DOJ has no appeals process in place to challenge arbitrary decisions.  Finally, the DOJ was unable to identify a single individual, other than Dr. Hatfill, whom it had ever terminated from employment based on similar circumstances.  Mr. Bryant's letter drew the following response from Senator Grassley:  "I also appreciate the department's candidness that the action regarding Mr. Hatfill and his employment is unprecedented, and that there is no formal policy, level of evidentiary standard, procedure, or formal definition for the term 'person of interest.'  Government agencies need to be mindful of the power they wield over individual citizens, and should exercise caution and good judgment when they use that power."

38

83.     Unfortunately, the defendants did not share Senator Grassley's view of their responsibilities.  In response to Mr. Glasberg's protests, the FBI and DOJ Offices of Professional Responsibility ("OPR") failed to conduct a serious investigation, and Mr. Ashcroft failed to rein in his subordinates.  H. Marshall Jarrett, the head of the DOJ OPR, ignored Dr. Hatfill's pleas to employ polygraph examinations to aid in identifying those defendants who had illegally and unethically leaked malicious untruths about Dr. Hatfill to the press.

84.     In contrast to the Amerithrax investigation, which has conducted countless polygraph examinations to test the truthfulness of witnesses, Mr. Jarrett decided instead to rely on the honor system.  In an April 11, 2003 letter responding to complaints of earlier leaks, Mr. Jarrett acknowledged as much when he stated:  "Each person interviewed denied, under penalty of perjury, having leaked any information to the media."  Mr. Jarrett did not reveal how many or which DOJ or FBI officials were interviewed or how many investigators or attendees of the summit referenced in paragraph 74 he did not even bother to question.

85.     Acknowledging the impropriety of the leaks, Mr. Jarrett expressed regret at his office's inability to identify the source of the leaks.  This claimed regret is belied by the token effort undertaken by the DOJ OPR to determine the source of the leaks.  Mr. Jarrett's half-hearted effort to identify the source of these defamatory leaks stands in stark contrast to the enormous investigative resources DOJ has brought to bear in other cases in which information that the DOJ considers embarrassing has been leaked to the press.

86.     Furthermore, there was no mystery about the source of some of the leaks.  Defendant Ashcroft's disclosure of Dr. Hatfill's "person of interest" status had occurred on national television; it took neither a polygraph nor even a particularly capable investigator to find the source of that disclosure.  FBI media representative Debra Weierman testified under oath that

39

she herself, acting on orders, disclosed previously secret details about the search of Dr. Hatfill's apartment on August 1, 2002, including the existence of a search warrant. Defendant Harp has testified that he frequently confirmed information for reporters if they asked him, and that on the many occasions when he was asked by his superiors to do "backgrounders" for the press he felt himself at liberty to speak more broadly than he understood the rules to otherwise permit.

87.     In addition, the FBI's National Press Office kept phone logs and electronic records that show specific requests by the media for on- or off-the-record discussions with FBI personnel. By comparing these logs to the published articles, it is often possible to see that a reporter called the FBI with a specific set of question, was granted a background interview with a specific agent, and then published a news report in which anonymous sources are quoted on the questions or topic reflected in the press logs. These records are therefore quite useful in identifying the source of illegal disclosures made by FBI employees – where those records exist. Unfortunately, the defendants have not produced any such records after September 2002. Defendants deny that any of these logs were actually destroyed, and also deny that anyone made a conscious decision to stop recording media requests for information about the anthrax case. At one point, counsel for the FBI claimed that anthrax-related entries in the logs ceased after September 2002 because of waning media interest in the investigation. This implausible explanation was specifically contradicted by FBI media representative Debra Weierman, but the missing logs have never been explained.

88.     Polygraph examinations were at one point suggested internally (not necessarily in connection with the OPR investigation), but FBI Director Robert Mueller himself ruled them out. According to testimony, when the topic of polygraphs for FBI agents came up in his presence, he

40

held up his hand and squelched the idea, telling those in attendance that polygraphs would be "bad for morale."

89.　The disparate treatment makes one thing clear: Leaks that embarrass the DOJ are treated seriously and lead to criminal referrals, while leaks the DOJ and FBI view as helpful (by placing the organizations in a good light) are ignored.

90.　Defendant Ashcroft knew that OPR would never sanction a sitting Attorney General for an ethical violation, no matter how egregious. His belief was confirmed when Mr. Jarrett, in concluding his investigation regarding Mr. Ashcroft's public use of the term "person of interest" to refer to Dr. Hatfill, informed the Attorney General that he had exercised "good judgment" in using that term. Other DOJ and FBI employees understood Mr. Ashcroft's implicit, if not explicit, support for their behavior would shield them from punishment, and these beliefs have been borne out.

**The Defendants' Obstinate Refusal to Correct the Problems**

91.　The day after Dr. Hatfill's termination, September 5, 2002, Mr. Glasberg wrote to defendant Ashcroft. Mr. Glasberg reviewed DOJ's central role in the firing of Dr. Hatfill, and quoted the following from a September 5, 2002 *New York Times* article: "Several senior law enforcement officials expressed embarrassment over the email incident, saying the Domestic Preparedness Office acted improperly because Mr. Hatfill has never been charged with any wrongdoing and has not been identified as a suspect in the anthrax attacks that killed five people last fall."

