**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **STEVEN J. HATFILL, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:03-CV-01793 (RBW)** |
| **v.** | ) | |
| | ) | |
| **ALBERTO GONZALES,** | ) | |
| **ATTORNEY GENERAL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### OPPOSITION OF ABC, THE WASHINGTON POST, NEWSWEEK, MICHAEL ISIKOFF, DANIEL KLAIDMAN AND ALLEN LENGEL TO PLAINTIFF'S MOTION TO COMPEL DOCUMENTS

Non-parties American Broadcasting Companies, Inc. ("ABC"), WP Company LLC d/b/a The Washington Post (the "Post"), Newsweek, Inc. ("Newsweek"), Michael Isikoff, Daniel Klaidman and Allen Lengel oppose Plaintiff's Motion to Compel Documents ("Mot.").

1.     Plaintiff's motion to compel documents reflecting the identities of confidential sources raises the same privilege issues as his Motion to Compel Further Testimony from Messrs. Isikoff, Klaidman and Lengel.[1]   The documents plaintiff seeks are indisputably protected by the reporter's privilege under the First Amendment and federal common law.  The issue is whether plaintiff has made the showing necessary to overcome those privileges, and for the reasons discussed at length in our Opposition to Plaintiff's Motion to Compel Further Testimony, we respectfully submit that he has not.  Dr. Hatfill cannot show, in the first instance, that the information these news organizations and individuals received from the defendant

---

[1]     There is no dispute between plaintiff and these non-parties concerning two of the four document requests at issue, as ABC, the Post and Newsweek have agreed to produce policies (to the extent they exist) that are responsive to requests three and four of Dr. Hatfill's subpoenas.  In addition, it bears noting that the categories of documents sought in the individual subpoenas Dr. Hatfill served last year on Messrs. Isikoff, Klaidman, and Lengel are "subsumed" within two of the categories of documents sought by subpoenas served on the organizations.  *See* Mot. at 3 n.3.

agencies was the sort of personal information that is protected from disclosure by the Privacy

Act.  As a result, the specific identities of the confidential sources relied on by these news

organizations and individuals cannot be considered essential to a just resolution of this case.  *See*

*Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981) (the information must "go[] to the heart of

the matter" and be "crucial to [plaintiff's] case") (internal quotation omitted).

But even if the information were essential, Dr. Hatfill cannot make the broader

showing that "the public interest in compelling disclosure, measured by the harm the leak

caused," outweighs "the public interest in newsgathering, measured by the leaked information's

value."  *In re Grand Jury Subpoena (Judith Miller)*, 397 F.3d 964, 998 (D.C. Cir. 2005)

("*Miller*") (Tatel, J., concurring).  The "leaks" at issue here did not cause any *public* harm; Dr.

Hatfill is simply seeking to vindicate a *private* reputational interest.  And the value of the

disclosures is plain to see—the public was informed about the status of a major investigation

and, to a substantial degree, reassured that the notorious anthrax mailings were not believed to be

another terrorist attack from outside the country.

2.    In addition to issues of reporter's privilege, Dr. Hatfill's motion to compel

raises issues concerning the attorney-client privilege and the work product doctrine.  Based on

the document collection efforts undertaken to date, it appears that a handful of documents

responsive to Dr. Hatfill's subpoena are protected from disclosure not only by the First

Amendment and federal common law, but also by the attorney-client privilege and attorney work

product doctrine.  Although Dr. Hatfill suggests in a one-paragraph argument that this Court

should vitiate the attorney-client privilege and work product protection as it applies to these

documents, he does not—and cannot—articulate any reasoned basis for doing so.

Dr. Hatfill's motion to compel should be denied.

I.      **THE DOCUMENTS SOUGHT BY DR. HATFILL ARE PROTECTED FROM DISCLOSURE BY THE REPORTER'S PRIVILEGE.**

As explained in detail in the Opposition to Plaintiff's Motion to Compel Further Testimony previously filed by Messrs. Isikoff, Klaidman, and Lengel (Docket No. 171), which we incorporate herein by reference, the First Amendment provides journalists in civil cases with a qualified privilege not to reveal the identities of their confidential sources. This privilege is designed to prevail in "all but the most exceptional cases." *Zerilli*, 656 F.2d at 712. A party seeking discovery from a reporter must show, *at a minimum,* that (i) the information sought is of central significance to his case; and (ii) it cannot be obtained from any other source through due diligence. *Id.* at 713; *see also Lee v. Dep't of Justice*, 413 F.3d 53, 59 (D.C. Cir. 2005). In addition, before ordering disclosure of confidential sources, the Court must "weigh the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value"—and satisfy itself that the balance favors disclosure.[2] *Miller*, 397 F.3d at 998 (Tatel, J., concurring); *Zerilli*, 656 F.2d at 712 ("if the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished"); *see also Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000) (court must consider whether "there is a compelling interest in the information"); *Shoen v. Shoen*, 5 F.3d 1289, 1296 (9th Cir. 1993) ("Once the privilege is properly invoked, the burden shifts to the requesting party to demonstrate a sufficiently compelling need for the journalist's materials to overcome the privilege."); *Baker v. F & F Inv.*, 470 F.2d 778, 783 (2d Cir. 1972) (requiring a "rare overriding and compelling interest").

