UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEVEN J. HATFILL, M.D.,        :
                                :
        Plaintiff,          :
                                :     Civil Action No. 03-1793 (RBW)
v.                          :
                                :
ALBERTO GONZALES, et al.,     :
                                :
        Defendants.      :
_____

**MEMORANDUM OPINION**

Currently before the Court is the plaintiff's Motion to Compel Further Testimony from Michael Isikoff, Daniel Klaidman, Allan Lengel, Toni Locy, and James Stewart [D.E. # 157].[1]  Also before the Court are several motions to quash subpoenas by various media companies:  American Broadcasting Companies, Inc., WP Company LLC d/b/a The Washington Post, and Newsweek, Inc.'s Motion to Quash [D.E. # 152]; Motion by Non-Party CBS Broadcasting, Inc. to Quash Subpoena [D.E. #156]; Motion to Quash Subpoenas by Non-Parties The Associated Press and the Baltimore Sun Company [D.E. #159]; and Motion by Non-Party The New York Times Company to Quash Subpoena [D.E. # 162].[2]  The Court having heard oral argument on the motion to compel, in addition to having reviewed the pleadings submitted in connection with the

_____

[1]The papers filed in response to the plaintiff's motion to compel are: the Memorandum of Points and Authorities of Toni Locy Opposing Plaintiff's Motion to Compel ("Locy Mem."); Non-Party James Stewart's Memorandum of Law in Opposition to Plaintiff's Motion to Compel ("Stewart's Mem."); and the Opposition of Michael Isikoff, Daniel Klaidman, and Allan Lengel to Plaintiff's Motion to Compel Further Testimony ("Isikoff Opp'n").  Dr. Hatfill has also filed his Consolidated Memorandum in Support of Motion to Compel Further Testimony ("Pl.'s Reply").

[2]The media companies have submitted the following documents in support of their motions to quash: Memorandum of American Broadcasting Companies, Inc., WP Company LLC d/b/a The Washington Post, and Newsweek, Inc. in Support of Their Motion to Quash ("ABC Mem."); Memorandum in Support of Motion by Non-Party CBS Broadcasting Inc. to Quash Subpoena ("CBS Mem."); Memorandum in Support of Motion to Quash Subpoenas by Non-Parties The Associated Press and the Baltimore Sun Company ("AP Mem."), and Memorandum in Support of Motion by Non-Party The New York Times Company to Quash Subpoenas ("NY Times Mem.").

motion, it concludes that the plaintiff's motion to compel the testimony of the several

reporters must be granted and that the media companies' motions to quash must be

granted.

I.      Relevant Factual Background

        On March 30, 2007, this Court issued an Order indicating that at the plaintiff's

discretion, he would be granted an additional period of discovery to attempt to obtain

the identity of the yet to be identified source or sources at the Department of Justice

("DOJ") or the Federal Bureau of Investigation ("FBI") who the plaintiff contends

provided information to news reporters concerning aspects of the criminal investigation

of the multiple mailings of anthrax in the Fall of 2001 that focused on the plaintiff as the

possible perpetrator.  March 30, 2007 Order at 2.  The plaintiff then filed a Praecipe

Regarding Discovery indicating his desire to conduct additional discovery, and the Court

issued an Order on April 20, 2007, allowing an additional period of sixty days for the

plaintiff to pursue further discovery.  Before requesting this additional discovery period,

the plaintiff had sought extensive discovery from the agency defendants and from

members of the media.  Plaintiff's Memorandum of Points and Authorities in Support of

Motion to Compel Further Testimony from Michael Isikoff, Daniel Klaidman, Allen

Lengel, Toni Locy, and James Stewart ("Pl.'s Mem.").  In particular the plaintiff deposed

six non-parties, who, while working as reporters for various media entities, were the

direct recipients of many of the agency defendants' alleged disclosures concerning Dr.

Hatfill.  Id.  During those depositions, the reporters identified more than 100 separate

disclosures about Dr. Hatfill that they claimed were directly from FBI or DOJ sources.

Id. at 3.  However, the reporters declined to reveal the identity of their FBI or DOJ

-2-

sources, or provide any other information about the sources that would aid the plaintiff in identifying them, on the grounds that such information is protected from disclosure by a "reporter's privilege" under the First Amendment of the United States Constitution and pursuant to federal common law.  Id. at 2, 4.  The motion to compel currently before the Court is yet another attempt by Dr. Hatfill to obtain the reporters' DOJ and FBI sources. As would be expected, the reporters oppose this motion.  In addition to seeking further discovery from the reporters, Dr. Hatfill served subpoenas pursuant to Rules 30(b)(6) and 45 of the Federal Rules of Civil Procedure on the media companies that had published information, seemingly in reliance on the unnamed DOJ and FBI sources, seeking testimony and documents that would identify or tend to identify the sources of the leaks.  Plaintiff's Consolidated Opposition to Media Companies' Motions to Quash ("Pl.'s Opp'n").

II.     Analysis

        A.      First Amendment Privilege

        The District of Columbia Circuit in Lee v. DOJ, 413 F.3d 53 (D.C. Cir. 2005), reiterated that it recognized in Zerilli v. Smith, 656 F.2d 705 (D.C. Cir. 1981), in the First Amendment context, a qualified privilege in Privacy Act cases, 5 U.S.C. § 552a (2000), for non-party journalists "where testimony of journalists' is sought because government officials have been accused of illegally providing the journalists with private information."  Lee, 413 F.3d at 59.  "[T]wo guidelines" were established by Zerilli "to determine when a plaintiff may compel a non-party journalist to testify to the identity of his confidential sources."  Id. at 57.  The question a court must first address when making this determination is whether "the information sought [goes] to the 'heart of the

matter.'" Id. at 59 (quoting Zerilli, 656 F.2d at 713) (quoting Cary v. Hume, 492 F.2d

631, 636 (D.C. Cir. 1974).  If it does not, disclosure may not be compelled.  "Second,

the litigant must exhaust 'every reasonable alternative source of information'" before a

journalist may be compelled to disclose his or her source of information.  Id. (quoting

Zerilli, 656 F.2d at 713 (quoting Carey, 492 F.2d at 638)).  The Court, however must

keep in mind that this privilege is not absolute.  Id. at 60.  As the Lee Court stated:

> The Supreme Court has noted in the context of privilege in grand jury
> cases that it "cannot seriously entertain the notion that the First
> Amendment protects a newsman's agreement to conceal the criminal
> conduct of his source, or evidence thereof, on the theory that it is better to
> write about crime than to do something about it."  Branzburg [v. Hayes,
> 408 U.S. 665, 692 (1972)] (quoted in In re Grand Jury Subpoena, Judith
> Miller, 397 F.3d 964, 970 (D.C. Cir. 2005).  The same principle applies
> here; the protections of the Privacy Act do not disappear when the illegally
> disclosed information is leaked to a journalist, no matter how newsworthy
> the government official may feel the information is.

