UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEVEN J. HATFILL, M.D., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 03-1793 (RBW) |
| v. | : | |
| | : | |
| Attorney General Michael MUKASEY[1], | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**MEMORANDUM OPINION**

Background

Left unresolved at the conclusion of the February 19, 2008 hearing on the

plaintiff's motion to find Toni Locy in contempt of court were the following questions: (1)

whether the Court's contempt citation against Ms. Locy and the monetary sanction

imposed should be stayed pending Ms. Locy's appeal to the District of Columbia Circuit

and (2) whether Ms. Locy should be personally required to pay the monetary sanction.[2]

This opinion resolves these two remaining matters.[3]

Ms. Locy is not a party in this litigation. However, while employed as a reporter

---

[1] The plaintiff's first amended complaint, filed November 18, 2005, names Alberto Gonzales, at that time the Attorney General of the United States, as the lead defendant in this civil case. The Court has substituted Attorney General Mukasey as the lead defendant in lieu of former Attorney General Gonzales pursuant to Federal Rule of Civil Procedure 25(d)(1).

[2] Ms. Locy's Motion for Reconsideration of August 13, 2007 Order or in Opposition to Plaintiff's Motion for Contempt [D.E. # 212] was orally denied at the February 19, 2008 hearing.

[3] Also before the Court is non-party James Stewart's Motion for Reconsideration. Although the Court indicated it would resolve Stewart's motion within several weeks after the February 19 hearing, due to the requirements imposed on the Court by the Civil Justice Reform Act ("CJRA") and the weighty issues asserted by Mr. Stewart's counsel in Stewart's motion, the Court will be unable to address his motion until after the next CJRA reporting deadline of March 31, 2008.

for the USA Today newspaper, Ms. Locy received information concerning Dr. Steven J.

Hatfill and a federal anthrax criminal investigation from sources at either or both the

Federal Bureau of Investigation ("FBI") and Department of Justice ("DOJ").[4]   Thereafter,

several articles written by Ms. Locy appeared in USA Today on two separate dates.

During discovery in this civil action brought by Dr. Hatfill following the publication of the

articles, Ms. Locy admitted remembering the identities of the sources who provided her

information about anthrax, and acknowledged that one or more of those sources would

have provided her information about Dr. Hatfill.  Memorandum of Points and Authorities

of Toni Locy In Support of Motion for Reconsideration and In Opposition to Plaintiff's

Motion for Civil Contempt ("Locy's Mem."), Exhibit ("Ex.") B (Deposition of Toni Locy)

("Locy Dep. II") [D.E. # 212] at 185, 210-211; see also Memorandum of Points and

Authorities of Toni Locy Opposing Plaintiff's Motion to Compel Further Testimony ("Locy

Opp'n"), Ex. B (Deposition of Toni Locy) ("Locy Dep. I") [D.E. # 169] at 46-61, 104-109.

She claimed, however, not to remember the identity of those who disclosed to her

information specifically about Dr. Hatfill.  Locy's Dep. II at 211.  Moreover, relying on

claims of a "reporter's privilege" under the First Amendment to the Constitution and

federal common law, Ms. Locy refused to reveal the identity of any of her sources.  Id.

at 185-216.

     In ruling on Dr. Hatfill's motion to compel Ms. Locy to reveal the identity of her

anthrax sources, the Court rejected her argument that her refusal to disclose the

---

[4] Ms. Locy resigned her position with USA Today in late 2005.  In August 2007, she became an assistant professor at West Virginia University.  Memorandum of Points and Authorities of Toni Locy In Support of Motion for Reconsideration and In Opposition to Plaintiff's Motion for Civil Contempt, Exhibit ("Ex.") A (Locy Declaration) [D.E. #212] at 1-2.

identity of her sources was sanctioned by the First Amendment and a common law

privilege she requested the Court recognize.   Hatfill v. Gonzales, 505 F. Supp.2d 33