92.　Explaining that the embarrassment of a few senior officials was no substitute for the $150,000 per year job of which DOJ officials had deprived Dr. Hatfill, Mr. Glasberg made

several requests of Mr. Ashcroft. He requested that Mr. Ashcroft "immediately publicly countermand the department's August 1 blackball of Dr. Hatfill," and apologize to Dr. Hatfill. He requested that Mr. Ashcroft "promptly . . . secure appropriate employment for Dr. Hatfill, at LSU or elsewhere," in light of the fact that the inappropriate actions of Mr. Ashcroft and his subordinates at DOJ had rendered Dr. Hatfill "not only unemployed, but as a practical matter unemployable." Finally, Mr. Glasberg requested Mr. Ashcroft provide the legal basis for DOJ's interference in Dr. Hatfill's employment. A copy of the letter was sent to Mr. Jarrett of OPR.

93.     Defendant Ashcroft never responded to Mr. Glasberg's letter. Nor did Mr. Ashcroft take any steps to ameliorate the unethical and illegal actions of his subordinates. At no time during the entire course of the Amerithrax investigation has the Attorney General, or anyone acting on his authority, taken any remedial action to stop the illegal disclosures and other violations of Dr. Hatfill's rights.

94.     Dr. Hatfill's public proclamation of his innocence and his attorney's formal protests about the defendants' illegal activities occurred in August 2002. By the time the Complaint was filed in this case one year later, the government still had not charged Dr. Hatfill with any wrongdoing, despite having devoted tens of thousands (if not hundreds of thousands) of man-hours to what has been called the largest investigation in FBI history. Yet despite his innocence – both presumptive and actual – he continued to suffer from the defendants' spree of secret leaks and public harassment, in derogation of his privacy and liberty. He was still unable to find gainful employment or enjoy any semblance of a normal life, and he was suffering from severe emotional distress.

95.     At some point, agents assigned to the Amerithrax investigation did attempt to correct, or at least assess, the investigation's evident leakiness by examining access to the

Automated Case Support database. That database automatically keeps track of each time that a particular record is viewed, and who it is viewed by. These agents queried the Automated Case Support database for a listing of everyone who viewed Amerithrax files during a specified, limited period of time. The query resulted in a "blizzard" of paper. According to Special Agent Roth, it would have taken another investigation comparable in size to the Amerithrax investigation to determine who was improperly accessing Amerithrax records. Despite this experience, the defendants still did not implement password protection for Amerithrax records in the Automated Case Support database.

96.     Not surprisingly, the leaks continued. As with earlier news reports containing illegal disclosures, it is impossible to catalog here all of the relevant news reports published during the year preceding the commencement of this lawsuit that appear to contain illegal disclosures, but they include at least the following:

a.   Brian Ross (reporting), ABC News, *World News Tonight with Peter Jennings*, "Anthrax Attacks One Suspect, Says FBI," October 22, 2002 broadcast;

b.   Brian Ross (reporting), ABC News, *World News Now*, "Anthrax Attacks Police Are Building Case Against One Man They Believe To Be Responsible," October 23, 2002 broadcast;

c.   Curt Anderson, *Associated Press*, "Justice says 'person of interest' label for Hatfill not meant to cast suspicions," December 12, 2002;

d.   ABC News, "Sources: Anthrax Probe Zeroes in on Scientist," January 9, 2003 (internet article);

e.  Allan Lengel, *Washington Post*, "Hunt for Clues in Anthrax Case Revived; FBI Agents Return to Frederick Forest in Search Reportedly Linked to Scientist," January 25, 2003;

f.  Jim Stewart (reporting), *CBS Evening News*, "Still no arrest in anthrax attack case, though FBI investigators believe they know who the culprit is and where he is," May 8, 2003 broadcast;

g.  CBS News, "FBI Still Watching Hatfill," May 8, 2003 (internet article);

h.  Marilyn W. Thompson, *Washington Post*, "New Find Reignites Anthrax Probe; Evidence From Pond May Indicate Killer's Method," May 11, 2003;

i.  Daniel Klaidman and Michael Isikoff, *Newsweek*, "Finally, the FBI Uncovers a Tantalizing Clue," May 26, 2003;

j.  Toni Locy, *USA Today*, "Anthrax investigators tail scientist '24/7,'" May 29, 2003;

k.  Brian Ross (reporting), ABC News, *World News Tonight With Peter Jennings*, "Anthrax Letters Investigation of Steven Hatfill Continues," June 9, 2003 broadcast;

l.  Jim Stewart (reporting), *CBS Evening News*, "Investigation into anthrax murders of 2001 centers on suburban Maryland pond," June 9, 2003 broadcast;

m.  ABC News, *Good Morning America*, "Anthrax Investigation: Speaking with Steven Hatfill's Friend and Spokesman Regarding Investigation," June 10, 2003 broadcast;

n.  Brian Ross (reporting), ABC News, *Good Morning America*, "Anthrax Investigation: FBI Searching Maryland Pond for Evidence in Anthrax Mailings," June 10, 2003 broadcast;