---

[2]      A privilege of equal scope also exists under the federal common law. *See* Isikoff, Klaidman and Lengel Opp. at 27-36 (Docket No. 171).

To avoid burdening the Court with repetitious briefs, we will not repeat here the arguments made in the Opposition to Plaintiff's Motion to Compel Further Testimony previously filed by Messrs. Isikoff, Klaidman, and Lengel (Docket No. 171). Suffice it to say, Dr. Hatfill cannot overcome the reporter's privilege in this case for three reasons. First, contrary to Dr. Hatfill's suggestion, the Privacy Act does not prohibit all government "leaks" about a criminal investigation. As this Court recognized in *Houston v. Dep't of Treasury*, 494 F. Supp. 24 (D.D.C. 1979), and *Tobey v. N.L.R.B.*, 807 F. Supp. 798 (D.D.C. 1992), *aff'd* 40 F.3d 469 (D.C. Cir. 1994), what the Privacy Act actually prohibits is disclosure of information that is truly personal in nature, and in order for the disclosure to give rise to civil liability, the person whose records were disclosed must be able to demonstrate actual, compensable harm resulting from the disclosure. *Doe v. Chao,* 540 U.S. 614, 620-23 (2004).

Most recently, in *Scarborough v. Harvey*, No. 05-1427 (D.D.C. May 22, 2007), this Court held that the Privacy Act's definition of the term "record" was broad enough to include alleged disclosures of information that included the plaintiffs' "names, financial history, associations, entrepreneurial activities, business interests, and business addresses."[3] Slip Op. at 5. The Court rejected a proposed distinction between "*personal* information" and "*entrepreneurial* information," *id.* at 19-20 (emphasis added), reasoning that either could reveal information "about" the plaintiff and that there was no basis for such a distinction in view of the statute's definition of records as including "education, *financial transactions*, medical history, and criminal or *employment history*," *id.* at 19 (emphasis partially in original). Moreover, this Court agreed with earlier courts (and with the reporters' position in this case) that information

---

[3]    At the outset of its opinion, the Court noted that it "sought to minimize its references to the particular information disclosed" by the defendants, so the precise details of the disclosures are unclear. Slip Op. at 2 n.3.

was not a record merely because it referred to an individual by name, unless it also revealed information "about" that individual in some additional respect.  *Id.* at 21.[4]

As set forth in detail in our previous Opposition brief (at pp. 10-21), the disclosures about which Dr. Hatfill complains (at least as they relate to the stories authored by Messrs. Isikoff, Klaidman and Lengel) do not constitute information "about" Dr. Hatfill for purposes of the Privacy Act, and as a result, Dr. Hatfill cannot establish that the sources of those disclosures are "centrally relevant" to his claim, as the law requires.

Second, even assuming that Dr. Hatfill could identify some disclosures to Messrs. Isikoff, Klaidman or Lengel that could have been violations of the Privacy Act, he has already established that the disclosures were made by the defendant agencies.  *See* Isikoff, Klaidman and Lengel Opp. at 22-24.  As Dr. Hatfill himself has argued, under the Privacy Act, that is all the information he needs.  *See* 5 U.S.C. § 552a(g)(4) ("In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the *agency* acted in a manner which was intentional or willful, the United States shall be liable to the individual . . .") (emphasis added).  The specific identities of his sources are not relevant.  Indeed, in *Lee,* the

---

[4]     For its interpretation of the Privacy Act, this Court relied upon two decisions by the Court of Appeals, neither of which, we respectfully submit, is inconsistent with the reporters' position that sovereign immunity principles and other canons of interpretation require the term "record" to be given a meaning that excludes the thoughts, impressions and observations of federal agents investigating a crime.  *Tobey v. N.L.R.B.*, 40 F.3d 469 (D.C. Cir. 1994), expressly *declined* to define the term "record," as it was not necessary to do so for purposes of deciding the case.  *Id.* at 472.  The Court expressed disapproval of an interpretation made by other courts that would require a record both to be about a person and to reveal some innate "*characteristic*" of that person as well, *id.*, but the reporters in this case argue for no such distinction.  Moreover, while *McCready v. Nicholson*, 465 F.3d 1 (D.C. Cir. 2006), observes that the Privacy Act's definition of the term "record" is broad relative to its definition of the term "system of records," *id.* at 9, the case did not even involve an effort to define the term "record."  Rather, it was assumed in that case that the information was a "record," and the parties contested only whether such records were also contained within a "system of records."  *Id*. at 6.  Neither *Tobey* nor *McCready* supports an interpretation of the Privacy Act that would impose liability beyond the statute's text to include analysis and observations made by third-parties investigating a known public event.