Id.  However, this does not mean that the journalist is left "without protection."  Id.  In

addition to "the qualified privilege described in Zerilli, the usual requirements of

relevance, need, and limited burdens on the subpoenaed person still apply."  Id.

(citations omitted).

As an initial matter, non-party journalists Isikoff, Klaidman, and Lengel challenge

whether the disclosures at issue can even be considered violations of the Privacy Act.

Isikoff Opp'n at 9-10.  They contend that "the fundamental flaw in Dr. Hatfill's motion to

compel is that the specific disclosures that were reported by these journalists are not

actionable under the Privacy Act."  Id. at 10.  Specifically, they posit that "the

information that they reported was not personal to Dr. Hatfill, and the identities of the

sources for that information thus cannot be considered 'essential' to the issues in this

case."  Id.  Similarly, non-party Stewart opines that "it is extremely unlikely that [Dr. Hatfill] could obtain testimony from them that would prove an intentional and willful disclosure of a record protected by the Privacy Act."  Stewart Mem. at 35.  Stewart further contends that "the statements in [his] broadcasts do not even suggest disclosure of information derived from records protected by the Privacy Act" because his "reports contain no personal information about Dr. Hatfill and no original disclosures of investigative details."  Id. at 35-36.  Moreover, because the information about Dr. Hatfill had been publicly disclosed long before his reports, Stewart argues that it is likely that the earlier disclosure removes the reports from the "purview of the Privacy Act in any event."  Id. at 36.

The Privacy Act provides a private right of action against a government agency when records pertaining to an individual have been improperly disclosed by that agency.  5 U.S.C. § 552a; Lee 413 F.3d at 55.  Specifically, the Privacy Act prohibits agencies of the executive branch from disclosing "any record which is contained in a system of records" to an unauthorized party.  5 U.S.C. § 552a(b).  "When a court finds that an agency made such a disclosure 'in a manner which was intentional or willful,' the United States is liable for damages plus attorneys' fees and costs."  Lee, 43 F.3d at 55 (citing 5 U.S.C. § 552a(g)(4).

> [T]he term 'record' means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph[.]

5 U.S.C. § 552a(a)(4).  And, Isikoff, Klaidman, and Lengel urge this Court to conclude

that the definition of record provided in the Privacy Act "cannot be stretched to include

the contents of these reporters' articles."  Isikoff Opp'n at 11.  Furthermore, they

contend that a "particular piece of information can only qualify as a 'record' if it is about

an individual in some greater sense than through its association with that individual's

name or other identifying characteristics."  Id. at 12.  Additionally, they surmise that "the

type of information that can qualify as a record under the Privacy Act is limited to items

which are similar in nature to information about a person's 'education, financial

transaction, medical history, and criminal or employment history.'"[3]  Id.(citation omitted).

The Court cannot accept the narrow definition these journalists seek to give the term

record as used in the Privacy Act.

     This Court recently addressed what constitutes a record under the Privacy Act as

related to investigative information in Scarborough v. Harvey, ___ F. Supp. 2d ___, ___,

No. 05-1427, 2007 WL 1721962, at *1 (D.D.C. May 22, 2007) (RBW).  There, the

Army's Criminal Investigation Division ("CID") commenced an investigation into the

alleged fraudulent issuance of individual surety bonds to the United States government.

Id.  The plaintiffs in Scarborough had brought an action under the Privacy Act alleging

that the agency defendants' disclosure and dissemination of confidential and sensitive

investigative information concerning them intentionally and willfully violated various

provisions of the Act.  Id. at *4.  Similar to the reporters' arguments in this case, the

defendants in Scarborough advanced a technical reading of the term "record," asserting

---

[3]Contrary to this assertion, the Privacy Act does not state that information which qualifies as a record under the Act is exclusively limited to items "similar in nature," id., to those listed in the Act.  See 2 U.S.C. 552a(a)(4).

that the plaintiffs' claims were not sustainable because the information disclosed was

entrepreneurial in nature, as opposed to being personal information, and that the

information disclosed was available to the public and therefore did not constitute

records, as that term is defined under the Privacy Act.  Id. at *5 (footnote and citations

omitted).  The Scarborough defendants therefore asked this Court "to accept a

distinction between 'personal information' (information about an individual acting in a

personal capacity) and 'entrepreneurial information' (information about an individual

acting in an entrepreneurial capacity, including actions taken on behalf of a sole

proprietorship), and argue[d] that only disclosure of information falling in[to] the former

category is intended to be protected by the Privacy Act."  Id. at *8.  However, this Court

noted that "this distinction is found nowhere within the text of the statute itself."  Id.

(citing 5 U.S.C. § 522a(a)) (footnote omitted).  Rather, the Court pointed out that "[t]he

Act defines 'record' in relatively broad fashion," id. (citing McCready v. Nicholson, 465

F.3d 1, 9 (D.C. Cir. 2006) (citing 5 U.S.C. § 552a(a)(4)), and reiterated that "[i]n order to

qualify as a record, information must be 'about' an individual[,] . . . [and it] must contain

the individual's name or other identifying particular[s]," id. (quoting Tobey v. NLRB, 40

F.3d 469, 471 (D.C. Cir. 1994)).  Moreover, the Court noted that "[t]he District of

Columbia Circuit has stated that, under the Privacy Act, an item is 'about an individual'

if it 'contain[s] information that actually describes the person in some way.'"  Id. (quoting

McCready, 465 F.3d at 9).  And, because the information disclosed contained the

names of at least one of the plaintiffs, this Court concluded that its "sole inquiry" was to

assess "whether the documents, and the information contained therein, are 'about' the

plaintiffs."  Id. at *8.  In making this assessment, the Court found that the definition of

record "is undeniably expansive, and there is nothing in the Privacy Act to indicate an

intent to exclude certain classes of information, as long as they 'actually describe [an

individual] in some way.'" Id. (quoting McCready, 465 F.3d at 9) (internal citations

omitted).  Each of the documents in Scarborough, the Court reasoned, "reference[d] the

plaintiffs by name and divulge[d] 'information that actually describe[d] the [plaintiffs] in

some way, thus meeting the requirements of §552a." Id. (citations omitted).  The Court

further ruled that "documents identifying the individual plaintiffs by name and describing

[their] involvement in allegedly criminal or otherwise unsavory activity [was] 'about' the

individual plaintiffs, and therefore not excluded from the Privacy Act's definition of

records.'" Id.