(D.D.C. 2007).  Specifically, as to Ms. Locy's First Amendment argument,  the Court

found that Dr. Hatfill had satisfied the "two Zerilli v. Smith, 656 F.2d 705 (D.C. Cir. 1981)

guidelines" for compelling a non-party journalist to reveal the identity of her confidential

sources.  Id. at 36-44.  First, the Court found that although Ms. Locy had revealed that

her sources were FBI and DOJ officials, the actual identity of the sources "goes to the

heart of" Dr. Hatfill's Privacy Act claims.  See id. at 43; see also 5 U.S.C. §

552a(g)(4)(2000) (requiring proof of agency willfulness and intent to establish a claim

under the Privacy Act).  Second, the Court concluded that Dr. Hatfill had exhausted all

reasonable alternatives for acquiring the identities of the sources who leaked the

information.  Hatfill, 505 F. Supp.2d at 43. Finally, the Court rejected Ms. Locy's

argument that non-disclosure of the identities was countenanced by federal common

law.  Id. at 43-48.  Specifically, the Court rejected Ms. Locy's invitation to recognize a

federal common law reporter's privilege and further concluded that to the extent a

federal common law privilege existed, it would not be absolute, and should not be

recognized in the context of a case involving a  "viable" Privacy Act claim.  Id. at 45.

Consequently, the Court ordered Ms. Locy (and several other reporters) "to comply with

the subpoenas issued to them by Dr. Hatfill and to produce full and truthful responses

to questions propounded to them by Dr. Hatfill's attorneys." August 13, 2007 Order

("August 13 Order") at 1.

On December 19, 2007, during Ms. Locy's second deposition, she defied the

Court's order by refusing to answer the plaintiff's questions about "the names of [her]

3

sources at the DOJ [and the FBI] regarding [her] anthrax investigation reporting," in

order to test, on appeal, "whether [she] must reveal confidential sources who may not

have provided the information at issue in this case," Locy's Mem. at 4, 17 (citation and

emphasis omitted; emphasis added).  After further attempts during the deposition to

acquire the information from Ms. Locy proved fruitless, Dr. Hatfill moved to hold her in

contempt.  The Court granted Dr. Hatfill's motion and imposed a graduated fine as the

initial sanction for Ms. Locy's continued defiance [5], but, as noted, the Court left

unresolved and took under advisement (1) whether the Court's monetary sanction

should be stayed pending resolution of the appeal of this Court's contempt order that

Ms. Locy represents she intends to file and (2) whether Ms. Locy should be personally

ordered to pay the monetary sanction, thus precluding her from accepting contributions

to satisfy any monetary obligations that accrue.  For the reasons set forth below, the

Court denies Ms. Locy's request for a stay and orders that she abstain from accepting

any contribution to satisfy the Court's monetary sanction.

Analysis

I.

In deciding whether a stay of an order pending appeal is warranted, a court must

assess the following: "(1) whether the petitioner is likely to prevail on the merits of [her]

appeal, (2) whether, without a stay, the petitioner will be irreparably injured, (3) whether

---

[5]  The Court ordered that until Ms. Locy complies with its requirement that she disclose those sources in the defendants' employ who disclosed to her information about anthrax, and therefore would have disclosed information about Dr. Hatfill, she must pay to the Court $500 dollars per day for the first seven days after the effective date of the contempt order, $1,000 dollars per day for the next seven days and $5,000 dollars per day thereafter.  However, the $5,000 dollar per day component of the fine will be modified, and Ms. Locy is required to pay this amount until she appears before this Court on April 3, 2008, if she has not already complied with the Court's order to compel.

issuance of a stay will substantially harm other parties interested in the proceeding, and (4) wherein lies the public interest." McSurely v. McClellan, 697 F.2d 309, 317 (D.C. Cir. 1982).  Upon examination of these factors, the Court concludes that Ms. Locy has failed to demonstrate her entitlement to a stay.

(A).    Likelihood of Success on Merits

Ms. Locy has failed to satisfy this first prong of McSurely.  This conclusion is called for by the District of Columbia Circuit's ruling in Lee v. DOJ, 413 F.3d 53 (D.C. Cir. 2005).  There, the Circuit Court affirmed the District Court's contempt citations against several reporters, concluding that Wen Ho Lee, the plaintiff in that Privacy Act case, had defeated the reporters' First Amendment qualified privilege by showing that the information sought from the reporters went to "the heart" of his Privacy Act claims against the government and that he had "exhausted every reasonable alternative source [for acquiring the] information."  Id. at 57, 58-61; see also In Re Grand Jury Subpoena, Judith Miller, 397 F.3d 964 (D.C. Cir. 2005).   Ms. Locy seeks to distinguish her situation from Lee in several respects.