o.   Toni Locy, *USA Today*, "FBI draining ponds in its anthrax investigation," June 10, 2003;

p.   David Snyder and Marilyn W. Thompson, *Washington Post*, "Md. Pond Drained for Clues in Anthrax Probe; FBI's 'Forensic Searches' Seek Clothing and Equipment," June 10, 2003;

q.   Jim Stewart (reporting), *CBS Evening News*, "FBI continues to focus on Dr. Steven Hatfill in their investigation of the anthrax attacks from 2001," July 2, 2003 broadcast;

r.   Curt Anderson, *Associated Press*, "Subject of FBI anthrax scrutiny did sensitive work for Pentagon, State Dept.," July 4, 2003;

s.   Curt Anderson, *Associated Press*, "FBI search of Maryland pond yields no evidence of anthrax," August 1, 2003;

t.   Allan Lengel and Guy Gugliotta, *Washington Post*, "Md. Pond Produces No Anthrax Microbes; FBI Sought Clues In Deadly Attacks," August 1, 2003; and

u.   Scott Shane, *Baltimore Sun*, "Hatfill prepares suit while FBI continues anthrax investigation; Congressman criticizes bureau's lack of progress; No trace found at Frederick pond," August 2, 2003.

97.   On information and belief, plaintiff alleges that DOJ and FBI records contain some version of each of the following facts or purported facts, all of which can be retrieved by the name of Dr. Hatfill or by some identifying particular assigned to Dr. Hatfill, and all of which were disclosed to the press during this period:

a.   that the FBI was very confident that Dr. Hatfill was responsible for the anthrax attacks;

b. that the FBI already had their man, Dr. Hatfill, even if they never got his indictment;

c. that Dr. Hatfill remained the number one suspect, even though investigators had failed to develop more than a highly circumstantial case against him;

d. that the bloodhounds used to obtain evidence pertaining to Dr. Hatfill were considered the best in the country;

e. that the bloodhounds individually reacted in all the same places;

f. that Dr. Hatfill's blood had been tested;

g. that the FBI sent two teams of agents to Africa to investigate whether Dr. Hatfill developed expertise with anthrax in the 1970s and 80s when he attended medical school in Rhodesia/Zimbabwe;

h. that divers were searching at least one pond;

i. that the pond search was near Dr. Hatfill's apartment;

j. that the pond search was near Fort Detrick, where Dr. Hatfill once worked;

k. that pond searches were triggered by information that Dr. Hatfill may have disposed of laboratory equipment in the ponds;

l. that a friend of Dr. Hatfill's told the FBI that Dr. Hatfill had once said the anthrax could be made without access to sophisticated laboratory equipment, and/or that it could be made in the woods and the evidence tossed in a lake;

m. that bloodhounds led the FBI to at least one pond;

n. that Dr. Hatfill was seen in the vicinity of the pond(s);

o. that investigators were looking for clothing or equipment that might have been used to work with anthrax before being thrown in the pond;

p.   that nothing of interest was discovered in the pond searches;

q.   that divers in one pond search recovered a clear box with holes in it that could accommodate gloves to protect the user as he worked;

r.   that items discovered in the pond searches were being tested for anthrax spores or any other link to the anthrax attacks;

s.   that initial tests on a clear box recovered in a pond search turned up traces of anthrax but later tests were negative;

t.   that additional pond searches were planned;

u.   that federal investigators might have had enough evidence to indict Dr. Hatfill but nowhere near enough for a conviction;

v.   that investigators were attempting to rule out anyone else who had come across their radar so they could focus entirely on Dr. Hatfill;

w.   that the FBI had made progress in the case against Hatfill;

x.   that the government might bring charges against Dr. Hatfill that were unrelated to the anthrax attacks;

y.   investigative theories about whether the culprit could have used a clear box with holes in it to commit the anthrax attacks;

z.   that the FBI had reviewed the manuscript of Dr. Hatfill's draft novel;

aa.  that Dr. Hatfill was under 24-hour, seven-day-a-week surveillance;

bb.  that surveillance of Dr. Hatfill was driven by the FBI's unwillingness to risk the embarrassment of losing track of him even for a few hours;

cc.  that the FBI's analysis of Dr. Hatfill's polygraph suggested he might have been

    evasive in answering a question about the attacks;

dd.  that investigators were unable to rebut Dr. Hatfill's assertion that he had never been

    to Princeton or Trenton, New Jersey;

ee.  that investigators had found no significant evidence in Dr. Hatfill's apartment or his

    girlfriend's residence;

ff.  that Dr. Hatfill was in Florida at the time a letter containing anthrax was mailed to

    American Media in Boca Raton;

gg.  that Dr. Hatfill was taking Cipro at the time of the attacks;

hh.  that the FBI was gathering information about whether Dr. Hatfill had any

    involvement in the mailing of two anthrax hoax letters sent from abroad in 2001;

ii.  that the government had obtained documents under grand jury subpoena and

    interviewed hundreds of people to construct an elaborate day-by-day timeline of Dr.