Court of Appeals explicitly noted that the identity of the *agencies* would be "arguably . . .

sufficient" to establish a Privacy Act violation. *Lee*, 413 F.3d at 61. The Court did not decide

the issue because the reporters in that case, unlike the reporters in this case, had not identified the

agencies where their sources were employed. *Id.* In this case, the issue left open in *Lee* has been

framed. If Dr. Hatfill is correct that all he needs is the identities of the *agencies* (and we believe

he is), his need to know the identity of any particular source is obviously greatly diminished, and

the identities of these reporters' sources cannot be considered "essential" to a just resolution of

this case.[5]

       Third, even assuming that there is a substantial Privacy Act claim in this case that

can only be proven through the identification of confidential sources, there remains the

overriding question whether the public interest in litigating that *private* right of action outweighs

the *public* interest underlying the First Amendment privilege. *See Miller,* 397 F.3d at 998

(Tatel, J., concurring) (court must weigh "the public interest in compelling disclosure, measured

by the harm the leak caused, against the public interest in newsgathering, measured by the leaked

information's value"); *Zerilli*, 656 F.2d at 712 ("if the privilege does not prevail in all but the

most exceptional cases, its value will be substantially diminished"). In explaining the sort of

cases in which a leak caused great harm "while providing minimal benefit to public debate,"

Judge Tatel used examples involving substantial harm to the *public—*indeed, to the national

---

[5]  As non-party journalist James Stewart has also argued, there is no basis at all for suggesting that Dr. Hatfill needs to identify sources in order to recover on his claims under sections 552a(e)(9) & (10) of the Privacy Act, alleging that the government failed to establish appropriate safeguards for protecting confidential information and failed to respond in the face of persistent leaks. *See* Docket No. 102 (Amended Compl.) ¶¶ 120, 122. Those allegations depend upon the agencies' policies, not the actions of any particular individual. To the extent Dr. Hatfill recovers full damages on those claims, he would not need to identify confidential sources at all. Mr. Stewart's arguments are incorporated herein by reference. *See* Non-Party James Stewart's Mem. of Law in Opp. to Pltf.'s Mtn. to Compel at 19-26 (Docket No. 174).

security. *Id.* at 996-97 (Tatel, J., concurring).  Yet this case does not involve any harm to the public at all.  Dr. Hatfill seeks to recover on a *private* right of action for injury to his reputation.  Without minimizing Dr. Hatfill's personal interest in protecting his reputation, that harm is not the type of substantial, *public* harm that Judge Tatel suggested was necessary to overcome the reporter's privilege.  This is particularly true in light of the substantial "public interest in newsgathering [in this case], measured by the leaked information's value."  In reporting on the government's progress in the anthrax investigation, these reporters were providing their readers with information of significant public interest.  The reports advanced the public's interest in knowing about the progress of a vitally important investigation and reassured the public that the notorious anthrax mailings were not believed to be another terrorist attack from outside the country (a misimpression Dr. Hatfill was himself trying to foster to divert investigators' attention from American scientists, including himself).[6]

Judge Tatel's weighing of the balance in Wen Ho Lee's Privacy Act case bears repeating here:

> Without slighting Lee's private interest in receiving compensation for governmental malfeasance, his claim *pales in comparison* to the public's interest in avoiding the chilling of disclosures about what the government then believed to be nuclear espionage.  This case is thus very different from *In re Grand Jury*.  Not only was that a criminal case, but there we held that the grand jury's interest in securing the name of a source suspected of committing a felony outweighed any applicable privilege.  Lee's private interest in this civil suit implicates no similarly critical concerns, and *it's hard to imagine how his interest could outweigh the public's interest in protecting journalists' ability to report without reservation on sensitive issues of national security.*

---

[6]    Months before any FBI source linked Dr. Hatfill to the investigation, Ex. A (Ross Tr. at 242-44), it was Dr. Hatfill who was meeting with members of the ABC News team, hoping to convince them to report that the FBI was "wasting its time looking at American scientists[,]" instead of making a connection between the attacks and Saddam Hussein, a connection Dr. Hatfill boasted "he could prove[.]"  *Id.* at 264-65.