　　　Here, the information disclosed is consistent with the definition of record as

contained in the Privacy Act, as Dr. Hatfill references multiple instances where DOJ and

FBI officials revealed investigative information about him to the reporters.  Specifically,

with respect to the use of bloodhounds to investigate Dr. Hatfill, Klaidman, of

Newsweek, reported that "when the handlers approached the Frederick, Maryland

apartment building of Dr. Steven J. Hatfill . . . [,] the dogs immediately became agitated,

Newsweek has learned.  The dogs went crazy says one law-enforcement source."  Pl.'s

Reply at 9 (citing Exhibit ("Ex.") B (M. Miller & D. Klaidman, The Hunt for the Anthrax

Killer, Newsweek, Aug. 12, 2002).  Another article written by Klaidman and Isikoff of

Newsweek states:

　　　　Something else about Dr. Hatfill caught their eye.  Agents surveilling his
　　　　apartment watched him as he pitched loads of his belongings into a
　　　　dumpster behind his apartment building – getting rid of some of the
　　　　evidence, some agent wondered.  Though the FBI says Hatfill had been

cooperative all along, the dogs and dumpster led agents to obtain a
criminal search warrant for Hatfill's apartment – to turn up the heat.

Pl.'s Reply at 10 (citing Ex. F (Klaidman and Isikoff, <u>Finally, the FBI Uncovers a
Tantalizing Clue</u>, <u>Newsweek</u>, May 26, 2003)).  Another article authored by Lengel of the
Washington Post reported that "[s]pecifically, investigators are trying to determine
whether Hatfill, a former scientist at the U.S. Army's principal biodefense laboratory at
nearby Fort Detrick, disposed of any containers or byproducts that may be linked to the
anthrax spores that were sent through the mail, law enforcement sources said."  Pl.'s
Reply at 11 (citing Ex. G, (A. Lengel, <u>Hunt for Clues in Anthrax Case Revived</u>,
<u>Washington Post</u>, Jan. 25, 2003)).  Like the plaintiffs in <u>Scarborough</u>, the information in
these news articles and reports "reference[] the plaintiff[] by name and divulges
'information that actually describes [the plaintiff] in some way."  2007 WL 1721962 at
*8.  Moreover, the identification of Dr. Hatfill by name and a description of his suspected
involvement in criminal or otherwise suspicious activity are clearly about him and
therefore not excluded from the Privacy Act's definition of records.  <u>See</u> <u>id.</u>[4]

Arguing in support of his motion to compel the testimony of the reporters, Dr.
Hatfill contends that "[t]here can be no serious question that the two-part test is satisfied
here just as it was in <u>Lee</u>."  Pl.'s Mem. at 7.  First, he opines that it is clear that the
information he is seeking goes to the heart of his case, stating that here, as in <u>Zerilli</u>,
"the relevant information is the identity of the individuals who may have leaked

---

[4]Dr. Hatfill identifies multiple additional occasions where all of the reporters made reference to personal information about him. <u>See</u>, <u>e.g.</u>, Pl.'s Reply at 12-13.  However, because the argument that the disclosures challenged by the plaintiff cannot be considered records under the Privacy Act and therefore their disclosure did not violate the Act was only raised by Isikoff, Klaidman, and Lengel, the Court need not provide examples of any disclosures made by the remaining reporters.

information in violation of the Privacy Act." <u>Id.</u>  Moreover, Dr. Hatfill posits that "[i]f he cannot show the identities of the leakers, [his] ability to show the other elements of the Privacy Act claim, such as willfulness and intent, will be compromised." <u>Id.</u> at 7-8 (quoting <u>Lee,</u> 413 F.3d at 60).  Dr. Hatfill also contends that he "has satisfied the other element, exhaustion of reasonable alternatives." <u>Id.</u> at 8.  Specifically, he points out that he has taken 35 non-expert depositions, propounded 230 interrogatories, requested 836 admissions, and issued 61 requests for production of documents. <u>Id.</u> at 8-9.  In response, the reporters uniformly oppose Hatfill's motion to compel further testimony, arguing that he has failed to satisfy the requirements of <u>Lee</u> by not demonstrating that the information he is seeking to compel is central to his case and that he has exhausted all reasonable alternatives for obtaining the information.  <u>See</u> Locy Mem. at 8, 12; Stewart's Mem. at 33-37; Isikoff Opp'n at 6.

 <u>Lee</u> provides direct and unequivocal guidance and instruction for the Court's assessment of whether Dr. Hatfill's motion to compel should be granted.  Wen Ho Lee, a scientist, was employed by the Department of Energy ("DOE") for 21 years.  <u>Lee</u>, 413 F.3d at 55.  He was investigated by the DOJ and the FBI for suspicion of espionage on behalf of the People's Republic of China, and was ultimately indicted on 59 counts for the alleged mishandling of classified computer files.[5]  <u>Id.</u>  After his indictment, Lee filed a Privacy Act action against the DOE and the DOJ (hereinafter referred to as "defendant agencies"), alleging that they had improperly disclosed personal information about him and about the investigation of him to members of the media.  <u>Id.</u>  The

---

[5]"The case was resolved through a plea agreement in which the government dismissed 58 counts of mishandling and Lee pleaded guilty to one count." <u>Id.</u>

investigation of Lee was first disclosed in the Wall Street Journal, followed by the

Washington Post, and the New York Times ("Times").  Id.  Although the Times article

did not mention Lee by name, it did refer to a Chinese-American computer scientist who

worked in nuclear weapons at Los Alamos and also provided details about the nature

and scope of the government's investigation.  Id.  Subsequently, several network news

stations broadcasted Lee's name, and the Associated Press identified Lee by name in

an article it issued.  Id.  Additional information was later revealed by the Times and the

Los Angeles Times.  Id. at 55-56.  When the government's investigation shifted from

espionage to mishandling of computer files, this was also reported in the Times, which

cited anonymous government sources and included specifics with respect to the alleged

mishandling of computer files by Lee.  Id. at 56.  This was similarly reported by the CNN

television network and the Los Angeles Times.  Id.