First, Ms. Locy contends that she satisfied the Court's August 13th Order by revealing to Dr. Hatfill the agencies that employed "some of her confidential sources. . . ." Locy's Mem. at 17.  Ms. Locy also argues as to the first prong of the McSurely test that she "is unaware of any court [that has] compell[ed] reporters to reveal their confidential sources [under] circumstances like those here." Locy's Mem. at 15-16. According to Ms. Locy, her case presents unique circumstances resulting from her purported inability to "recall the names of her confidential sources who provided the information at issue in this case." Id. at 16.  Thus, to comply with the Court's order, Ms.

5

Locy emphasizes that she would have to "reveal her sources for <u>all</u> of her anthrax-related, non-Hatfill related reporting, despite the fact that this would result in the disclosure of numerous individuals who provided information under a promise of confidentiality about articles <u>not</u> at issue in this case." <u>Id.</u> (emphasis in original).   Thus, Ms. Locy asserts, on its merits, her situation presents a '"substantial case'" worthy of a stay.  <u>Id.</u> at 18.

As an initial matter, the Court notes that it is not insignificant that, according to Ms. Locy's attorney and Ms. Locy, the reason she is unable to now reconstruct who leaked information to her about Dr. Hatfill is the result of her own decision to dispose of her notes.  Locy Opp'n., Locy Dep. I at 13-14.  To permit Ms. Locy to distinguish her situation from the reporters' whose contempt citations were upheld in <u>Lee</u> solely because of her own doing, albeit before <u>Lee</u> was decided, would permit her to escape the impact of the <u>Lee</u> holding absent a rational basis for doing so.

Additionally, in furtherance of her argument that her case presents unique circumstances, Ms. Locy would have the Court believe that, "in certain respects," her situation is like reporter Jeff Gerth's in <u>Lee</u>, 413 F.3d at 63-64, because, although she remembers the names of her confidential anthrax sources, she now claims to be unable to remember the identities of those who supplied her with information specific to Dr. Hatfill.  Locy's Mem. at 16-17 (citing <u>Lee</u>, 413 F.3d at 53).   "Compelling [her] to identify all of her sources [, she argues,] would trounce the constitutional interest in protecting . . . the identities of <u>all</u> of them, based solely upon plaintiff's hope that, at a future deposition, <u>some</u> subset might acknowledge being a source for [her] articles."   Locy's Mem. at 16 (emphasis in original).

6

Relying on Washington Metro Area Transit Comm'n v. Holiday Tours, 559 F.2d 841 (D.C. Cir. 1977), Ms. Locy accurately notes that "[t]o grant a stay, the Court is not required to find that ultimate success by the movant is a mathematical probability," Locy's Mem. at 15 (quoting Holiday Tours, 559 F.2d at 843), and that on the facts of this case she is not required to show "that it is likely [she] will prevail on the merits," id. (citing Mc Gregor Printing Corp. v. Kemp, 811 F. Supp.2d 10, 12 (D.D.C. 1993)). Rather, Ms. Locy contends that she "need only show a 'substantial case on the merits'". Id. (quoting Holiday Tours, 559 F.2d at 843). This analysis of the state of the law is unremarkable in light of the court's pronouncement in Holiday Tours that "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." Holiday Tours, 559 F.2d at 843. In any event, even accepting Ms. Locy's position on the quantum of her burden, she has failed to satisfy the first prong of McSurely.

At the outset, it is important to reiterate that this Court has found that the identity of the individuals who leaked information in violation of the Privacy Act is "clearly central to [Dr. Hatfill's] Privacy Act claims." Hatfill, 505 F.Supp. 2d at 42-43; see also Lee, 413 F.3d at 60 ("if [a plaintiff] cannot show the identities of the leakers, [his] ability to show the other elements of [a] Privacy Act claim, such as willfulness and intent, will be compromised."). Accordingly, the Court found that Dr. Hatfill's interest in securing those names is so substantial that it trumped the reporters' asserted qualified privilege to withhold their sources' identities. Hatfill, 505 F. Supp. 2d at 42-43; see also Lee, 413 F.3d at 55 (finding no abuse of discretion in requiring journalists to testify under similar circumstances). Moreover, the Court expressly rejected the notion that disclosure of

7

the confidential sources' employers alone assuaged the need to identify the actual

leakers due to Dr. Hatfill's need to show that the agency defendants acted willfully and

intentionally to make out a Privacy Act claim.  Hatfill, 505 F. Supp. at 43.