    Hatfill's activities;

jj.  that Dr. Hatfill left USAMRIID in 1999 to take a job with S.A.I.C. working on

    bioterror training for the CIA, Army Special Forces, and other government clients;

kk.  that Dr. Hatfill lost his CIA clearance and his job at S.A.I.C. after failing certain

    questions in a polygraph test regarding his experiences in South Africa;

ll.  that several of Dr. Hatfill's associates mentioned him as someone who should be

    interviewed by the FBI;

mm.    that Dr. Hatfill's 2002 polygraph results were inconclusive;

nn. that Dr. Hatfill's girlfriend moved to the United States from Malaysia and an anthrax hoax letter was mailed from Malaysia;

oo. that another anthrax hoax letter was mailed from London at a time that Dr. Hatfill was at a United Nations weapons inspection training program outside London;

pp. that the FBI obtained car rental records relating to Dr. Hatfill's stay in England and tracked his movements before and after the U.N. training program;

qq. that Hatfill once supervised construction of a mockup of the mobile germ labs Iraq was suspected to have;

rr. that the mockup mobile germ lab was never made operational and no anthrax spores were ever found on the equipment; and

ss. that the cost of the Frederick pond search was only a fraction of the money spent by the FBI and Postal Inspection Service to trail Dr. Hatfill, search places he lived, and trace his activities at or about the time the letters were mailed in 2001.

98.     Even the filing of the Complaint in this case in August 2003 did not stop either the illegal leaks or the public harassment. On March 30, 2004, just days after the agency defendants resorted to a secret, *ex parte* submission for the Court to review *in camera* in connection with a request for a stay of discovery, anonymous "law enforcement sources" disclosed details from the supposedly secret *ex parte* affidavit to *The Washington Post* and added that "Hatfill continues to be a key focus of the probe." The *Post* reported that these sources "spoke on the condition that they not be named, citing government rules." On July 18, 2004, following another *ex parte* submission to the Court, the *Washington Post* again published a news report in which "law enforcement sources" discussed the forensic tests being conducted by the Amerithrax team and stated that Dr. Hatfill was still viewed as a person of interest.

99.     The leaks that appeared in *The Washington Post* in March and July 2004

prompted the Court to observe "that somebody in the Justice Department, the executive branch

of government, can stop it by letting it be known that this is unacceptable for these types of

statements to be made. . . . [Y]ou all need to do something and let it be known that if people in

Justice are going to do that, you all are going to prosecute them."  However, according to

Amerithrax Inspector Richard Lambert, the Court's observations did not prompt the defendants

to send any such communication.  In fact, Inspector Lambert was not aware of *any* written

directive *ever* sent by FBI Director Mueller or anyone in upper management to the effect that the

leaks had to stop or that agents caught leaking protected information would be terminated or

prosecuted.

100.     The defendants' official lassitude regarding the leaks contrasts sharply with an

incident that took place shortly after Michael A. Mason became the Assistant Director in Charge

of the FBI's Washington Field Office.  According to a September 30, 2003 *Washington Post*

report on his initial press conference, Assistant Director Mason "said he objects to [the phrase

'person of interest'] in all cases and prefers to identify people only when they are formal suspects

and the FBI has enough evidence to charge them with a crime.  Naming someone as a person of

interest does not help an investigation, he said, and can unfairly harm a person's reputation."

Later in the article, he was quoted as having said, "In my mind, there is absolutely zero value to

coming forward with names or definitions of persons of interest."  This concise and entirely

orthodox statement of official and time-honored DOJ and FBI policy evidently displeased FBI

Director Mueller because it was an implicit criticism of defendant Ashcroft's public statements.

Director Mueller's Deputy, Bruce J. Gephardt, called Mason to tell him that his "person of

interest" comments had not gone over well at FBI headquarters. In such an environment, it should come as no surprise that the leaks continued.

101. Relevant news reports published after the commencement of this lawsuit that appear to contain illegal disclosures include at least the following:

a. Marilyn W. Thompson, *Washington Post*, "The Persuit (sic) of Steven Hatfill; He says he's a patriot, and some on the front lines of the war against terror sing his praises. But his provocative life and career have kept him at the center of the FBI's frustrating hunt for the anthrax killer," September 14, 2003;

b. Don Foster, *Vanity Fair*, "The Message in the Anthrax," October 2003;

c. Don Foster, *Reader's Digest*, "Tracking the Anthrax Killer," December 2003;

d. Carol D. Leonnig and Allan Lengel, *Washington Post*, "Judge Delays Lawsuit To Help Anthrax Probe," March 30, 2004;

e. Allan Lengel, *Washington Post*, "Anthrax Probers Still Seek Md. Leads; Frederick Remains A Focus of Attention," July 18, 2004;

f. Brian Ross (reporting), ABC News, *World News Tonight With Peter Jennings*, "Anthrax Investigation Last-Ditch Effort," July 20, 2004 broadcast; and

g. James Gordon Meek and Helen Kennedy, *Daily News*, "Check Doc In Anthrax Case," August 6, 2004.