*Lee v. Dept. of Justice*, 428 F.3d 299, 302 (D.C. Cir.  2005) (Tatel, J., dissenting from denial of rehearing *en banc*) (emphasis added) (citation omitted).

In the end, Dr. Hatfill cannot demonstrate either a compelling need for, or a compelling public interest in the disclosure of the identities of the confidential sources relied upon by ABC, the Post or Newsweek in their reporting on the anthrax investigation.  As a result, Dr. Hatfill's motion to compel the production of documents reflecting the identities of (or tending to identify) those sources should be denied.

## II.    DR. HATFILL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE SHOULD LIKEWISE BE DENIED.

In addition to being protected by the reporter's privilege under the First Amendment and federal common law, some of the documents responsive to Dr. Hatfill's subpoenas are further protected from disclosure by the attorney-client privilege and the attorney work product doctrine.  In a one-paragraph "argument" (Mot. at 10), Dr. Hatfill casually suggests that this Court should vitiate the attorney-client privilege and attorney work product doctrine that applies to these documents on the ground that these non-parties "have yet to confirm they have responsive documents over which these claims are raised or provide privilege logs detailing the basis of such privileges."  *Id.*  What Dr. Hatfill fails to mention is that ABC, the Post and Newsweek have filed a *motion to quash* the subpoenas in their *entirety*, arguing that they should not be required to respond to the subpoenas at all.  *See* Docket No. 152.  That motion is now fully briefed and ripe for adjudication by the Court.  It is due to the pendency of the motions to quash—not inadvertence or neglect, as Dr. Hatfill suggests—that ABC, the Post and Newsweek have not provided privilege logs.  If their motions are denied, or if plaintiff's motion to compel is granted, they will provide a log of any documents being withheld on grounds of attorney-client

- 8 -

privilege or the work product doctrine as required by the federal rules.  Then, and only then, will the propriety of their privilege claims be ripe for this Court's review.

In any case, it is abundantly clear that the documents at issue are in fact protected by the attorney-client privilege and the work product doctrine.  They all either constitute or reflect confidential communications between an attorney and client for the purpose of securing legal advice relating to this case.  *See In re Lindsey*, 148 F.3d 1100, 1103 (D.C. Cir. 1998) ("The attorney-client privilege protects confidential communications between clients and their attorneys when the communications are for the purpose of securing legal advice or services.") (*citing In re Sealed Case,* 737 F.2d 94, 98-99 (D.C. Cir. 1984)); *see also Cobell v. Norton*, 377 F. Supp. 2d 4, 9 (D.D.C. 2005) (describing elements of the attorney-client privilege) (citing cases).  And the documents are also attorney work product—they are the written work product of attorneys working on this very case.  As the Court of Appeals has stated, the work product doctrine "provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories."  *Coastal States Gas Corp. v. Dept. of Energy,* 617 F.2d 854, 864 (D.C. Cir. 1980); *see also Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.,* 5 F.3d 1508, 1515 (D.C. Cir. 1993) (holding that the "scope of protection under work-product doctrine is broader than that under attorney-client privilege. . . .  [It] extends protection to documents and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative.") (quotation omitted); *Gilchrist v. Dept. of Justice*, No. 05-1540, 2006 WL 3091534, at *4 (D.D.C. Oct. 30, 2006) ("The attorney work-product privilege protects material gathered and memoranda prepared by an attorney in anticipation of litigation.").

In short, there is no basis whatsoever for vitiating the attorney-client privilege and work product protection that protects these documents from discovery.  In the event the motions

to quash filed by ABC, the Post and Newsweek are denied, or if this motion to compel is granted, the media organizations will provide plaintiff with a complete log of the documents being withheld on grounds of privilege.  If Dr. Hatfill wishes then to challenge our assertions of attorney-client privilege and work product, he will be free to do so.  His suggestion that those privileges should be "overruled" now, before the Court has even acted on the motions to quash, is contrary to law and without basis.

## III.    CONCLUSION

Dr. Hatfill's motion to compel documents from the ABC, the Post, Newsweek, Michael Isikoff, Daniel Klaidman and Allen Lengel should be denied.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP


_____/s/_____
Kevin T. Baine (No. 238600)
Kevin Hardy (No. 473941)
Carl R. Metz (No. 490633)

725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000
(202) 434-5029 (facsimile)

*Counsel for WP Company LLC d/b/a*
*The Washington Post, Newsweek, Inc.,*
*American Broadcasting Companies, Inc.,*
Dated:  June 1, 2007                 *Michael Isikoff, Daniel Klaidman and Allen Lengel*