Lee's Privacy Act claims alleged "unlawful disclosures by employees of the

defendant agencies designed to prejudice [his] image and distract from [their] own

security breaches."  Id.  Lee asserted that the leaked information, all of which was

disclosed in the press and should have been part of personnel or classified records,

included personal and investigative information, e.g., information about his and his

wife's employment history, their financial information, details of their travel to China and

Hong Kong, and details of the investigation and interrogation of Lee, as well as

purported results of polygraph tests.  Id.  Lee commenced discovery, seeking to

uncover the source of the leaks, but his efforts were stymied by assertions of the law

enforcement privilege by the defendants.  Id.  Specifically, his discovery efforts included

the submission of at least 420 written discovery requests to the defendants.  Id.  He

also deposed witnesses identified by the government in their interrogatory responses, which included six DOE employees, six DOJ employees and eight FBI officials, but was likewise unsuccessful in uncovering the source of the leaks.  Id.  Finally, Lee issued subpoenas to the various journalists seeking their testimony and documents relating to the leaks, "reasoning that his other discovery attempts had produced and would continue to produce no results."  Id.  The journalists moved to quash the subpoenas, and the District Court denied the motions and ordered the journalist to "appear for [] depositions and 'truthfully answer questions as to the identity of any officer or agent of defendants, or any of them, who provided information directly about Wen Ho Lee, and as to the nature of the information so provided.'"  Id.

The District Court concluded "that Lee had met both of [the Zerilli] guidelines to overcome the journalists' qualified privilege," finding "that the information was clearly central to the case" and "that Lee had exhausted all reasonable alternatives."  Id. at 57.  The Lee Court found that the second Zerilli guideline had been satisfied because the depositions Lee had already taken "showed a pattern of evasion and stonewalling" and because he had used the main discovery devices prescribed by the Federal Rules of Civil Procedure for obtaining the type of information he sought to acquire from the reporters.[6]  Id.  As noted already, the journalists were required to "appear for depositions and 'truthfully answer questions as to the identify of any officer or agent of defendants, or any of them, who provided information directly about [Lee], and as to the nature of the information so provided."  Id. at 56.  However, "[a]fter the journalists were

---

[6]These tools included an analysis of the "responses to factual allegations in the answer to the complaint, requests for documents under Fed. R. Crim. P. 34, use of interrogatories under Fed. R. Civ. P. 33, requests for admissions under Fed. R. Civ. P. 36, and depositions under Fed. R. Civ. P. 30(b)(1) and (b)(5)."  Id.

deposed and refused to answer certain questions, . . . [they] were held in contempt."

Id. at 57.  Upon refusing "to reconsider on the privilege issue," the District Court "fined

each [journalist] $500 per day, [but] stayed the fines pending appeal."  Id.  Ultimately,

the Circuit Court affirmed the District Court's ruling with respect to four of the five

journalists.  Id. at 64.  In affirming the District Court, the Circuit Court reasoned:

> The Supreme Court has noted in the context of privilege in grand jury
> cases that it "cannot seriously entertain the notion that the First
> Amendment protects a newsman's agreement to conceal the criminal
> conduct of his source, or evidence thereof, on the theory that it is better to
> write about crime than to do something about it."  Branzburg [v. Hayes,
> 408 U.S. 665, 692 (1972)], quoted in In re Grand Jury Subpoena, Judith
> Miller, 397 F.3d 964, 970 (D.C. Cir. 2005).  The same principle applies
> here; the protections of the Privacy Act do not disappear when the illegally
> disclosed information is leaked to a journalist, no matter how newsworthy
> the government official may feel the information is.

Id. at 60.

In affirming the District Court, the Court of Appeals agreed "that the information

he [was] seeking [went] to the heart of his case [because] [a]s in Zerilli, the relevant

information [was] the identity of the individuals who . . . ha[d] leaked information in

violation of the Privacy Act."  Id.  And, the Circuit noted that if Lee could not "show the

identities of the leakers, [his] ability to show the other elements of [a] Privacy Act claim,

such as willfulness and intent, [would] be compromised."  Id.  Thus, while the Circuit

acknowledged that "it might be possible" for a plaintiff to prove an element like "malice,"

when such proof is necessary to establish a civil claim, without identifying the offender,

"success [is] very unlikely under such circumstances."  Id. (citing Carey v. Hume, 492

F.2d 631, 637 (D.C. Cir. 1974)).  Likewise, the Circuit found that "Lee ha[d] also met his

burden as to exhaustion." Id. In reaching this conclusion, the Court of Appeals rejected the proposition that both Supreme Court and Circuit precedent require that a minimum number of depositions be taken to satisfy the exhaustion requirement. Id. Rather, the Court concluded that "the number of depositions necessary for exhaustion must be determined on a case-by-case basis," id. at 61, and left to the discretion of the District Court whether the exhaustion prong of the Zerilli guidelines has been satisfied, id. And, the Court of Appeals noted that not every possible means of discovering information from reporters, regardless of how "onerous," must be pursued to satisfy Zerilli's exhaustion requirement. Id. (quoting Carey, 492 F.2d at 639).

The present case is strikingly similar to Lee. Like the plaintiff in Lee, Dr. Hatfill has demonstrated that he was the subject of leaks by the DOJ and the FBI pertaining to his personal life and an investigation with overtures that suggested his involvement in extremely serious criminal conduct. The information was allegedly leaked to the reporters by government officials, resulting in the publication of news articles and the broadcasting of news reports concerning Dr. Hatfill and the anthrax investigation. Also like the plaintiff in Lee, Dr. Hatfill sought to obtain the identity of the sources through other means of discovery such as depositions, interrogatories, requests for production of documents and requests for admissions. Specifically, Dr. Hatfill issued "61 requests for production of documents, propounded 230 interrogatories and 836 request[s] for admissions, and took 27 depositions of agency defendant personnel." Pl.'s Mem. at 2. Further like the plaintiff in Lee, Dr. Hatfill was hindered in his efforts to identify the leakers by assertions of the law enforcement privilege as to a great number of the discovery requests. See, e.g., Plaintiff's Motion to Compel Discovery and Overrule

-14-

Defendants' Assertion of Law Enforcement Privilege over Information Disclosed to the Press, [D.E. # 121].  Thus far, Dr. Hatfill's discovery efforts have revealed numerous leaks from government officials to the press regarding personal information about Dr. Hatfill, his status in the anthrax investigation, and the techniques used to investigate his possible involvement in the events related to the anthrax mailings.  However, all of his efforts have failed to reveal the names of the sources who leaked this information.

Additionally, through an agreement with the agency defendants and the news agencies, Dr. Hatfill had agreed to withdraw Federal Rule of Civil Procedure 30(b)(6) deposition subpoenas for the testimony of various news agency representatives in exchange for the testimony of the reporters who are the subject of his current motion to compel.  The depositions of these reporters revealed over 100 separate disclosures about Dr. Hatfill that they received directly from either FBI or DOJ sources, purportedly in violation of the Privacy Act.  Pl.'s Mem. at 3.  However, the reporters have vowed to maintain the confidentiality of their sources, asserting a reporters's privilege as grounds for their positions.  As in Lee, this Court concludes that Dr. Hatfill has satisfied both prongs of the Zerilli guidelines necessary to defeat the journalists' qualified privilege, because as more fully set out below, the information sought is clearly central to his Privacy Act claims, and he has exhausted all reasonable alternative means of acquiring the sources who leaked the information that is the subject of this litigation. See Lee, 413 F.3d at 56.