Nonetheless, Ms. Locy now asserts that because she has purportedly forgotten

the identity of the specific sources who disclosed information about Dr. Hatfill, her

interest in safeguarding the confidentiality of her entire class of anthrax sources is

paramount to Dr. Hatfill's need to identify those sources who leaked information specific

to him, as disclosure of the entire class "would trounce the constitutional interest in

protecting . . . the identities of all of them."  Locy's Mem. at 16.   This argument

exaggerates the extent of the constitutional interest Ms. Locy has in protecting the

identity of her sources under the circumstances of this case.  In Lee, 413 F.3d at 60,

the District of Columbia Circuit explained:

> The Supreme Court has noted in the context of privilege in
> grand jury cases that it "cannot seriously entertain the notion
> that the First Amendment protects a newsman's agreement
> to conceal the criminal conduct of his source, or evidence
> thereof, on the theory that it is better to write about crime
> than to do something about it."  Branzburg, 408 U.S. at 692,
> quoted in In re Grand Jury Subpoena, Judith Miller, 397 F.3d
> 964, 970 (D.C. Cir. 2005).  The same principle applies here;
> the protections of the Privacy Act do not disappear when the
> illegally disclosed information is leaked to a journalist, no
> matter how newsworthy the government official may feel the
> information is.

The Court reads this passage to mean that the lawless will find no safe haven in the

news reporter's "qualified privilege."  Lee, 413 F.3d at 59.  Thus, in this case, the

qualified news reporter's privilege succumbs to Dr. Hatfill's need to discern the identity

of the individuals who illegally leaked information about him in violation of the Privacy

8

Act.

Therefore, because Ms. Locy has failed to eliminate for Dr. Hatfill any of her anthrax sources from the class of those who may have disclosed information about him and has merely claimed an inability to specifically identify those who provided her with that information, discerning the identity of the pertinent sources necessarily requires deposing all of them to eliminate those who did not implicate Dr. Hatfill.  The post-disclosure interest of protecting the identities of those who did not implicate Dr. Hatfill can be satisfied by the issuance of a protective order, which the Court has indicated it is willing to issue.   Protective orders have been utilized in numerous situations to conceal the disclosure of sensitive or confidential information.  And this Court is confident, with the consequences of sanctions this Court would not hesitate to impose if the order is violated, that a properly crafted protective order will ensure that the identity of those who did not provide information about Dr. Hatfill will remain confidential to all other than Dr. Hatfill and his attorneys.

Ms. Locy's reliance on the reversal of Jeff Gerth's contempt citation in Lee, 413 F.3d at 64, as support for her non-compliance with this Court's order to compel is misplaced.  In that case, reporters Jeff Gerth and James Risen authored an article in the New York Times which "did not identify [plaintiff Wen Ho] Lee by name, but referred to a Chinese-American computer scientist working in nuclear weapons at Los Alamos and provided considerable detail about the nature and scope of the government's investigation."  Lee, 413 F.3d at 55.  After Wen Ho Lee was identified in other news reports, Risen and Gerth published a second article "that cited anonymous government sources and included allegations that [Wen Ho] Lee had mishandled computer codes."

Id. at 56.  Gerth acknowledged that he spoke with off-the-record sources when reporting on the Wen Ho Lee case, but claimed only to have done confidential reporting regarding another individual named Peter Lee.  Id. at 63-64.  Gerth also consistently maintained that "he did not know the identity of any sources who provided information specifically about Wen Ho Lee cited in the articles he co-authored with Risen."  Id. at 64.  The discovery order in Lee limited disclosure to sources who provided information "'directly about Wen Ho Lee,' not about the background of the case or related cases, even if they were tangentially related to Wen Ho Lee."  Id.  When deposed, Gerth therefore refused to disclose whether his sources included FBI employees.  Id.  Thus, Gerth never refused to answer questions directly covered by the District Court's discovery order, and consequently, "clear and convincing" evidence of his violation of the discovery order was deemed lacking.  Id.