102. On information and belief, plaintiff alleges that DOJ and FBI records contain some version of each of the following facts or purported facts, all of which can be retrieved by the name of Dr. Hatfill or by some identifying particular assigned to Dr. Hatfill, and all of which were disclosed to the press during this period:

   a.  that Dr. Hatfill's friend Bill Patrick told the FBI that he was under the impression that the 1999 study he wrote for Dr. Hatfill about anthrax in the mail would be used for preparedness training, but that in fact the study received no attention until 2002;

   b.  that Dr. Hatfill attended an advanced training course for the United Nations Monitoring, Verification, and Inspection Commission in Swindon, England;

   c.  that Dr. Hatfill was the only attendee to rent a car at the U.N. training seminar;

   d.  that the FBI asked British police to help retrace Dr. Hatfill's every move while he was in England;

   e.  that the FBI sought help from police in Kuala Lumpur, investigating any possible connection with Dr. Hatfill and a former girlfriend from Malaysia;

   f.  that Dr. Hatfill obtained a prescription for Cipro not long before the attacks;

   g.  that bloodhounds gave agents a positive identification after sniffing around Dr. Hatfill's apartment;

   h.  that Dr. Hatfill had once talked hypothetically about the possibility of disposing of materials contaminated with anthrax by throwing them in a body of water;

   i.  that Fort Detrick, where Dr. Hatfill used to work, was one of three labs the FBI identified as the likely source of the anthrax used in the attacks;

   j.  that investigators wanted to test a "mobile lab" built by Dr. Hatfill but the Army resisted and moved it to Fort Bragg, North Carolina, where Dr. Hatfill used it to train Special Forces in preparation for the war in Iraq;

   k.  that Dr. Hatfill's responsibilities at USAMRIID included the writing of bioterror scenarios;

l.  that one bioterror scenario envisioned by Dr. Hatfill actually happened in Wichita, Kansas in 1998;

m.  that agents searching Dr. Hatfill's apartment found a canister of *Bacillus thuringiensis,* or B.t.;

n.  that USAMRIID adopted B.t. for study in 1995, after UNSCOM discovered that it was Iraq's favored anthrax simulant;

o.  that it was the FBI's best team of trained bloodhounds that persuaded the Amerithrax task force to place Dr. Hatfill under 24-hour surveillance;

p.  that Dr. Hatfill continued to be a key focus of the probe;

q.  that Dr. Hatfill continued to be a "person of interest";

r.  that certain investigative techniques were part of a last-ditch effort by the FBI to find some hard evidence against Dr. Hatfill that would stand up in court; and

s.  that despite searches of another scientist, Dr. Hatfill remained atop the list of "persons of interest."

103.    The filing of the Complaint in this case also failed to bring a halt to the pattern of law-enforcement harassment that so significantly curtailed Dr. Hatfill's liberty.  Perhaps emboldened by their superiors' violations of DOJ and FBI rules, the Constitution, and common decency, DOJ and FBI officials continued to subject Dr. Hatfill to an unrelenting campaign of harassment, weakly camouflaged as surveillance.  For many months after this lawsuit was filed, government agents continued to "bumper lock" Dr. Hatfill whenever he went out in public.  He was followed by a caravan of five to seven FBI employees wherever he went.

104.    At one point, Dr. Hatfill volunteered to wear a portable electronic tracking system at all times so that his minders at the FBI could know his whereabouts.  He offered to have an

FBI agent ride in his car with him instead of following him in a separate car. The FBI declined this offer because the true purpose of its monitoring of Dr. Hatfill was not surveillance. It was harassment.

105.    The FBI's campaign of harassment resulted in an FBI employee running over Dr. Hatfill's foot with a car in order to prevent (or retaliate for) Dr. Hatfill's attempt to take the employee's photograph to corroborate the harassment he endures 24 hours a day. When an officer of the D.C. Metropolitan Police Department arrived on the scene, Dr. Hatfill explained to an initially skeptical officer that the people who were following him were FBI agents who followed him everywhere. The officer then spoke privately with the FBI agents, who surprised him by confirming this story. When the agents prevailed upon the police officer to ticket Dr. Hatfill for something instead of ticketing the FBI agent who ran over Dr. Hatfill's foot, the officer had to ask his superiors if they knew of anything Dr. Hatfill could be ticketed for. Eventually, he wrote Dr. Hatfill a ticket for "walking to create a hazard," the one and only time the officer had ever written such a ticket, or is likely to.

106.    The government has also continued its campaign to preclude Dr. Hatfill from securing employment. Not content to have had him fired from his job at LSU, nor with having communicated suspicions of his guilt nationwide, the agents "surveilling" Dr. Hatfill resorted to much more direct methods of intimidation to scare away the sole potential employment lead Dr. Hatfill had in 2003. In or around March 2003, Dr. Hatfill went to a McLean, Virginia hotel room to meet a prospective employer to discuss plans for Dr. Hatfill to provide consulting services. Those plans were dashed, however, when at the conclusion of his meeting, he and his prospective employer walked out of the meeting room and were met by FBI special agents conspicuously and intrusively pointing a video camera at the prospective employer. After being

subjected to this invasion, the prospective employer no longer had any interest in hiring Dr.

Hatfill; thus, the FBI's harassment had its intended effect.