First, although the reporters have disclosed that their sources were FBI and DOJ officials, it seems clear that the actual identity of the sources will be important, and quite

possibly essential, in proving his Privacy Act claims.  This is so because for the plaintiff

to succeed on his Privacy Act claim and receive an award of damages under §

552a(g)(4), he must prove that the agency acted willfully or intentionally. 5 U.S.C. §

552a(g)(4).  An agency acts willfully or intentionally "either by committing the act without

grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the

[Privacy] Act." Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984).  Thus, the

identity of DOJ and FBI sources will be an integral component of the plaintiff's attempt

to prove the requisite agency mens rea. See McCready v. Principi, 297 F. Supp. 2d

178,197 (D.D.C. 2003) (rejecting Privacy Act claim where no one could identify the

identity of the leaking official, stating that "without more evidence of the perpetrator of

the alleged 'leak' and that the 'leak' was intentional or willful, no violation of the Privacy

Act can be determined").  Thus, the names of the sources are central to Dr. Hatfill's

case.

Second, Dr. Hatfill has exhausted all reasonable alternatives for acquiring the

sources of the leaked information.  As discussed above, Dr. Hatfill has sought to obtain

the identity of the leakers through other means of discovery, such as depositions,

interrogatories, requests for production and requests for admissions.  Most telling of his

exhaustion of alternative means of acquiring the information are Dr. Hatfill's attempts to

identify the names of the sources from the DOJ and the FBI themselves.  Particularly, in

2004, with the Court's approval, the parties agreed upon comprehensive waivers that

would be distributed to DOJ and FBI personnel, offering them the opportunity to waive

any promises of confidentiality the press had promised, in exchange for the sought after

information.  Pl.'s Mot. at 5.  Over 100 officials from both agencies voluntarily signed

the waivers, but the reporters nevertheless refused to reveal whether any of the employees who had signed the waivers were their sources.  Id. at 5-6.  On this record, the Court concludes that Dr. Hatfill has exhausted his alternative means for obtaining the information and he is therefore entitled to further testimony from the reporters.

C.     Federal Common Law Privilege

In addition to the First Amendment protection the reporters are afforded, they also urge the Court to recognize a federal common law privilege for reporters because "reason, experience and precedent support a privilege protecting reporters from the compelled disclosure of confidential sources, regardless of the need of private litigants." Isikoff Opp'n at 29; Stewart Mem. at 38; Locy Mem. at 13-15.  The reporters propose that in addition to the exhaustion and centrality factors discussed above, a common law privilege further requires the Court to weigh the plaintiff's private interest in obtaining the information against the public's interest in newsgathering.  Locy Mem. at 15.  The reporters contend that this additional analysis will lead the Court to conclude that the plaintiff has failed to overcome a federal common law reportorial privilege they urge this Court to recognize.  Id.  The reporters' request raises two fundamental questions that have not yet been definitively resolved by the District of Columbia Circuit or the Supreme Court: (1) whether a federal common law reportorial privilege exist and (2) if such a privilege exists, the scope of the privilege and how it may be overcome.  See In re Grand Jury Subpoena, Judith Miller, 397 F.3d 964, 972-73 (D.C. Cir. 2005).

Previously unrecognized common law testimonial privileges may be recognized by federal courts pursuant to Rule 501 of the Federal Rules of Evidence, if doing so is

prudent "in the light of reason and experience."  Fed. R. Evid.  501; see Jaffee v. Redmond, 518 U.S. 1, 8 (1996).  As the Supreme Court has stated, "the common law is not immutable but flexible, and by its own principles adopts itself to varying conditions." Jaffee, 518 U.S. at 8 (quoting Funk v. United States, 290 U.S. 371, 383 (1933)). Whether a new common law privilege warrants recognition under Rule 501, therefore, "should be determined on a case-by-case basis."  Id.  (quoting S. Rep. No. 93-1277, at 13 (1994), reprinted in 1990 U.S.C.C.A.N. 7051, 7059)) (footnote omitted).  Rule 501 "did not freeze the law governing the privilege of witnesses in federal trials at a particular point in our history, but rather directed federal courts to 'continue the evolutionary development of testimonial privileges.'" Id. at 8-9 (quoting Trommel v. United States, 445 U.S. 40, 47 (1980)) (additional citation omitted).

The Supreme Court also stated in Jaffee that "[t]he common law principles underlying the recognition of testimonial privileges" can be characterized as follows:

> For more than three centuries it has now been recognized as a fundamental maxim that the public has a right to every man's evidence.  When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.

Id. at 9 (quoting United States v. Bryan, 339 U.S. 323, 331 (1950)) (footnote omitted). To qualify as an "[e]xception[]" from the general rule disfavoring testimonial privileges" requires "a 'public good transcending the normally predominant principle of utilizing all rational means for ascertaining [the] truth.'"  Id. (quoting Trammel v. United States, 445

U.S. 40, 50 (1980) (quoting Elkins v. United States, 364 U.S. 206, 234 (1960)

(Frankfurter, J., dissenting) (internal quotation omitted).  It was against this legal

backdrop that the Jaffee Court acknowledged "a privilege protecting confidential

communications between a psychotherapist and her patient."  Id.  Recently, the District

of Columbia Circuit succinctly summarized the four factors the Supreme Court identified

in Jaffee for lower courts to consider

> in determining whether to establish a new privilege under Fed. R. Evid.
> 501, . . . [, namely,] whether the privilege is [1] 'rooted in the imperative
> need for confidence and trust', . . . [2] whether the privilege would 'serve
> public ends,' . . . [3] what evidentiary benefit would arise from denying the
> privilege, . . . [4] and the States' rules on the subject . . . ."

In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n, 439 F.3d

740, 750 (D.C. Cir. 2006) (citing Jaffee, 518 U.S. at 10-15) (internal citations omitted).

The reporters contend that all four of these factors are satisfied with respect to

recognizing a common law reporters' privilege in this Circuit.  Isikoff Opp'n at 30-34.

The Court is unpersuaded that the reporters have satisfied these prerequisites.

In Jaffee, the Supreme Court found that psychotherapy "is rooted in the

imperative need for confidence and trust," 518 U.S. at 10 (citation omitted), because it

"is completely dependent upon [patients'] willingness and ability to talk freely," id.