Ms. Locy ignores the contrasting affirmance in Lee of reporter Bob Drogin's contempt citation.  Drogin had authored articles that were published in the Los Angeles Times that provided details about the investigation that were particular to Wen Ho Lee, sometimes quoting an unnamed government source.  Lee, 413 F.3d at 55-56.  During discovery, although Drogin asserted throughout his deposition testimony "that he did not recall the names of [his] sources," in response to a particular inquiry, Drogin violated the discovery order by invoking the privilege and refusing to reveal the name of the "senior Clinton Administration official" who provided information about the FBI plan to arrest Wen Ho Lee.  Id. at 63 (internal quotation marks omitted).  Because the question Drogin refused to answer fell squarely within the parameters of the court's discovery order in Lee, the Circuit Court upheld the District Court's contempt finding against

Drogin.  Id.

The discovery order in this case required Ms. Locy  "to comply with the subpoenas issued to her by Dr. Hatfill and to produce full and truthful responses to questions propounded to [her] by Dr. Hatfill's attorneys," (emphasis added). [6]  August 13, 2007 Order at 1.  In response to the Court's order to compel, Ms. Locy (1) admitted that she engaged in confidential reporting concerning Dr. Hatfill and the anthrax investigation; (2) acknowledged that she had the ability to identify each of her sources who provided her information about the anthrax investigations; and (3) conceded that one or more of those sources had disclosed to her information about Dr. Hatfill.  Locy's Mem., Ex. B (Locy Dep. II) at 210-211.  Ms. Locy only claims to have forgotten which of her anthrax sources provided information specific to Dr. Hatfill, Locy's Mem. at 211, and she has consistently refused to identify any of her sources based on the reporter's privilege.[7]  Thus, her circumstances are readily distinguishable from Gerth's situation and are more akin to Drogin's.  Like Drogin, Ms. Locy knows that one or more of her identifiable sources leaked information to her about Dr. Hatfill, and her refusal to reveal any of their identities "during [her] deposition confirmed that [she] did not intend to cooperate with the discovery order."  Lee, 413 F.3d at 62; see also Locy's Mem., Ex. B

---

[6]  Ms. Locy does not contend that she failed to comprehend the Court's order or that she answered the questions directly covered by the Court's discovery order.  See Locy's Mem., Ex. B (Locy Dep.II) at 187 (stating she understood that this Court had ruled that neither the Constitution nor federal common law allowed her to withhold the names of her FBI and DOJ sources and that her refusal to reveal the names of those sources would result in defiance of the Court's order); see also Lee, 413 F.3d at 62 (finding that another reporter, Josef Hebert was properly held in contempt because, in refusing to answer questions covered by the discovery order, he did "not attempt to argue that these questions were not encompassed by the discovery order," he merely asserted the reporter's privilege).

[7]  Furthermore, Ms. Locy's attorney also asserted the work product privilege on numerous occasions throughout Ms. Locy's second deposition.  Locy's Mem., Ex. B (Locy Dep.II) at 194-214.

(Locy Dep. II) at 185-216;  see also Locy Opp'n., Ex. B (Locy Dep. I) at 83-84.   The

Court therefore concludes that Ms. Locy's attempt to distinguish her situation from the

reporters who the District of Columbia Circuit found in Lee had properly been held in

contempt by the District Court is without merit.   Accordingly, the first prong of McSurely

does not weigh in Ms. Locy's favor.

(B).     Irreparable Injury

        Ms. Locy argues that irreparable injury will result from the denial of her request

for a stay.   In that regard, she complains about the "Hobson's choice" which confronts

her,  i.e., comply with the Court's order and reveal her confidential sources or continue

to safeguard her sources and incur the substantial fines imposed by the Court for her

non-compliance.   Locy's Mem. at 18-19.   The Court is not persuaded that this dilemma

weighs in her favor.