# CAUSES OF ACTION

## Count I

(Violation of Fifth Amendment Due Process Rights)

107.    Paragraphs 1 through 106 are realleged and incorporated herein.

108.    It is clearly established Supreme Court law that the Fifth Amendment to the U.S.

Constitution encompasses "the right of the individual to contract [and] . . . to engage in any of

the common occupations of life."  *Board of Regents of States Colleges v. Roth,* 408 U.S. 564,

572 (1972).  Thus, "where a person's good name, reputation, honor or integrity is at stake

because of what the government is doing to him, notice and an opportunity to be heard are

essential."  Id. at 573 (internal quotation marks omitted).  "To be deprived not only of present

employment but of future opportunity for it certainly is no small injury when government

employment so dominates the field of opportunity."  *Paul v. Davis,* 424 U.S. 693, 704 (1976)

(internal quotation marks omitted).

109.    In this case, the individual defendants violated Dr. Hatfill's Fifth Amendment

rights by publicly stigmatizing him through a campaign of leaks, *faux* surveillance, and

instructing Louisiana State University to remove him from all federally funded programs,

without notice or any opportunity to be heard and without any avenue for appealing the decision.

The immediate result was his termination from his $150,000-per-year job at LSU, but the

incident effectively deprived Dr. Hatfill of the liberty to work in his chosen field.  The actions of

FBI agents at Dr. Hatfill's McLean, Virginia job interview confirm the intentional and malicious nature of defendants' actions.

110.     The defendants' unlawful conduct has caused Dr. Hatfill to sustain continuing injury that is likely to continue (or recur) indefinitely unless and until the anthrax case is solved. Defendant Darnell, who still works in federal contracting for the Department of Homeland Security, has testified that he considers Dr. Hatfill ineligible for any federal employment until he is exonerated in the anthrax case.  The testimony of defendant Henke is to the same effect, and both are corroborated by the testimony of former Assistant Attorney General Daniels.  Plaintiff therefore seeks declaratory and injunctive relief against all individual defendants. Plaintiff also seeks monetary damages against federal employees acting under color of legal authority, in their individual capacities, under *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971).  However, in accordance with the Court's September 2005 order dismissing the *Bivens* claims, plaintiff includes them herein only for the purpose of preserving the claims for appeal if any of his damages remain uncompensated after the trial of this matter.

## Count II

### (Violation of First Amendment Right to Free Speech and Petition the Government for Redress of Grievances)

111.     Paragraphs 1 through 106 are realleged and incorporated herein.

112.     The First Amendment guarantees the right to free speech and to petition the government for redress of grievances.  Government officials may not interfere with these rights directly, punish an individual for exercise of those rights, or engage in retaliatory conduct aimed at chilling future exercise of those rights.

113.     Unknown agents of the FBI and employees of the DOJ and FBI sought to punish and retaliate against Dr. Hatfill for the exercise of his First Amendment rights.  The government's pattern of leaking new facts about Dr. Hatfill whenever Dr. Hatfill or his friends or associates criticized the investigative focus on him violated Dr. Hatfill's first amendment rights by penalizing his exercise of free speech.  Although Dr. Hatfill does not seek reconsideration of the Court's September 2005 ruling that the original complaint does not state a claim for any violation of the First Amendment, Dr. Hatfill hereby preserves that claim and will appeal the dismissal of this count if any of his damages remain uncompensated after trial of the claims stated under Counts I and III.

## Count III

(Violations of Privacy Act, 5 U.S.C. § 552a
against Defendants FBI and DOJ)

114.     Paragraphs 1 through 106 are realleged and incorporated herein.

115.     Defendants FBI and DOJ both maintain, with respect to the Amerithrax investigation, a "system of records" as defined by the Privacy Act, 5 U.S.C. § 552a(a)(5).  This "system of records" includes "records," as defined by 5 U.S.C. § 552a(a)(4), pertaining to Dr. Hatfill, including without limitation the records contained in the Automated Case Support database.

116.     Many of the reports described in paragraphs 36-37, 56-57, 62, 65-66, 74-76, 96-97, and 101-02 contain factual errors that may cause them to be at variance with actual FBI records.  However, a person searching the Amerithrax records (including all records in the Automated Case Support database) for all records retrievable by the name of Dr. Hatfill (or by

some identifying particular assigned to Dr. Hatfill) would retrieve or be able to retrieve all of the following:

    a.  records containing the date and location of searches related to Dr. Hatfill;

    b.  records containing the legal and factual basis for searches related to Dr. Hatfill, including any warrants;

    c.  records containing information about any evidence sought or obtained in searches related to Dr. Hatfill;

    d.  records containing information about any items physically removed from locations that were searched for reasons having to do with investigative interest in Dr. Hatfill;

    e.  records containing information about the extent to which Dr. Hatfill has cooperated with investigators;

    f.  records containing information about Dr. Hatfill's employment history, including the jobs he held and the types of duties he performed;

    g.  records containing information about any security clearances Dr. Hatfill held, the times he held them, and the reasons for any revocation or non-renewal;

    h.  records containing information about particular reports or projects that Dr. Hatfill worked on, saw, or otherwise came in contact with, including classified training programs and a 1999 study of a hypothetical anthrax attack carried out by mail;