(citation omitted).  By contrast, a free press is not dependent upon a "right" to keep a

reporter's confidential sources secret, see Lee v. Dep't of Justice, 401 F. Supp. 2d 123,

141 (D.D.C. 2005), nor are confidential sources a "public good of transcendent

importance," Jaffee, 518 U.S. at 11; Lee, 401 F. Supp. 2d at 141 ("The transcendent

importance of a free press is that reporters can report the news and express opinions

without fear of Government oppression or interference.  That is the true purpose and function of the language in the First Amendment . . . Anonymous sources are not a <u>sine qua non</u> of journalism but only an important and useful tool") (citation omitted).

Unlike the psychotherapist's privilege recognized in <u>Jaffee</u>, "the likely evidentiary benefit that would result from the denial of the [reporter's] privilege" is far from "modest."  518 U.S. at 11.  Denying civil litigants access to the identity of government officials who have allegedly illegally leaked information to reporters would effectively leave Privacy Act violations immune from judicial condemnation, while leaving potential leakers virtually undeterred from engaging in such misbehavior when the communications are made to reporters.  The present case perfectly illustrates the perverse effect recognition of a reporter's privilege would have on those individuals to whom the Privacy Act is intended to afford remedial relief, handicapping an aggrieved party's ability to obtain remedial relief for the alleged destruction of his good name, reputation and ability to earn a living in his chosen profession purportedly caused by illegal leaks perpetrated by government officials.  Thus, the reporters' concern of not "chilling" the free flow of information to the media must be subordinate in the context of an actionable Privacy Act violation claim.  This result is called for because affording supremacy to a reporter's privilege in such situations would erect a potentially insurmountable hurdle for a Privacy Act litigant seeking to hold the government accountable for leaks condemned by the Act.  Therefore, even assuming arguendo, that a qualified common law reporter's privilege is recognizable in this Circuit, extending the privilege to Privacy Act cases where a viable claim has been pled would be inappropriate.  To rule otherwise would frustrate the fundamental purpose for the

Privacy Act's adoption.  Lee, 401 F. Supp. 2d at 141-42 (holding that protecting reporters from forced disclosure of their confidential sources "would undermine the fundamental purpose of the Privacy Act").

In one of its most recent cases addressing the subject, the Circuit Court noted that its three panel members were "not of one mind on the existence of a common law privilege."  In re Miller, 397 F.3d at 973 (explaining that "Judge Sentelle would hold that there is no such common law privilege . . . [,]Judge Tatel would hold that there is such a common law privilege . . . ," while Judge Henderson concluded that the Court "need not, and therefore should not, reach that question").  Consequently, the In re Miller Court declined to reach the question but agreed that "if there is any such privilege, it is not absolute and may be overcome by an appropriate showing."  Id.  And, all three judges wrote extensive concurrences on the matter.  Most Notably, Judge Sentelle argued that Branzburg foreclosed recognition of a federal common law privilege for reporters.  Id. at 972-973 (Sentelle, J. concurring) (finding it "indisputable that the High Court rejected a common law privilege in the same breath as its rejection of such a privilege based on the First Amendment"); but see id. at 983 (Henderson, J. concurring) (stating that "I cannot agree with Judge Sentelle's conclusion that the United States Supreme Court has answered the question we now avoid").  However, Branzburg involved a grand jury investigation, and "[to] date, the [District of Columbia] Circuit has limited the applicability of Branzburg to criminal proceedings."  Lee, 401 F. Supp. 2d at 136 (citation omitted).  Therefore Branzburg "is not dispositive within [this] Circuit in the context of civil litigation."  Id.; see also Zerilli, 656 F.2d at 711 (noting that "this Circuit has previously held that in civil cases . . . [Branzburg] is not controlling"); Carey v. Hume, 492 F.2d

631, 635-36 (D.C. Cir. 1974).

In any event, if this Court were to follow Judge Tatel's lead and recognize a common law reporters' privilege, Judge Tatel's formulation in In re Miller would have this Court employ a three-part balancing test, that would require the Court to "consider not only [1] the [plaintiff's] need for the information and [2] exhaustion of alternative sources; but [to] also . . . [3] weigh the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's value." In re Miller, 397 F.3d at 997-98 (Tatel, J. concurring).  While the first and second parts of Judge Tatel's proposed test, exhaustion and centrality, parallel the First Amendment analysis discussed above and provoke little controversy, his balancing component, as Judge Henderson recognized, is extremely problematic.  See id. at 985 (Henderson, J. concurring).  Thus, although declining to reach the common law privilege question, Judge Henderson noted that while she endorses the centrality and exhaustion prongs, she had great doubt about the propriety of the judicial branch adopting Judge Tatel's "public interest" balancing prong, id. at 984-85 (Henderson, J. concurring) ("I am not convinced that a balancing test that requires more than an evaluation of the essentiality of the information to the prosecution and the exhaustion of available alternative sources thereof is either useful or appropriate . . . 'The task of judges, like other officials outside the legislature branch, is not to make the law but to uphold it in accordance with their oaths'") (quoting Branzburg, 408 U.S. at 706), in the absence of legislative authorization, id. at 985.  But, Judge Tatel opines that the "public interest" balancing prong is necessary because "need and exhaustion will almost always be satisfied" in a leak case, "leaving the

reporter's source unprotected regardless of the information's importance to the public."
Id. at 997 (Tatel, J. concurring).  Despite this Court's respect for Judge Tatel's legal
acumen, without controlling precedent from the Circuit that the public interest balancing
element is a necessary protection for reporters, the Court must decline to employ it,
especially given its rejection by this Circuit in the First Amendment context.  See, e.g.,
Zerilli, 656 F.2d at 712.

On facts strikingly similar to the present dispute,[7] Judge Collyer of this Court
declined to employ the third prong of Judge Tatel's concurrence, concluding that to do
so would be "inherently unworkable[,]" especially on the facts before her.  Lee, 401 F.
Supp. 2d at 139.[8]  She noted that Judge Tatel's test that would apply to a federal
common law privilege is essentially the same test he proposed for First Amendment
privilege claims in his dissent from the denial for rehearing en banc in Lee.  Id. at 141.
As Zerilli, 656 F.2d 705, and Lee, 413 F.3d at 53, are clearly at odds with Judge Tatel's
"public interest" balancing analysis approach in the First Amendment context in cases
arising under the Privacy Act, this Court must also reject the reporters' invitation to
bestow life to the "public interest" analysis in the context of a federal common law

---

[7]As discussed above, Dr. Hatfill's and Dr. Lee's cases share many common characteristics.  They are both scientists who were investigated by the FBI for extremely serious and well-publicized crimes.  Lee, 401 F. Supp. 2d at 126.  Both men alleged that government officials leaked information to reporters in violation of the Privacy Act for the purposes of decreasing the immense pressure the government faced to show that progress had been made in solving the crimes, and the success of their claims under the Privacy Act was in Lee, and is here, largely dependent upon being able to identify the confidential sources, which the reporters refuse to voluntarily disclose.  Id.