        One objective of a civil contempt order is to coerce compliance with a court's

earlier ruling by depriving the contemnor of a plausible alternative.  See United Mine

Workers v. Bagwell, 512 U.S. 821, 829 (1994).   To relieve a contemnor of the order's

coercive influence by granting a stay simply because the contemnor considers the

consequence of defiance a substantial (legal or monetary) sacrifice that she would like

to evade would defeat the underlying rationale (and potential effectiveness) of a civil

contempt order, particularly where, as here, on appeal, the contemnor is unlikely to

prevail on the merits.    See  Branzburg v. Hayes, 408 U.S. 665, 692 (1972); McSurely,

697 F.2d at 317 ("'mere injury, however substantial, in terms of money, time and energy

necessarily expended in the absence of a stay, are not enough' to satisfy the

requirement of irreparable injury.") (quoting Virginia Petroleum Jobbers Ass'n v. FPC,

12

259 F.2d 921, 925 (D.C. Cir. 1958)).

Additionally, Ms. Locy asserts that revealing her sources would moot the assertion of a reporter's privilege and, collaterally, her appeal.  Locy's Mem. at 18-19. The District of Columbia Circuit has established a high bar for what constitutes irreparable injury.  Specifically, the Circuit has held that "the injury must be both certain and great; it must be actual and not theoretical."  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation and citation omitted). Ms. Locy has articulated an injury which the Court presumes for the sake of argument is irreparable, in the sense that the issue she desires to raise on appeal will be moot if a stay is not granted.  See People for the American Way Found. v. United States Dep't of Justice, 516 F. Supp. 2d 174, 177 (D.D.C. 2007) (finding that defendant would suffer irreparable injury because its right of appeal would become moot once the confidential information was released).

(C).    Substantial Harm to Other Interested Parties

Ms. Locy claims that Dr. Hatfill would suffer only minimal injury from granting her request for a stay.  Locy's Mem. at 19.  The Court disagrees.  As Dr. Hatfill accurately represents, the lapse of time generally jeopardizes a party's ability to advance his claims.  Steven J. Hatfill's Reply Memorandum in Support of His Motion to Find Toni Locy in Contempt of Court ("Pl.'s Reply Mem.") at 11; see McSurely, 697 F.2d at 317 (noting that subjecting a long-pending case to further delay would subject the plaintiff to injury);[8] cf. Johnson v. S.E.C., 87 F.3d 484, 492 (D.C. 1996) (explaining that "cardinal

_____

[8]  Here, this case is already over four years old.

13

principle of modern law and of [the District of Columbia Circuit]" is to construe statutes

of limitation to "secure the prompt enforcement of claims during the lives of the

witnesses, and when their recollection may be presumed to be still unimpaired").

Indeed, Ms. Locy's own failure of recollection aptly illustrates this point.  And the Court

has previously explained why it is important that Dr. Hatfill have access to Ms. Locy's

sources.   Hatfill, 505 F. Supp. 2d at 42-43; see Lee, 413 F.3d at 60 (observing that a

plaintiff's failure to identify "the leakers" in that case will compromise the plaintiff's

"ability to show the other elements of the Privacy Act claim, such as willfulness and

intent").  Thus, contrary to Ms. Locy's position, further delay of a case that is already

over four years old may very likely prejudice Dr. Hatfill, with the potential result being

the erosion of his ability to effectively establish his Privacy Act claims.  When weighing

the competing equities between Dr. Hatfill's need to identify the leakers before their

memories are exhausted against Ms. Locy's desire to preserve her ability to pursue her

appeal, her interest, at a minimum, is counter-balanced by Dr. Hatfill's.  Thus, the Court

must look to the other McSurely  factors in evaluating the merits of Ms. Locy's request

for the stay.  See Serono Laboratories, Inc., v. Shalala, 158 F.3d 1313, 1326 (D.C. Cir.

1998) (indicating that when the hardships are equally balanced the Court's decision

must be based on the remaining factor).

(D).    The Interests of the Public

       Finally, Ms. Locy argues that it is in the public interest to grant her request for the

stay in order to avoid the "chilling effect" the disclosure of her sources would have on

the free flow of information to journalists and "the media's ability to report the news."

Locy's Mem. at 19.  Despite these legitimate First Amendment interests, Branzburg and

14

Lee make clear that federal courts are disinterested in promoting lawlessness in order to facilitate the media's ability to inform the public.  See Lee, 413 F.3d at 59-60 (quoting Branzburg, 408 U.S. at 692).   Thus, as the Circuit Court noted in Lee, even in the civil context, "the protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist, no matter how newsworthy the government official may feel the information is."  Lee, 413 F.3d at 60.   This assessment requires, on the facts of this case, the conclusion that the greater public interest rests on the side of insuring that violators of the Privacy Act not be shielded from detection at the expense of those who, like Dr. Hatfill (allegedly), are injured by the illegal disclosures and who the Act is therefore designed to protect.