    i.  records containing information about Dr. Hatfill's medical history, including any prescriptions written or obtained for Cipro and the circumstances surrounding such prescriptions;

    j.  records containing information about Dr. Hatfill's educational history;

k.   records containing information about places Dr. Hatfill had lived, and places he had lived near (*e.g.,* any place or institution allegedly known formally or informally by a name including the word "Greendale");

l.   records containing information about whether Dr Hatfill was a "person of interest" in the Amerithrax investigation;

m.   records containing information about Dr. Hatfill's relative position on the "persons of interest" list in the Amerithrax investigation;

n.   records containing information about the times, dates, and substance of conversations Dr. Hatfill had with Amerithrax investigators;

o.   records containing information about the times, dates, and substance of conversations that Amerithrax investigators had with persons other than Dr. Hatfill, in which Dr. Hatfill was named or mentioned;

p.   records containing information about polygraph examinations administered to Dr. Hatfill, including the results of such examinations and any official assessments of those results;

q.   records containing investigative analysis of, or information or speculation about, whether Dr. Hatfill had the technical ability to produce or send anthrax of the type(s) or quality(ies) used in the 2001 attacks;

r.   records containing investigative analysis of, or information or speculation about, Dr. Hatfill's access to anthrax of the type(s) used in the 2001 attacks;

s.   records containing investigative analysis of, or information or speculation about, any possible motive Dr. Hatfill might have had for committing the 2001 attacks;

t.   records containing investigative analysis of, or information or speculation about, any connection between Dr. Hatfill and any hoax involving anthrax or another biological agent;

u.   records containing information about whether Dr. Hatfill is or has ever been a suspect, possible suspect, potential suspect, or non-suspect;

v.   records containing information about investigative techniques used in relation to Dr. Hatfill, including without limitation interviews, polygraphs, bloodhounds, surveillance, and forensic examinations;

w.   records containing information about investigative techniques *not* used in relation to Dr. Hatfill, including without limitation interviews, polygraphs, bloodhounds, surveillance, and forensic examinations;

x.   records containing information about the results of any investigative techniques used in relation to Dr. Hatfill, including without limitation interviews, polygraphs, bloodhounds, surveillance, and forensic examinations;

y.   records containing investigative analysis of, or information or speculation about, any writings by Dr. Hatfill, including without limitation a draft novel involving a fictional incident of biological terrorism;

z.   records containing investigative analysis of, or information or speculation about, any résumé or purported résumé of Dr. Hatfill's;

aa.  records containing any investigative analysis of, or speculation about, the relative probability of guilt for Dr. Hatfill;

bb.  records containing any investigative analysis of, or speculation about, whether Dr. Hatfill could, would, or should be indicted for the anthrax attacks;

60

cc.  records containing any investigative analysis of, or speculation about, whether Dr. Hatfill could, would, or should be charged with any crime unrelated to the anthrax attacks;

dd.  records containing any statements in which Dr. Hatfill is alleged to have described a method for disposing of materials contaminated with anthrax or another biological agent;

ee.  records containing any investigative analysis of, or information or speculation about, whether Dr. Hatfill had ever been to Princeton or Trenton, or could have been there when the anthrax-laden letters were mailed;

ff.  records containing information about Dr. Hatfill's activities in Rhodesia/Zimbabwe or South Africa;

gg.  records containing information about any mobile germ labs (real or mockup) that Dr. Hatfill designed or helped to build;

117.  The vast majority of the disclosures described in paragraphs 36-37, 56-57, 62, 65-66, 74-76, 96-97, and 101-02 came from FBI or DOJ sources. This is often apparent from the face of the article itself. In addition, FBI officials have admitted leaking some facts, and defendant Ashcroft's "person of interest" disclosures are available on videotape.

118.  Section 552a(b) of the Privacy Act provides, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record obtains." No exception to this disclosure prohibition applies here. The agency defendants have willfully and intentionally disclosed records pertaining to Dr. Hatfill from within their "systems of records" on countless occasions, without Dr. Hatfill's prior written

consent or approval, in violation of this provision.  The persons to whom records have been unlawfully disclosed have included reporters, Louisiana State University, Mrs. Virginia Patrick, and the D.C. Metropolitan Police Department.

119.   Section 552a(c) of the Privacy Act requires each agency to keep an accurate accounting of each disclosure of records under its control, stating the date, nature, and purpose of each disclosure of a record to any person or to another agency, along with the name and address of the person or agency to whom the disclosure is made.  This accounting must be retained for at least five years, and must be made available to any individual named in the disclosed record at his or her request.  The agency defendants willfully and intentionally failed to keep an accurate accounting – indeed, they failed to keep any accounting at all – of the numerous disclosures of records naming Dr. Hatfill that they disclosed to persons outside DOJ or the FBI, or to other agencies.

120.   Section 552a(e)(10) of the Privacy Act requires each agency to "establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained."  Despite this requirement, the defendants failed or refused to safeguard Amerithrax records pertaining to the Dr. Hatfill, even to the point of failing to require password protection in the Automated Case Support database – a procedure that is routinely used in cases involving national security.  Indeed, the defendants failed or refused to implement such safeguards even after they became aware that Amerithrax files in the ACS database had been viewed by persons who were not assigned to the Amerithrax case.  The failure to implement this protection, particularly after it was clear that the Amerithrax

investigation was beset by leaks and that the records were being viewed by people not associated
with the investigation, violated section 552a(e)(10).