[8]This Court agrees with Judge Collyer's assessment that the proposed test – "weigh[ing of] the public interest in compelling disclosure . . . against the public interest in newsgathering" – is "inherently unworkable."  Lee, 401 F. Supp. 2d at 138-39.  Judge Collyer prudently reasons that "[s]ubmission of a reporter's privilege to a judge's determination of the newsworthiness of his or her story is . . . very troubling [because] [s]uch a practice would create a subjective and elastic standard whose outcome could not be predicted."  Id. (citing Jaffee, 518 U.S. at 17-18, ("Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege."))

privilege.  See Lee, 401 F. Supp. 2d at 139 (reasoning that "it would circumvent the

Court of Appeals' decisions in In re Miller and Lee to recognize the same test now

under the common law").

Judge Collyer further concluded that "[c]ourts are ill-suited to decide the degree

to which information is beneficial or unimportant to the common weal." Id.  She noted

that the plaintiff's plight in that case may be characterized in one sense as "advancing

an entirely personal quest for monetary damages . . . . [o]r, [on the other hand,] he may

be seen as attempting to bring to light a serious abuse of power by senior federal

officials who intentionally leaked information about [him] to cover up their own

ineptitude." Id. at 139-40.  Furthermore, the Jaffee Court also rejected a balancing

assessment component, reasoning that "[m]aking the promise of confidentiality

contingent upon a trial judge's later evaluation of the relative importance of the patient's

interest in privacy and the evidentiary need for disclosure would eviscerate the

effectiveness of the privilege." Jaffee, 518 U.S. at 17-18.

In the final analysis, this Court must agree with Judge Collyer that to adopt the

public-private balancing test as part of a yet to be recognized common law reporter's

privilege in this Circuit "would circumvent the [District of Columbia Circuit's] decisions in

In re Miller and Lee.  Lee, 401 F. Supp. 2d at 139.  Refusal to acquiesce to the pleas of

the reporters comports with the guidance from both the Supreme Court and District of

Columbia Circuit that "new privileges should be created sparingly and with caution." Id.

at 136-37 (citing United States v. Nixon, 418 U.S. 683, 710 (1974) ("Exceptions to the

demand for every man's evidence are not lightly created or expansively construed, for

they are in derogation of the search for truth.")); see also Linde Thomson Langworthy

Kohn & Vandyke, P.C. v. Resolution Trust Corp., 5 F.3d 1508, 1514 (D.C. Cir. 1993)

(noting that "federal courts should not create evidentiary privileges lightly") (citations

omitted).  Accordingly, adhering to the historical rejection of a common law reporter's

privilege in this Circuit, this Court also refuses to bring into being such a privilege.

III.    The Motions to Quash

        The media companies who were served with Federal Rules of Civil Procedure

30(b)(6) subpoenas uniformly contend that "[t]he subpoenas should be quashed

pursuant to Rule 45, on the ground that they are duplicative of other discovery, unlikely

to lead to the discovery of admissible evidence, [overbroad,] and unduly burdensome . .

. ."[9]  ABC Mem. at 5; see also CBS Mem. at 2-3; AP Mem. at 11-15; and NY Times

Mem. at 6-7.[10]  The New York Times, the Associated Press, and the Baltimore Sun

additionally argue that the Court's imposed deadline for the completion of discovery

having expired, the plaintiff has improperly attempted to avoid the requirement of

showing "good cause" to pursue additional fact discovery under Rule 16(b) of the

---

        [9]Federal Rule of Civil Procedure 45 governs the circumstances under which a subpoena may be quashed
by a court. The rule states, in pertinent part, that
        (3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the
        subpoena if it
         (i) fails to allow reasonable time for compliance;
         (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100
         miles from the place where that person resides, is employed or regularly transacts business in
         person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may
         in order to attend trial be commanded to travel from any such place within the state in which the
         trial is held;
         (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies;
         or
         (iv) subjects a person to undue burden.

        [10]CBS incorporates by reference the points and authorities set forth in the memorandum of law filed on
behalf of the Washington Post, Newsweek, and ABC.  CBS Mem. at 2.  Similarly, the New York Times incorporates
by reference the points and authorities advanced by the Associated Press and the Baltimore Sun in support of its
motion to quash.  NY Times Mem. at 1.

Federal Rules of Civil Procedure.  AP Mem. at 9-10; see NY Times Mem. at 1.

Alternatively, the media companies argue that the subpoenas should be quashed

because Dr. Hatfill "cannot possibly overcome the reporter's privilege recognized in this

Circuit."  AP's Mem. at 18; see NY Times Mem. at 1.

On the other hand, Dr. Hatfill contends that "deposing the reporters (at least

these six reporters) has not proved a successful method of obtaining the needed

information."  Pl.'s Opp'n at 3.  He opines that "[e]ven where none of a media

company's agents other tha[n] its reporter[s] know the sources' identities, [he] must

seek such testimony from the corporate entities in order to have any realistic chance of

obtaining that information."  Id. at 7.  He further contends that in the event the media

companies refuse to answer the questions asked, "the Court will have the ability to

assess sanctions of a sufficient magnitude to ensure compliance by the corporate entity

that otherwise would simply foot the bill while its employee reporters, with its

encouragement and support, withhold that information from the Court."  Id.  He also

argues that he has overcome the qualified reporter's privilege with respect to the media

companies and incorporates by reference his arguments raised in support of his motion

to compel with respect to this position.  Id. at 18.  This Court cannot agree with Dr.

Hatfill's position that he has defeated the protection provided to the media companies

under the First Amendment.

As discussed above, to determine when a court can compel a non-party journalist

(as well as a media company) to provide testimony about a confidential source, "the

information sought must [not only] go to the 'heart of the matter,'" Lee, 413 F.3d at 59

(citing <u>Zerilli</u>, 656 F.2d at 713 (quoting <u>Cary</u>, 492 F.2d at 636), but "the litigant must

exhaust 'every reasonable alternative source of information,'" <u>id.</u> (citations omitted).

Here, this Court has already determined that the names of the sources who leaked

information about Dr. Hatfill to the media are central to his Privacy Act claims.  However,

with respect to the second prong of the analysis — that "the litigant must exhaust 'every

reasonable alternative source of information,'" <u>id.</u> (citing <u>Zerilli</u>, 656 F.2d at 713) – Dr.