The Privacy Act provides a private right of action against government agencies when records pertaining to an individual have been impermissibly disclosed by a federal agency.  5 U.S.C. § 552a(g)(1) (2000); Lee, 413 F.3d at 55.  Specifically, the Privacy Act prohibits executive branch agencies from disclosing "any record which is contained in a system of records" to an unauthorized party except in certain situations not applicable here.  5 U.S.C. § 552a(b).  "When a court finds that an agency made such a disclosure 'in a manner which was intentional or willful,' the United States is liable for damages plus attorneys' fees and costs."  Lee, 43 F.3d at 55 (citing 5 U.S.C. § 552a(g)(4)).  This congressional waiver of the government's sovereign immunity demonstrates the significance Congress attached to the harm occasioned by the illegal dissemination of information about an individual by a government agency.  And the remedy Congress has afforded "will be compromised" if Dr. Hatfill "cannot show the identities of the leakers." Lee, 43 F.3d at 60.  Thus, when contrasted against Ms. Locy's

15

desire to withhold the identities of her government sources, under circumstances where both she and the leakers presumably knew that disclosure of the information was prohibited by the Privacy Act, and quite possibly Rule 6(e) of the Federal Rules of Criminal Procedure,[9] the Court has little problem finding that the public interest weighs against staying Ms. Locy's contempt citation.

(E).    Balancing of the McSurely Factors

Having completed the evaluation of the four factors that must be considered  in deciding whether to grant Ms. Locy's request for the stay, the Court must now "balance the strengths of [her] argument in each of the four required areas." Chaplaincy, 454 F.3d at 297 (internal quotation and citation omitted).  As noted, the Court has assumed that Ms. Locy will suffer irreparable harm if she is required to disclose her confidential sources before having the ability to challenge on appeal this Court's requirement that she do so.  On the other hand, Ms. Locy's harm "must be weighed against" the injury Dr. Hatfill will potentially sustain if this already more than four year old case is further delayed so that Ms. Locy can pursue her appeal. Serono, 158 F.3d at 1326.  Like Serono, this "balance of harm results roughly in a draw." Id. What therefore tips the scales against Ms. Locy's request for the stay are the two remaining factors.  And it is the Court's view that both of these factors weigh heavily against Ms. Locy.

---

[9]   Rule 6(e) provides in pertinent part that the parties and witnesses to a grand jury proceeding may not "disclose a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). It is the Court's understanding that a grand jury investigation concerning the anthrax mailings was initiated by the government.  To the extent the Court's actions chill the illegal disclosure by government officials concerning matters pending before a grand jury or information covered by the Privacy Act, such a result is actually desirable from the Court's perspective.  There were important reasons underlying the enactment of the Privacy Act and the adoption of Rule 6(e), and as the Court stated during the February 19, 2008 hearing, advancing those objectives by silencing potential leakers "would not be a bad thing."

16

The public interest factor alone would cause the Court to pause before denying

Dr. Hatfill a reasonable opportunity to have his day in Court in the foreseeable future.[10]

But it is the "conclusion that [Ms. Locy] is not likely to succeed on the merits [of her

appeal that] effectively decides" her request for a stay.  Id.  In fact, having concluded

that this case is controlled by the Circuit Court's opinion in Lee and that Ms. Locy has

failed to demonstrate that her situation materially differs from the reporters whose

contempt citations were upheld in Lee, it is the Court's view that appellate review will

not provide the relief Ms. Locy seeks.  This reality compels the Court to deny Ms. Locy's

request that it stay the execution of its contempt citation pending the resolution of her

anticipated appeal.

II.