121.    Section 552a(e)(5) of the Privacy Act requires each agency covered by the Act to
"maintain all records which are used by the agency in making any determination about any
individual with such accuracy, relevance, timeliness, and completeness as is reasonably
necessary to assure fairness to the individual in the determination."  Section 552a(e)(6) requires
that, whenever a record is disclosed, the disseminating agency must "make reasonable efforts to
assure that such records are accurate, complete, timely, and relevant for agency purposes."  Dr.
Hatfill is not in a position to know whether the defendants' records pertaining to him are accurate
and complete enough to satisfy section 552a(e)(5); however, many of the disclosures made by
the agency defendants about Dr. Hatfill were in fact inaccurate or incomplete.  Either the records
themselves were inaccurate and incomplete, in violation of section 552a(e)(5), or else the
disclosures of those records were inaccurate and incomplete, in violation of section 552a(e)(6).
Agency witnesses have repeatedly testified under oath that they paid close attention to news
reports concerning Dr. Hatfill's role in the anthrax investigation, but that they made no attempt
whatsoever to correct inaccuracies that placed Dr. Hatfill in a misleadingly negative light.

122.    Section 552a(e)(9) of the Privacy Act requires each covered agency to "establish
rules of conduct for persons involved in the design, development, operation, or maintenance of
any system of records, or in maintaining any record, and instruct each such person with respect
to such rules and the requirements of this section, including any other rules and procedures
adopted pursuant to this section and the penalties for noncompliance."  To the extent that any of
the disclosures alleged herein resulted from the defendants' failure to establish adequate rules,

procedures, and penalties for noncompliance, or to train employees whose jobs involve frequent interaction with journalists, the defendants have violated section 552a(e)(9).

123.    Although the Privacy Act permits agencies to exempt certain systems of records from compliance with certain subsections of the Privacy Act, no agency is permitted to exempt any system of records from compliance with subsections (b), (c), (e)(6), (e)(9), and (e)(10).

124.    The FBI's and DOJ's intentional, willful, and unauthorized disclosures of records pertaining to Dr. Hatfill, and other intentional and willful violations of the Privacy Act, have had an adverse effect on Dr. Hatfill.  Among other adverse effects, the unlawful disclosures and other violations caused Dr. Hatfill's termination from the LSU First Responder Training Program and from LSU itself; eliminated Dr. Hatfill's employment opportunities and ability to earn a living; damaged his personal and professional reputation; and caused Dr. Hatfill extreme mental and emotional distress.

125.    Defendants FBI and DOJ are sued, in their capacity as agencies, for actual damages sustained by Dr. Hatfill and costs and reasonable attorneys fees, as provided for in 5 U.S.C. § 552a(g)(4).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Issue a declaratory judgment that the individual defendants' conduct as described above violated Dr. Hatfill's constitutional rights under the Fifth Amendment;

B.    Issue a declaratory judgment that the agency defendants' conduct as described above violated the Privacy Act of 1974;

C.    Issue a permanent injunction prohibiting defendants Ashcroft and Harp from

ever disclosing facts about Dr. Hatfill that they learned during their government employment;

D.    Issue a permanent injunction prohibiting defendants Darnell, Beres, Henke, DOJ, and FBI from interfering with Dr. Hatfill's efforts to obtain employment;

E.    Issue a permanent injunction prohibiting defendants Darnell, Beres, and Henke from violating Dr. Hatfill's constitutional rights under the Fifth Amendment by substantially repeating the conduct in which they engaged as described above;

F.    Issue a permanent injunction requiring defendants DOJ, FBI, and Gonzales to comply henceforth with the Privacy Act's requirements on training, security policies, and accounting for disclosures;

G.    Issue a permanent injunction prohibiting defendants DOJ, FBI, and Gonzales from publicly disclosing any investigative information pertaining to Dr. Hatfill, including without limitation whether he is a "person of interest" or whether any particular investigative technique employed in the Amerithrax investigation has anything to do with him;

H.    Award reasonable and appropriate damages to Dr. Hatfill in an amount to be ascertained at trial, for monetary and non-monetary injuries including without limitation lost earnings, diminished future earning capacity, medical expenses, pain and suffering, and emotional distress;

I.    Award plaintiff's costs, expenses, and reasonable attorneys' fees; and

J.      Award such other legal or equitable relief to Dr. Hatfill as the Court may deem

just and proper.


DATED: November 18, 2005         Respectfully submitted,

Thomas G. Connolly, D.C. Bar # 420416
Mark A. Grannis, D.C. Bar # 429268
Patrick O'Donnell, D.C. Bar # 459360
Amy E. Richardson D.C. Bar # 472284
Tonya L. Mitchell, D.C. Bar # 494088
Harris, Wiltshire & Grannis, LLP
1200 18th Street NW, Suite 1200
Washington, DC 20036
Phone: (202) 730-1300
Fax:    (202) 730-1301