Hatfill has not fulfilled this obligation with respect to the media companies.  This Court

has already granted the plaintiff's motion to compel with respect to the individual

reporters, which is directly targeted at obtaining the names of the reporters' sources.

There is no question that the reporters have direct knowledge of the names of the DOJ

and FBI personnel who leaked information concerning Dr. Hatfill, as they admitted to

having knowledge of this information during their previous deposition testimony.  And,

these reporters are employees of four of the media companies that Dr. Hatfill has

subpoenaed, namely, CBS Broadcasting, American Broadcasting Company, Inc., <u>The</u>

<u>Washington Post</u>, and <u>Newsweek</u>.  Thus, it is the Court's view that it is premature to

authorize the taking of depositions of corporate representatives of media companies

when their specific reporters are already being compelled by this Court to provide

testimony on the same subject.[11]

        The Court is mindful that the reporters have previously invoked protection under

---

[11]In retrospect, the Court's Order of May 31, 2007 denying the defendants' motion for clarification, which sought to limit the plaintiff's request for additional discovery, was issued without adequate consideration being given to the distinction between the media companies whose reporters were deposed and those media companies from whom Dr. Hatfill has never sought any discovery.  This dichotomy may cause the Court to reach a different conclusion with respect to whether Dr. Hatfill may be allowed to proceed with discovery from the media companies that he chose not to depose.

the First Amendment.  However, they were not previously under court order to reveal

their sources.  Thus, depending upon the outcome of the reporter's depositions, it may

be necessary for the Court to revisit in the future whether corporate representatives of

the media companies who employed the reporters when they disclosed the information

concerning Dr. Hatfill to the public should be compelled to provide deposition testimony.

However, to allow the depositions of the media companies to go forward at this time

would be putting the cart before the horse.  Accordingly, because Dr. Hatfill has not

exhausted every reasonable alternative means to identify the sources of the leaks

before seeking to acquire the information from the media companies themselves, the

motions to quash the subpoenas must be granted.

　　　　As to the media companies (and their reporters), from whom no discovery efforts

have been directed – The New York Times, the Associated Press, and the Baltimore

Sun – the Court has the same view concerning Dr. Hatfill's failure to satisfy the

exhaustion requirement as prescribed by Zerilli and Lee.  Enforcing the Rule 30(b)(6)

subpoenas served on these companies would, in and of themselves, not provide Dr.

Hatfill with admissible evidence that he would be able to use at trial to prove the

elements of his Privacy Act claims.  Any information the corporate representatives of

these entities provided through their depositions concerning the identities of the

government sources would in all likelihood constitute inadmissible hearsay, as their

knowledge would presumably be based on what they learned from someone other than

the sources themselves.[12]  Thus, to establish the identity of the sources at trial, Dr. Hatfill

must do so through the testimony of the individuals (presumably the companies'

reporters) who directly spoke to the sources.  So at some point, the individuals who

spoke to the sources would have to be identified and Dr. Hatfill would have to seek to

obtain the identity of the sources from them.  And, it is this Court's view that this must be

accomplished before efforts to obtain the information from the companies' corporate

representatives may occur.  To hold otherwise would part with the teachings of Zerilli

and Lee.

However, should Dr. Hatfill seek to pursue discovery from reporters of The New

York Times, the Associated Press, and the Baltimore Sun (and ultimately the companies

themselves), the Court may in retrospect have to revisit its May 31, 2007 Order, which

because of its breadth, would authorize Dr. Hatfill to pursue the course just described.

The Court's reservation about permitting Dr. Hatfill to proceed as previously authorized

stems from his failure to seek any discovery from the reporters who authored the articles

for the companies or from the companies themselves during the initial discovery period

designated by the Court in its scheduling Order.  June 6, 2005 Scheduling Order

(Discovery period ordered closed on May 31, 2006).  Because Dr. Hatfill opted not to

seek discovery from these non-parties as he could have during the discovery period, the

Court now has concerns about permitting him to do so at this time since "[a] Scheduling

Order is "intended to serve as 'the unalterable road map (absent good cause) for the

remainder of the case.'"  Dag Enterprises, Inc. v. Exxon Mobil Corp., 226 F.R.D. 95, 104

---

[12] "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Federal Rule of Evidence 801(c).

(D.D.C. 2005) (citation omitted).  Rule 16 of the Federal Rules of Civil Procedure makes plain that a scheduling order entered by a district judge "shall not be modified except upon a showing of good cause and by leave of the district judge . . . ." Fed. R. Civ. P. 16(b); see also Local Civil Rule 16.4 ("The court may modify the scheduling order at any time upon a showing of good cause."); see also Olgyay v. Soc'y for Env. Graphic Design, Inc., 169 F.R.D. 219, 219 (D.D.C. 1996) (discovery after the cutoff date, even upon agreement of the parties, requires a showing of good cause and the modification of the court's scheduling order).  Thus, if Dr. Hatfill chooses to pursue discovery from these media companies (or their reporters), he will be required to seek leave of court to amend the scheduling order upon a showing of good cause as to why discovery should be reopened and why he should now be allowed to depose these media companies or their reporters.  But to re-emphasize, taking Rule 30(b)(6) depositions of corporate representatives employed by the media companies from which he never sought discovery would be a final, as opposed to an initial effort, to obtain the identity of persons at the DOJ and FBI who leaked information concerning Dr. Hatfill.  Accordingly, the motions to quash with respect to The New York Times, the Associated Press, and the Baltimore Sun are also granted.

V.      Conclusion

        Based on the foregoing analysis, the plaintiff's Motion to Compel Further Testimony from Michael Isikoff, Daniel Klaidman, Allan Lengel, Toni Locy, and James

Stewart [D.E. # 157] is granted.[13]   These reporters are therefore ordered to comply with the subpoenas issued to them by Dr. Hatfill and to provide full and truthful responses to questions propounded to them by Dr. Hatfill's attorneys.   On the other hand, the motions to quash the subpoenas of ABC, The Washington Post, Newsweek, CBS, The Associated Press, the Baltimore Sun, and The New York Times are granted.

SO ORDERED this 13th day of August, 2007.[14]

REGGIE B. WALTON
United States District Judge

---

[13]Consistent with this Memorandum Opinion, the plaintiff's Motion to Compel Documents from the Media Companies, Allen Lengel, James Stewart, Daniel Klaidman, and Michael Isikoff, [D.E. # 166] is granted in part and denied in part.  The motion with respect to the individual reporters is granted.  The motion with respect to the media companies is denied.

[14]An Order consistent with this Opinion is being issued contemporaneously herewith.