Dr. Hatfill also requests that the Court order Ms. Locy to personally pay the

monetary sanction imposed by the Court.  Memorandum in Support of Plaintiff Steven

Hatfill's Motion That Toni Locy Be Held in Civil Contempt [D.E. # 205] at 7.  Ms.Locy

opposes this request.  Locy's Mem. at 14 n. 6.  She states that in cases when a court

did preclude reimbursement of court sanctions, the court did so because the

contemnors alone were "solely responsible for sanctionable conduct and, as a result,

the court ordered that the fine should be borne solely by the attorneys, and not their

---

[10]  At Dr. Hatfill's request, the Court scheduled a pretrial conference for October, 10, 2008, with the anticipation of scheduling the trial for sometime in December of this year.  The Court agreed to schedule the trial as soon as possible because of Dr. Hatfill's representations that his ability to obtain employment in his field of expertise as a medical doctor and scientist have been compromised by the allegations that he was suspected of being responsible for the anthrax mailings.  First Amended Complaint [D.E.# 103] ¶¶ 4, 45-49.

clients." Id. (citing Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 914 F. Supp. 1172 (E.D. Pa. 1996), and In re HMCA (Carolina), Inc., 301 B.R. 764 (Bankr. D.P.R. 2003)).  Ms. Locy posits that because her "reporting was conducted within the scope of her employment for [USA TODAY]," she cannot be precluded from accepting contributions to defray the monetary sanction imposed by the Court.  Id.  The Court is unpersuaded by this argument.

As Dr. Hatfill correctly asserts, "Ms. Locy stands in precisely the analogous position" as the contemnors in Massachusetts Sch. of Law and HMCA].  Plaintiff Steven J. Hatfill's Reply Memorandum in Support of His Motion to Find Toni Locy in Contempt of Court [D.E. # 216] at 9 n.4.  "While her reporting was conducted within the scope of her employment for USA Today, her contempt was not."  Id. (internal quotation and citation omitted).  "It began long after she left the employment of USA Today."  Id.  Dr. Hatfill further notes that Ms. Locy "has emphasized to this Court that she herself, and no one at [USA Today] . . . can answer the questions she has been ordered to answer." Id.  (citing Locy Opp'n. at 7).  It is, therefore, Ms. Locy who is personally responsible for her disobedience of the Court's order, and, as she acknowledges, only she has the ability to bring herself into compliance.  Thus, because Ms. Locy is the only person who has the ability to comply with the Court's order, she alone should be required to bear the financial burden of her choice not to do so.  See Mass. School of Law, 914 F. Supp. at 1179-80 (E.D.Pa. 1996) (requiring the contemnor to personally pay contempt fines due to his inexcusable misconduct).

Moreover, one of the purposes of civil contempt is to "coerce compliance with the

court's order." In re Magwood, 785 F.2d 1077, 1081 (D.C. Cir. 1986).  To relieve a

contemnor of the order's coercive impact by allowing the contemnor to receive

reimbursement for her disobedient behavior defeats this underlying rationale and would

handicap the court's ability to extract the compliance it seeks.   Cf. In re HMCA

(Carolina), Inc, 301 B.R. at 765 (stating that  "[t]o have any meaning, these sanctions

must be paid by the wrongdoers").   Furthermore, permitting reimbursement would

encourage others to disregard court orders, knowing that they will not ultimately be held

personally responsible for their disobedience.  See Mass. School of Law , 914 F. Supp.

at 1179 (stating that one purpose of a contempt sanction is to "deter others from

engaging in similar conduct") (citing Wouters v. Martin County, 9 F.3d 924, 933 (11th

Cir. 1993).  Thus, the Court will preclude Ms. Locy from accepting reimbursement to

satisfy the monetary sanction imposed by the Court.

Conclusion

This Court appreciates the importance of the media's ability to freely report the

news in a democratic society like the United States.  But just as the First Amendment is

a fundamental component of the American system, so too is the rule of law and the

doctrine of  stare decisis.  These latter two principles compel this Court to adhere to the

dictates of its appellate court.  The District Court of Columbia Circuit, having spoken in

Lee, compels compliance by this Court.  Failing to see a material difference between

Ms. Locy's situation and the reporters whose contempt citations were affirmed in Lee,

her request to stay this Court's contempt citation must be denied.  In addition, to

maximize the potential that Ms. Locy will ultimately comply with the Court's order that

she reveal her sources at the DOJ and FBI who disclosed information to her about the

19

anthrax investigation, Ms. Locy is required to personally bear the responsibility of paying the fine the Court imposed in conjunction with its contempt citation.

   **SO ORDERED** on this 7th day of March, 2008.[11]


                                        REGGIE B. WALTON
                                        United States District Judge

---

[11]  An Order consistent with the Court's ruling accompanies this Memorandum Opinion.